UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X

VIE LUXE INTERNATIONAL, LLC AND MARJORIE
GUBELMANN RAEIN,

                                   Plaintiffs,

                    v.

DANIEL BENEDICT, DANIEL BENEDICT DESIGN, INC.,
AND MICHELE BROWN,

                                Defendants.

------------------------------------------------------------------------ X

:  08 Civ. 5023 (LAP)(GWG)

: **AFFIDAVIT OF**
: **MARJORIE GUBELMANN**
: **RAEIN**

STATE OF NEW YORK   )
                      :    ss.
COUNTY OF NEW YORK  )

I, Marjorie Gubelmann Raein being duly sworn deposes and says:

        1.     I am a member of Vie Luxe International, LLC ("Vie Luxe" or the "Company"). I have personal knowledge of the facts set forth herein.

        2.     Vie Luxe is a luxury home fragrance business that manufactures and sells candles, home fragrance accessories and bath and beauty products.

**Nature of this Action**

        3.     In just over two months following Defendant Daniel Benedict's ("Benedict's") termination from Vie Luxe for Cause, he has (i) destroyed Company client information stored on the Company's laptop computer as verified by Kroll Ontrack, Inc., a forensic computing firm; (ii) refused to return Company property, including client files; (iii) illegally solicited the business of numerous Company clients using the proprietary information he learned while at the Company; (iv) caused at least one Company client to cancel an order they had placed with the Company; and (v) associated with the Company's only other salesperson – Michele Brown ("Brown") to launch a competing business – all in violation of his express

covenants not to solicit clients, interfere with the Company's business relations or hire its employees, and in violation of his fiduciary duties towards the Company. Benedict's wrongful acts threaten the Company with financial ruin and the imminent loss of the customer goodwill built up over the past four years. Plaintiffs accordingly seek a temporary restraining order and preliminary injunction to stop Defendants from continuing to steal Vie Luxe clients using the Company's confidential and proprietary information and order the return of Vie Luxe property.

4.      For the past four years, Benedict has been tasked with building the Vie Luxe brand, and developing Vie Luxe products and client relationships. Accordingly, he has intimate knowledge of all of the Company's client relationships, including client contact and preference information. Benedict also has extensive knowledge relating to the Company's designs and fragrances, and relationships with the Company's vendors. Now that his association with the Company has ended, he already has utilized that proprietary information to help launch his own competing business, to the Company's detriment.

5.      Benedict has taken numerous, wrongful steps to interfere with Vie Luxe's business relationships after he received notice of his termination for Cause, including deleting customer related information, including packaging designs, from the laptop computer the Company provided to him for business use. The Company paid Benedict to develop these designs and related information on behalf of its clients. Without access to that information, the Company is at a severe disadvantage in servicing its clients, and in fact, the Company lost an order from the very client whose designs Benedict deleted.

6.      In addition, Benedict has teamed up with Brown, Vie Luxe's former salesperson, to start up his own competing candle business. Defendants have solicited Vie Luxe clients, and instructed Vie Luxe vendors to manufacture candles for him using the fragrances that

2

he helped develop for Vie Luxe. The Company, already in a precarious financial state due to Benedict's mismanagement of the Company, cannot withstand this kind of frontal assault. Accordingly, it seeks a temporary restraining order to prevent Defendants from further damaging the Company's invaluable client relationships and goodwill, and to save the Company from imminent financial ruin.

**Benedict Joins the Company**

7.    I formed Vie Luxe in or about March 2004. Shortly thereafter, I agreed with Daniel Benedict ("Benedict") to extend to him a minority membership in Vie Luxe.

8.    I agreed to contribute $150,000 to start the business, based on Benedict's projections of the amount of capital we would need to launch the business. Benedict invested no capital in the business but rather agreed to provide his exclusive services in managing the operations of Vie Luxe. We agreed that he would receive compensation of $129,000 per annum.

9.    In consideration of my agreement to admit him into the company, Benedict and I entered into the Amended and Restated Operating Agreement of Vie Luxe International, LLC (the "First Operating Agreement") and a Membership Interest Acquisition Agreement (the "Membership Agreement"), both dated May 1, 2004. A copy of the Membership Agreement is attached hereto as Exhibit A.

10.    Because the Company's success would depend on its client relationships and developing and promoting its product lines, the Company required Benedict to enter into certain covenants restricting his use of the Company's confidential information and prohibiting him from soliciting its clients and employees during and for a period of 18 months after the termination of Benedict's services for the Company. These protections are of paramount importance to the Company.

11.    These covenants included a confidentiality provision, an assignment of work product provision, and a nonsolicitation provision.  The nonsolicitation provision provided as follows:

"Section 3.04   Non-Solicitation.   During the period Benedict is performing services to the Company and for a period of 18 months following the termination of his services for the Company for any reason (the "Restricted Period"), Benedict alleges that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(a) solicit the employment or services of, or hire or engage, or assist anyone else to hire or engage, any person who was known to be employed by or was a known employee to the Company or independent contractor to the Company upon the termination of his services to the Company, or within twelve months prior; or

(b) cause or attempt to cause any customer that Benedict serviced or learned of while in the employ of the Company ("Customer"), or any potential customer of the Company which has been the subject of a known written or oral offer or proposal by the Company, or of substantial preparation of such a proposal or offer, within twelve months prior to his termination ("Potential Customer"), licensor, supplier or vendor of the Company to reduce or sever its affiliation with the Company;

(c) perform any work or service for, any Customer or Potential Customer, which business, work or services is similar or related to the business of the Company; or

(d) otherwise interfere with the business or accounts of the Company.

For purposes hereof, "solicitation" shall include directly or indirectly initiating any contact or communication of any kind whatsoever for purposes of inviting, encouraging or requesting such Customer, Potential Customer, employee or consultant to materially alter its business relationship, or engage in business, with Benedict or any person, firm or entity other than the Company."

See Ex. A, Section 3.04.

4

12.    Benedict agreed to these restrictions.  He explicitly acknowledged that the restrictions were reasonable and necessary to protect the Company's business and would not interfere with his ability to earn a living in the industry.  See Ex. A, Section 3.05(b).  He also acknowledged that, in the event he breached these provisions, the Company would be irreparably harmed, and would have the right to obtain injunctive relief without posting a bond.  See id., Section 3.05(a).

### Vie Luxe's Clients and Confidential Information

13.    Vie Luxe's major products are its premium scented candles, which are sold in department stores and boutiques under the Vie Luxe brand name.  Vie Luxe also develops and manufactures scented candles on behalf of various high-end, brand name retailers including Nancy Corzine, Carolina Herrera, Nina Griscom, Calvin Klein, Restoration Hardware, Oscar De La Renta, the W Hotels, St. Regis, the Plaza Hotel and the Plaza Florist ("Private Label Clients").

14.    Vie Luxe clients currently range in size from large, first-class department stores, including Bergdorf Goodman and Saks Fifth Avenue, to small boutiques.  Vie Luxe candles are sold in brick and mortar stores all over the globe, including in Europe and Asia, and are available over the internet through various online retailers, including Amazon.com.

15.    Vie Luxe candles and other accessories have a unique design, scent, and packaging which are exclusive and proprietary to Plaintiffs.  The Vie Luxe brand is known and marketed to the public based on its superior quality, design and fragrance.

16.    Since the Company's birth in 2004, the Company acquired numerous clients, based on my extensive personal contacts in the fashion and design industry as well as through the resources and financial support I provided to develop sales and clientele for the Company.

17.    Vie Luxe has established its business by cultivating its relationships with its department store, boutique, Private Label Clients and other clients and providing a superior product. Because Vie Luxe has established a favorable business relationship with its clients, it can count on repeat business from them, even though it cannot anticipate the size and quality of a client's next order.

18.    Developing products for Private Label Clients especially requires close contact and communication between the client and Vie Luxe. Private Label Clients may have specific requirements regarding the finished product they envision putting their brand name on, including color, scent, packaging, and presentation. Vie Luxe's original designs are used in conjunction with these requests. Developing a final product for the Private Label Clients involves accommodating the clients' unique specifications. The only way a competitor would be privy to these preferences and requirements would be to work with that particular client on that particular project.

19.    While Private Label Client orders represent a small percentage of Vie Luxe's overall sales, they have become an important part of Vie Luxe's overall revenue stream because Vie Luxe requires Private Label Clients to pay a 50% deposit up front, prior to ordering production. These trade terms differ from other client orders. The advance payment is an important part of Vie Luxe's ability to support its business with access to cash, especially during the summer months when sales have traditionally been slow.

20.    While I provided the Company with financial support (to date, I have invested approximately $705,000 in the Company) and access to high level contacts in the fashion and design industry, I did not have a direct hand in the day-to-day running of the Company. Rather, Benedict was tasked to help develop and maintain the Company's client

6

connections, manage inventory and production. Accordingly, he appeared on behalf of the Company at trade shows and other networking events, all at the Company's expense. He was assisted in this by the Company's only other salesperson, Brown.

21.     Brown, like Benedict, was at all times bound by the restrictions contained in the Executive Confidentiality Agreement between Vie Luxe and Michele Brown dated as of July 20, 2004 (the "Confidentiality Agreement") a copy of which is attached as Exhibit B. The Confidentiality Agreement mirrored Benedict's Membership Agreement, restricting Brown's use of the Company's confidential information and prohibiting her from soliciting its clients and employees during and for a period of 18 months after the termination of Brown's services for the Company. Brown, as the Company's salesperson, had extensive client contact and was privy to and helped develop the Company's marketing plans. Accordingly, the protections in the Confidentiality Agreement are of paramount importance to the Company.

22.     In addition to marketing, Benedict's other primary tasks included product development and production fulfillment. He was in charge of placing orders with the manufacturers and ensuring that these orders were filled correctly. Accordingly, Benedict had direct contact with clients, developed product and packaging designs, and interacted with Company vendors. He had unfettered access to all of the Company's confidential and proprietary information.

23.     While Vie Luxe gross sales grew during its first two years, and the brand acquired worldwide recognition, the Company lost money each year and, by 2006, was in need of another infusion of operating capital to remain afloat. At that time, I had contributed $405,000 to the Company – far in excess of the $150,000 I originally committed.

24.     In early 2006, I had involved Julie Bedard, the Chief Financial Officer in my family's offices in Florida, to do a complete review of the Company's operations and financial condition to determine what was going wrong. She confirmed that problems with production issues and inventory control were a critical problem and were a drag on the company's sparse operating capital.

25.     Managing production issues and inventory control were Benedict's responsibility. Tracking and maintaining inventory and anticipating customer demand is one of the most crucial aspects in running a successful business because if there is inadequate inventory to meet customer demand, orders will be cancelled and sales will be lost. It is critical to order products to be manufactured in time to meet anticipated customer demand, especially during the busy holiday season. Benedict had failed to properly maintain inventory and manage production, and, accordingly, the Company suffered.

26.     At the end of 2005 and beginning of 2006, I had several conversations with Benedict about the continued viability of the Company's operations. Ms. Bedard also spoke with Benedict. Ultimately, I was faced with the choice of closing down the business and losing the $405,000 I already had contributed up to that time, or agreeing to invest additional money in the hopes that the business could eventually turn a profit. Benedict assured me that he would improve his performance.

27.     Based on Benedict's urging and insistence that he would run the Company profitably, I agreed to contribute an additional $300,000 in operating capital to the Company, for a total of $705,000 since inception.

28.     Benedict again did not contribute any operating capital or other amounts. Instead, he agreed that his membership interest would be diluted from 40% to 10%. His

compensation was modified for 2006, with Benedict taking a 20% annualized reduction in

compensation but providing for a substantial increase if Benedict achieved certain objective

financial goals.  (Because this reduction occurred in mid-year 2006, Benedict actually only had a

12% reduction in total compensation for 2006.)  Accordingly, we recorded our agreement in the

Second Amended and Restated Operating Agreement of Vie Luxe International, LLC dated June

9, 2006 (the "Second Operating Agreement"), a copy of which is attached as Exhibit C.

29.    In the Second Operating Agreement, Benedict specifically agreed and

reaffirmed that:

> Benedict shall devote substantially all his business time and
> energies to the following aspects of the Company's business:
>
> (i) Product development and design;
>
> (ii) Production and fulfillment management;
>
> (iii) Sales, with a specific focus on department store sales;
>
> (iv) Public relations and marketing;
>
> (v) Management of the Company's participation in, and set up, of
> trade shows; and
>
> (vi) In-store training in marketing and sale of Company products.
>
> See Ex. C, Section 7(a).

30.    Because of his problems managing the Company's business to date, we

had agreed to enumerate certain of Benedict's duties to better define for him what he needed to

be focusing on in managing the Vie Luxe business, and to emphasize their importance to the

business.  Accordingly, under the Second Operating Agreement, if Benedict failed to adequately

perform his production and fulfillment management duties, I could terminate his services and membership for Cause.[1]

31.    The Second Operating Agreement, like the First Operating Agreement, contained a provision that Benedict's services and membership could be terminated for "Cause." "Cause" includes, *inter alia*, the Company's determination, acting solely through me, that Benedict failed to perform adequately a material part of his duties or a breach by Benedict of his service, confidentiality and non-solicitation obligations under the Membership Agreement. Upon a termination for Cause, Benedict is to receive payment of 50% of the fair market value of his membership interests in the Company. See Ex. C, Section 12.

32.    Notwithstanding his agreement and his potential incentive increases to his compensation if the Company were profitable, Benedict continued to grossly mismanage Vie Luxe. Beginning at about the end of 2006, Benedict was told repeatedly, both verbally and in writing, that his failure to perform the inventory and production management components of his duties were causing the Company to continue to lose money.

33.    By the end of 2007, it had become apparent that Benedict simply did not understand how to successfully manage the business and, despite numerous specific warnings, either did not have the desire or the capacity to solve the problems he created.

34.    In the beginning of 2008, Ms. Bedard had several conversations with Benedict on my behalf about his poor performance and the dire economic state of the Company.

---

[1]    In the Second Operating Agreement, Benedict and I did not limit my ability to terminate his membership if I saw fit to do so. However, we did negotiate a Cause provision that would limit the amount he would be due upon termination to 50% of the fair market value of his membership interest in the Company.

**Benedict's Termination for Cause**

35.    Ultimately, in March 2008, I determined that Benedict failed adequately to perform his production and fulfillment management duties. I decided to terminate his membership and services for Cause under the Second Operating Agreement.

36.    Benedict was notified of this decision and given an opportunity to cure within fifteen (15) days, as required by the Second Operating Agreement, by letter dated March 26, 2008. A copy is attached as Exhibit D.

37.    Benedict failed to cure within the fifteen day period and his services and membership ended on April 10, 2008 pursuant to a letter of even date. A copy is attached as Exhibit E. He was instructed to return to the Company all of its property, including its documents and laptop computer the Company had purchased for Benedict's business use, and he was reminded of his restrictive covenants under the Membership Agreement. See id.

38.    Notwithstanding Plaintiffs' request, Benedict failed to return any Vie Luxe property for another nineteen days. When he finally did on April 29, 2008, it consisted of the laptop computer the Company provided him for his business use (the "Laptop"), a slim file folder of inventory projections, and a set of keys.

39.    When the Laptop was forensically examined by Kroll Ontrack, it was discovered that Benedict had deleted from the computer designs and other client information relating to the W Hotels, the St. Regis, and Carolina Herrera, three of the Company's Private Label Clients. (See Affidavit of Christopher Andrews, sworn to June 18, 2008). Benedict had been paid to develop this information to service the Company's clients.

40.    The Company had to expend time, resources, and money to attempt to identify the files Benedict deleted and attempt to restore them.

41.     Prior to Benedict's termination, he maintained a desk full of paper documents relating to the Company's accounts.  Following his termination, his desk was found to be empty, and the files missing.  The missing information contains key information relating to the status of ongoing client relationships, and is critical to the ongoing functions of the business.

42.     Within two weeks of Benedict's termination, Brown resigned from the Company.

43.     The Company discovered that, prior to Benedict's termination from the Company, Benedict had neglected to follow up with certain customer orders, threatening the Company's relationship with these clients, including the W Hotels, a Private Label Client. Benedict had failed to order the correct boxes to package the W Hotels candles, and accordingly, a portion of their order did not ship, and Vie Luxe did not get paid.  The Company spent time smoothing over Vie Luxe's relationship with the W Hotels to remedy Benedict's neglect of this important customer account.

**Defendants Solicited Vie Luxe Clients and Interfered With Vie Luxe Business**

44.     Following his termination, I arranged to have all email sent to Benedict's Vie Luxe email address – which the Company properly controlled – routed to me so we could follow up with client and vendor communications.  This was especially important given our discovery that Benedict had simply failed to respond or follow up with certain clients, and because we wanted to ensure all our clients continued to receive personalized attention during the period following Benedict's departure, while we transitioned his former duties over to others.

45.     I was shocked to learn that, on April 15, 2008, *five days after* the his termination, Benedict had communicated with the W Hotels, regarding an order it had placed with Vie Luxe –the very order Benedict had neglected prior to his termination.  A copy of this email is attached as Exhibit F.  Because Benedict was no longer associated with the Company, he

had no right or responsibility to communicate directly with Vie Luxe clients. On April 16, 2008, the Company notified Benedict that it had discovered his improper communication, and ordered him to cease and desist all contact with Vie Luxe clients. A copy of this correspondence is attached as Exhibit G.

46.    Nevertheless, I received another email addressed to Benedict's former Vie Luxe email account, evidencing that on or about May 5, 2008 Benedict communicated with Calvin Klein, another Private Label Client, regarding placing a new candle order with Benedict. A copy of that email is attached as Exhibit H.

47.    I received another email addressed to Benedict's former Vie Luxe account, evidencing that, on or about April 16, 2006, Benedict received a communication from the Metropolitan Opera to try to schedule a meeting. On May 9, 2008, I received another email addressed to Benedict indicating that he had met with the Metropolitan Opera in connection with placing an order for candles with Benedict. While Vie Luxe had not previously done business with the Metropolitan Opera, given the fact that the Metropolitan Opera had emailed Benedict's Vie Luxe email account less than a week following his termination for Cause, it appears clear that the Metropolitan Opera is a "Potential Customer" of Vie Luxe as defined in the Membership Agreement. A copy of these emails are attached as Exhibit I.

48.    On May 27, 2008, the W Hotels placed a $26,752.50 order with Vie Luxe. A copy of the purchase order is attached as Exhibit J. Based on the conversations the Company had with the client to smooth over the poor service Benedict had provided prior to his termination, the Company expected that the relationship with the W Hotels was remedied and would continue. The next day, the W Hotels abruptly cancelled the order. When asked why they cancelled their order, the W Hotels did not give an explanation. I thought this was very curious.

49.     On or about June 5, 2008, I received an email, again addressed to Benedict's Vie Luxe email account, from Vie Luxe's scent supplier. The email documented that Benedict had contacted our scent supplier and placed an order for a Vie Luxe scent – using the Vie Luxe inventory code – that Vie Luxe uses in its candles for the W Hotels. A copy of this email is attached as Exhibit K. Not long after, on June 13, 2008, I received another email, from our packaging manufacturer that suggested that Benedict had contacted Vie Luxe's candle glass supplier and placed an order for candle glass. A copy of this email is attached as Exhibit L.

50.     On June 17, 2008, I received another email addressed to Benedict's Vie Luxe email account indicating that Vie Luxe's scent supplier shipped to our candle manufacturer on Benedict's behalf a scent we use in our Calvin Klein candles. A copy of this email is attached as Exhibit M.

51.     In addition, I have learned that Benedict incorporated a new business called "Daniel Benedict Design, Inc." on or about April 21, 2008 – less than two weeks after his termination for Cause. A copy of the New York State Division of Corporations Entity Information for Daniel Benedict Design, Inc. is attached as Exhibit N.

52.     Prior to her last day of work, Brown emailed various Vie Luxe clients to inform them that she and Benedict had left the Company, provided the client with her personal email address and saying that she would be in touch. Brown also delivered a copy of these emails – which contained the client contact information – to her personal email address, either by forwarding a copy of the email or by simultaneously sending a carbon copy to herself. See emails attached as Exhibit O.

53.     I recently learned that Defendant Brown has joined Daniel Benedict Design, Inc. This is extremely upsetting because it confirms that Benedict is targeting not only

the Private Label Clients but, with Brown's aid and assistance, also our other commercial clients. Benedict now has access to the confidential client information entrusted to Brown about Vie Luxe's sales efforts and client contacts, in addition to Benedict's own wealth of knowledge.

54.    I believe that this information confirms that Benedict and Brown are using the confidential and proprietary information they learned while working for the Company to solicit Company clients improperly.

55.    I believe this information confirms that the reason the Company lost the W Hotels order was because Defendants stole it from the Company using Vie Luxe confidential and proprietary information, including information about Vie Luxe designs, fragrance formulations, and customer preferences.  It now appears that Defendants have also stolen our unique scent for Calvin Kelin and are using that information to deprive Vie Luxe of Calvin Klein's business. This is precisely the type of harm the restrictive covenants were implemented to protect against.

56.    The Company has been placed into a crisis mode due to Benedict's mismanagement.  For him to steal our proprietary information and our clients, including our Private Label Clients, takes much-needed cash out of the Company's pockets.  It is hard to imagine the extent of client orders that might be placed in the future, but for Defendant's wrongful interference.

57.    Over the past several weeks, the Company has become increasingly concerned about its financial condition.  The mess that Benedict made of the Company's finances has not yet been cured, even though the Company has taken steps to try to rectify the inventory problems.  To lose the current and potential business from the Company's Private Label Clients and its other customers (including department stores and boutiques) threatens the continued viability of the Company and harms the goodwill built up over the last four years.

Marjorie Gubelmann Raein

Sworn to before me this
19th day of June, 2008

Notary Public

JOHN J. CONNORS
ry Public, STATE OF NEW YORK
No. 01CO5025237
d in NEW YORK COUNTY
...on Expires 03-21-02

16

# Exhibit A

## MEMBERSHIP INTEREST ACQUISITION AGREEMENT

MEMBERSHIP INTEREST ACQUISITION AGREEMENT (this "Agreement"), dated as of May 1, 2004, by and between DANIEL BENEDICT, an individual residing at 3 East 78th Street, New York, New York 10021 ("Benedict"), and VIE LUXE INTERNATIONAL, LLC, a New York limited liability company (the "Company"), with an address at 38 East 57th Street, 14th Floor, New York, New York 10021.

### W I T N E S S E T H:

WHEREAS, the Company desires to employ Benedict to operate the Company's day-to-day affairs and, in connection therewith, Benedict desires to become a member of the Company as set forth in that certain Amended and Restated Operating Agreement of the Company (the "Operating Agreement"), to be entered into concurrently with this Agreement, by and between Benedict and Marjorie Gubelmann Raein ("Raein"); and

WHEREAS, the Company is willing to issue to Benedict, and Benedict desires to acquire, a membership interest in the Company on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the above premises and the agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE I
ISSUANCE OF THE MEMBERSHIP INTEREST

SECTION 1.01  Issuance. Subject to the terms and conditions of this Agreement, effective on the date hereof, the Company hereby issues a membership interest to Benedict having the rights, privileges, powers, and obligations ascribed to such interest in the Amended and Restated Operating Agreement (the "Membership Interest"), and hereby admits Benedict as a member of the Company, in consideration of Benedict's agreement to provide his full-time services to the Company in the manner specified in the Operating Agreement.

SECTION 1.02  Execution of Operating Agreement. Concurrently with the execution hereof, Benedict is executing and delivering, and agreeing to be bound by the terms and conditions of, the Operating Agreement.

ARTICLE II
REPRESENTATIONS AND WARRANTIES OF BENEDICT

To induce the Company to enter into this Agreement, Benedict represents and warrants to the Company as follows:

245476-5-W

SECTION 2.01   Binding Agreement.   Upon execution and delivery of this Agreement by both parties hereto, this Agreement constitutes a valid and binding agreement of Benedict, enforceable against Benedict in accordance with its terms, except (i) that such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect relating to creditors' rights and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

SECTION 2.02   Consents and Approvals.   There is no requirement applicable to Benedict to make any filing with, or to obtain any permit, authorization, consent, waiver or approval of, any person or any governmental or regulatory authority as a condition to the lawful consummation by Benedict of the acquisition of the Membership Interest pursuant to this Agreement and entry into the Operating Agreement which has not already been obtained, except for the concurrent entry into the Operating Agreement by Benedict and Raein.

SECTION 2.03   No Regulatory Approval.   Benedict acknowledges that the Membership Interest has not been filed, registered with, approved or disapproved by the Securities Exchange Commission nor by the securities, regulatory or other authority of any jurisdiction and it is not anticipated that any such filing or registration will take place.

SECTION 2.04   Restricted Securities.   Benedict is acquiring the Membership Interest for his own account for investment purposes and not with a view to or in connection with any distribution or resale thereof.   Benedict acknowledges having been advised by the Company that the Membership Interest has not been, and is not being, registered under the Securities Act of 1933, as amended (the "1933 Act").   Accordingly, Benedict agrees that the Membership Interest may not be sold, offered for sale, transferred, pledged, hypothecated or otherwise disposed of, in whole or in part, except in compliance with the 1933 Act, any applicable state blue sky law, as well as the Operating Agreement, and that the Membership Interest must be held indefinitely unless a subsequent disposition thereof is registered under the 1933 Act or the transaction is exempt from such registration.   Benedict understands that the Company is under no obligation to register the Membership Interest on his behalf or to assist him in complying with any exemption from registration.

SECTION 2.05   Speculative Nature.   Benedict understands that the Company is newly-formed, has generated no income from operations, and that no assurance can be given that the Company will ever be profitable.   Benedict can afford to hold the unregistered Membership Interest for an indefinite period of time and to sustain a complete loss of such interest and has adequate means for providing for his current needs and possible contingencies and has no need for liquidity of the Membership Interest.

SECTION 2.06   Opportunity to Investigate.   Benedict acknowledges that he has had an opportunity to ask questions and receive answers from the Company and its managing member, Raein, regarding the proposed business of the Company, its assets,

prospects and financial condition, and has obtained such additional information and reviewed such documents received as he considers necessary or appropriate to decide whether to accept the issuance of the Membership Interest on the terms set forth herein. Benedict has received the information he has requested and acknowledges that his inquiries have been answered to his satisfaction.

SECTION 2.07   No Other Representations by the Company.   Benedict acknowledges that neither the Company nor Raein has made nor is making any representations or warranties, express or implied, except as specifically set forth herein, concerning, among other things: the Company, the present or likely value of the Membership Interest, the amount of the Federal, state or other taxes reportable or payable by him with respect to the issuance of the Membership Interest to him, the character of any income or the timing of the recognition of any income related thereto, and acknowledges that the Company has no obligation or liability to pay, indemnify or hold Benedict harmless from the tax consequences to Benedict arising from or relating to the issuance or ownership of the Membership Interest. Benedict been encouraged to consult, and has relied, to the extent he believed advisable, on his own professional legal, tax and financial advisers.  Benedict has read and understood this Agreement, the Operating Agreement, has had the opportunity to consult, and has consulted, to the extent he deems advisable, his own counsel, tax and other advisors regarding his acquisition of the Membership Interest, and has not relied upon any statements made by or on behalf of the Company regarding the tax consequences of his acquisition of such interest.

## ARTICLE III
## CONFIDENTIALITY AND NON-SOLICITATION

SECTION 3.01   Exclusive Services.   Except as otherwise provided in the Operating Agreement, for so long as Benedict is a member of the Company, Benedict shall devote his full time and best efforts to the performance of services for the Company.

SECTION 3.02 Confidentiality. (a) As used herein, "Confidential Information" means any confidential or proprietary information relating to (i) the Company including, without limitation, the Company's trade secrets, information concerning the creation, acquisition, composition, or disposition of products and services, the identity of, and terms and conditions of arrangements with the Company's producers, vendors, suppliers and distributors, customer lists and buying habits or other personal information about customers, the service needs of actual or prospective customers, client preferences and policies, pricing information, business and marketing plans, financial information, budgets, compensation or personnel records, proprietary software or data processing programs, proprietary databases, customer maintenance listings, research and development data and other know-how, and (ii) Raein, her family and their respective personal and business affairs. Notwithstanding the above, Confidential Information does not include information which: (i) is or becomes public knowledge without breach of this Agreement; or (ii) is received by Benedict from a third party without any violation of any obligation of confidentiality and without confidentiality restrictions; provided, however, that nothing in this Agreement shall prevent Benedict from participating in or disclosing

245476-5-W                                        3

documents or information in connection with any judicial or administrative investigation, inquiry or proceeding to the extent that such participation or disclosure is required under applicable law.

(b)     At all times, both during the period of Benedict's services for the Company and after termination of Benedict's services, Benedict will keep in strictest confidence and trust all Confidential Information and will not directly or indirectly use any Confidential Information, or disclose any Confidential Information, or permit or encourage any other person or entity to do so, except as may be necessary in the ordinary course of performing his duties for the Company, without the prior written consent of the Company.

(c)     Benedict agrees to return promptly all Confidential Information in tangible form, including, without limitation, all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks, mobile or remote computers (including personal digital assistants) or in any other manner to the Company automatically, without request, within five days after the termination of Benedict's performance of services for the Company for any reason.

(d)  Benedict agrees that he will not during his relationship with the Company improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that he will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.     He represents that there are no non-competition or other contractual impediments of any kind which restrict in any way his ability to render services to the Company or comply with the provisions of this Agreement or the Operating Agreement.

SECTION 3.03  Assignment of Work Product.  (a)  Benedict acknowledges that all improvements, know-how, concepts, writings, original works of authorship, original pictorial, graphic or other art work, processes, methods and ideas (whether copyrightable, patentable or otherwise) made, generated, conceived, written or reduced to practice by Benedict, alone or in conjunction with others, during or before or after working hours (whether or not at the request or upon the suggestion of the Company), during the period during which Benedict is providing services to the Company, relating to the products, services or other business activities of the Company or its customers which are known to him as a consequence of his services for the Company (collectively, the "Work Product") shall be disclosed to the Company upon request from time to time.

(b)     Benedict agrees that any and all such Work Product shall be the exclusive property of the Company and hereby irrevocably and unconditionally, to the fullest extent permitted by law, assigns to the Company all right, title and interest (including without limitation all intellectual property rights) in and to all Work Products. Benedict further acknowledges that all Work Products which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(c)     Benedict will, at the Company's expense, assist the Company in executing, acknowledging and delivering all papers and documents, doing all things and supplying all information, that the Company may deem necessary or desirable to transfer or record the transfer of his entire right, title and interest in Work Products to the Company, and to enable the Company to obtain patent, copyright or trademark protection for Work Products anywhere in the world, during the period that he is providing services to the Company. The obligations of Benedict hereunder shall continue beyond the termination of his services for the Company with respect to Work Products conceived or made by him during the period he provides services to the Company and shall be binding upon his executors, heirs, assigns, administrators and other legal representatives.

SECTION 3.04 Non-Solicitation.     During the period Benedict is performing services for the Company and for a period of 18 months following the termination of his services for the Company for any reason (the "Restricted Period"), Benedict agrees that he will not, directly or indirectly, for his benefit or for the benefit of any other person, firm or entity, do any of the following:

(a)     solicit the employment or services of, or hire or engage, or assist anyone else to hire or engage, any person who was known to be employed by or was a known employee to the Company or independent contractor to the Company upon the termination of his services to the Company, or within twelve months prior thereto; or

(b)     cause or attempt to cause any customer that Benedict serviced or learned of while in the employ of the Company ("Customer"), or any potential customer of the Company which has been the subject of a known written or oral offer or proposal by the Company, or of substantial preparation of such a proposal or offer, within twelve months prior to his termination ("Potential Customer"), licensor, supplier or vendor of the Company to reduce or sever its affiliation with the Company;

(c)     perform any work or services for, any Customer or Potential Customer, which business, work or services is similar or related to the business of the Company; or

(d)     otherwise interfere with the business or accounts of the Company.

For purposes hereof, "solicitation" shall include directly or indirectly initiating any contact or communication of any kind whatsoever for purposes of inviting, encouraging or requesting such Customer, Potential Customer, employee or consultant to materially alter its business relationship, or engage in business, with Benedict or any person, firm or entity other than the Company.

SECTION 3.05 Injunctive Relief. (a) Benedict acknowledges that the services to be rendered by him to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by him of any of the provisions contained in this Agreement will

245476-5-W                          5

cause the Company irreparable injury. Benedict therefore agrees that the Company shall be entitled, in addition to any other right or remedy, to a temporary or preliminary injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining him from any such violation or threatened violations.

(b)     The parties acknowledge that the type and periods of restriction imposed in this Agreement are fair and reasonable and are reasonably required for the protection of the Company. Benedict specifically acknowledges that the restrictions contemplated by this Agreement will not prevent him from being employed or earning a livelihood in the type of business conducted by the Company following the termination of his services for the Company.

ARTICLE IV
MISCELLANEOUS

SECTION 4.01    Survival.    The representations, warranties, covenants and agreements contained herein shall survive the issuance of the Membership Interest hereunder.

SECTION 4.02    Employment.    Benedict acknowledges that he will be retained by the Company on an "at will" basis  and that nothing in this Agreement, the Operating Agreement or otherwise confers upon Benedict any right to be retained  as an employee of, consultant to, or in any other capacity with, the Company or any of its affiliates.

SECTION 4.03    Counterparts.    This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

SECTION 4.04    Severability.    Whenever possible each provision of this Agreement will be interpreted in a manner to be effective and valid to the maximum extent permitted but if any provision or term of this Agreement is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provision or the remaining provisions or terms of this Agreement. If any of the covenants set forth in this Agreement are held to be unreasonable, arbitrary, or against public policy, such covenants will be considered divisible with respect to scope, time, and geographic area, will be effective, binding and enforceable against me to the maximum extent permitted.

SECTION 4.05  Parties in Interest.  This Agreement and all provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns. Neither this Agreement nor any right or obligation hereunder may be assigned or transferred without the express written consent of all parties.

SECTION 4.06    Entire Agreement.    This Agreement and the Operating Agreement contain the entire understanding of the parties with respect to their subject matter and supersede all prior agreements and understandings between the parties with respect to the subject matter hereof.

SECTION 4.07    Notices. All notices, demands, offers or other communications required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested overnight delivery service, or by hand delivery, and addressed to the other party hereto at such party's address set forth above as the same shall be amended from time to time, and shall be deemed given upon the date of delivery.

SECTION 4.08    Amendments; Waiver.    Neither this Agreement nor any provision hereof may be modified, amended or waived unless in writing and signed by the parties. No waiver by any party, whether express or implied, of any provision of this Agreement, or of any breach or default, shall constitute a waiver of a breach of a similar or dissimilar provision or condition at the same time or any prior to subsequent time.

SECTION 4.09    Governing Law; Consent to Jurisdiction.    This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable principles of conflicts of law of such State).  Each of the parties (i) irrevocably consents and agrees that any legal or equitable action or proceeding arising under or in connection with this Agreement may be brought in any Federal or state court in the County of New York, State of New York, (ii) by execution and delivery of this agreement, irrevocably and unconditionally submits to the jurisdiction and venue of such courts, and (iii) agrees that any action brought against such party may be commenced by service of process by any method permitted by applicable law and as set forth in the notice section of this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date first written above.

VIE LUXE INTERNATIONAL, LLC

By: _____
Marjorie Gubelmann Raein
Managing Member

_____
DANIEL BENEDICT

Exhibit B

## EXECUTIVE CONFIDENTIALITY AGREEMENT

EXECUTIVE CONFIDENTIALITY AGREEMENT (this "Agreement"), dated as of *July 20* , 2004, by and between *Michele Brown* , an individual residing at *400 East 57th Street, NY, NY 10022* ("Executive"), and VIE LUXE INTERNATIONAL, LLC, a New York limited liability company (the "Company"), with an address at 38 East 57th Street, 14th Floor, New York, New York 10021.

To induce the Company (which, for these purposes shall also include any presently existing or hereafter formed subsidiaries and affiliates thereof) to enter into an employment, consulting or other business relationship with Executive under which compensation is being or will be paid to Executive (together, "employment," and variations such as "employ" will have a similar meaning), and in consideration of Executive's employment with the Company and Executive's receipt of the compensation now and hereafter paid to me by the Company, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### CONFIDENTIALITY AND NON-SOLICITATION

SECTION 1.01    Exclusive Services. Unless otherwise agreed to by the Company in writing, Executive shall devote Executive's full time and best efforts to the performance of services for the Company.

SECTION 1.02 Confidentiality. (a) As used herein, "Confidential Information" means any confidential or proprietary information relating to (i) the Company including, without limitation, the Company's trade secrets, information concerning the creation, acquisition, composition, or disposition of products and services, the identity of, and terms and conditions of arrangements with the Company's producers, vendors, suppliers and distributors, customer lists and buying habits or other personal information about customers, the service needs of actual or prospective customers, client preferences and policies, pricing information, business and marketing plans, financial information, budgets, compensation or personnel records, proprietary software or data processing programs, proprietary databases, customer maintenance listings, research and development data and other know-how, and (ii) Marjorie Gubelmann Raein ("Raein"), her family and their respective personal and business affairs. Notwithstanding the above, Confidential Information does not include information which: (i) is or becomes public knowledge without breach of this Agreement; or (ii) is received by Executive from a third party without any violation of any obligation of confidentiality and without confidentiality restrictions; provided, however, that nothing in this Agreement shall prevent Executive from participating in or disclosing documents or information in connection with any judicial or administrative investigation, inquiry or proceeding to the extent that such participation or disclosure is required under applicable law.

(b)     At all times, both during the period of Executive=s services for the Company and after termination of Executive's services, Executive will keep in strictest confidence and trust all Confidential Information and will not directly or indirectly use any Confidential Information, or disclose any Confidential Information, or permit or encourage any other person or entity to do so, except as may be necessary in the ordinary course of performing Executive's  duties for the Company, without the prior written consent of the Company.

(c)     Executive agrees to return promptly all Confidential Information in tangible form, including, without limitation, all photocopies, extracts and summaries thereof, and any such information stored electronically on tapes, computer disks, mobile or remote computers (including personal digital assistants) or in any other manner to the Company automatically, without request, within five days after the termination of Executive's  performance of services for the Company for any reason.

(d)     Executive agrees that Executive will not during Executive's relationship with the Company improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that he will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.   Executive represents that there are no non-competition or other contractual impediments of any kind which restrict in any way Executive's ability to render services to the Company or comply with the provisions of this Agreement.

SECTION 1.03  <u>Assignment of Work Product</u>. (a) Executive acknowledges that all improvements, know-how, concepts, writings, original works of authorship, original pictorial, graphic or other art work, processes, methods and ideas (whether copyrightable, patentable or otherwise) made, generated, conceived, written or reduced to practice by Executive, alone or in conjunction with others, during or before or after working hours (whether or not at the request or upon the suggestion of the Company), during the period during which Executive is providing services to the Company, relating to the products, services or other business activities of the Company or its customers which are known to him as a consequence of Executive's services for the Company (collectively, the "<u>Work Product</u>") shall be disclosed to the Company upon request from time to time.

(b)     Executive agrees that any and all such Work Product shall be the exclusive property of the Company and hereby irrevocably and unconditionally, to the fullest extent permitted by law, assigns to the Company all right, title and interest (including without limitation all intellectual property rights) in and to all Work Products. Executive further acknowledges that all Work Products which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(c)     Executive will, at the Company's expense, assist the Company in executing, acknowledging and delivering all papers and documents, doing all things and supplying all information, that the Company may deem necessary or desirable to transfer

or record the transfer of Executive's entire right, title and interest in Work Products to the Company, and to enable the Company to obtain patent, copyright or trademark protection for Work Products anywhere in the world, during the period that he is providing services to the Company. The obligations of Executive hereunder shall continue beyond the termination of Executive's services for the Company with respect to Work Products conceived or made by Executive during the period he provides services to the Company and shall be binding upon Executive's executors, heirs, assigns, administrators and other legal representatives.

SECTION 1.04 <u>Non-Solicitation</u>.    During the period Executive is performing services for the Company and for a period of 18 months following the termination of Executive's services for the Company for any reason (the "<u>Restricted Period</u>"), Executive agrees that Executive will not, directly or indirectly, for Executive's benefit or for the benefit of any other person, firm or entity, do any of the following:

(a)    solicit the employment or services of, or hire or engage, or assist anyone else to hire or engage, any person who was known to be employed by or was a known Executive to the Company or independent contractor to the Company upon the termination of Executive's services to the Company, or within twelve months prior thereto; or

(b)    cause or attempt to cause any customer that Executive serviced or learned of while in the employ of the Company ("<u>Customer</u>"), or any potential customer of the Company which has been the subject of a known written or oral offer or proposal by the Company, or of substantial preparation of such a proposal or offer, within twelve months prior to Executive's termination ("<u>Potential Customer</u>"), licensor, supplier or vendor of the Company to reduce or sever its affiliation with the Company;

(c)    perform any work or services for, any Customer or Potential Customer, which business, work or services is similar or related to the business of the Company; or

(d)    otherwise interfere with the business or accounts of the Company.

For purposes hereof, "<u>solicitation</u>" shall include directly or indirectly initiating any contact or communication of any kind whatsoever for purposes of inviting, encouraging or requesting such Customer, Potential Customer, Executive or consultant to materially alter its business relationship, or engage in business, with Executive or any person, firm or entity other than the Company.

SECTION 1.05 <u>Injunctive Relief</u>. (a) Executive acknowledges that the services to be rendered by him to the Company are of a special and unique character, which gives this Agreement a peculiar value to the Company, the loss of which may not be reasonably or adequately compensated for by damages in an action at law, and that a material breach or threatened breach by Executive of any of the provisions contained in this Agreement will cause the Company irreparable injury. Executive therefore agrees that the Company

shall be entitled, in addition to any other right or remedy, to a temporary or preliminary injunction, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security, enjoining or restraining him from any such violation or threatened violations.

(b)    The parties acknowledge that the type and periods of restriction imposed in this Agreement are fair and reasonable and are reasonably required for the protection of the Company. Executive specifically acknowledges that the restrictions contemplated by this Agreement will not prevent him from being employed or earning a livelihood in the type of business conducted by the Company following the termination of Executive's services for the Company.

ARTICLE II
MISCELLANEOUS

SECTION 2.01  Survival.  The representations, warranties, covenants and agreements contained herein shall survive the termination of Executive's employment.

SECTION 2.02  Employment.  Executive acknowledges that Executive will be retained by the Company on an "at will" basis and that nothing in this Agreement or otherwise confers upon Executive any right to be retained as an executive of, consultant to, or in any other capacity with, the Company or any of its affiliates.

SECTION 2.03  Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

SECTION 2.04  Severability.  Whenever possible each provision of this Agreement will be interpreted in a manner to be effective and valid to the maximum extent permitted but if any provision or term of this Agreement is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provision or the remaining provisions or terms of this Agreement. If any of the covenants set forth in this Agreement are held to be unreasonable, arbitrary, or against public policy, such covenants will be considered divisible with respect to scope, time, and geographic area, will be effective, binding and enforceable against me to the maximum extent permitted.

SECTION 2.05  Parties in Interest.  This Agreement and all provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective heirs, representatives, successors and permitted assigns. Neither this Agreement nor any right or obligation hereunder may be assigned or transferred without the express written consent of all parties.

SECTION 2.06  Entire Agreement.  This Agreement contain the entire understanding of the parties with respect to the subject matter hereof and supersedes all

prior agreements and understandings between the parties with respect to the subject matter hereof.

SECTION 2.07  Notices. All notices, demands, offers or other communications required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested overnight delivery service, or by hand delivery, and addressed to the other party hereto at such party's address set forth above as the same shall be amended from time to time, and shall be deemed given upon the date of delivery.

SECTION 2.08  Amendments; Waiver. Neither this Agreement nor any provision hereof may be modified, amended or waived unless in writing and signed by the parties. No waiver by any party, whether express or implied, of any provision of this Agreement, or of any breach or default, shall constitute a waiver of a breach of a similar or dissimilar provision or condition at the same time or any prior to subsequent time.

SECTION 2.09  Governing Law; Consent to Jurisdiction.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (regardless of the laws that might otherwise govern under applicable principles of conflicts of law of such State).  Each of the parties (i) irrevocably consents and agrees that any legal or equitable action or proceeding arising under or in connection with this Agreement may be brought in any Federal or state court in the County of New York, State of New York, (ii) by execution and delivery of this agreement, irrevocably and unconditionally submits to the jurisdiction and venue of such courts, and (iii) agrees that any action brought against such party may be commenced by service of process by any method permitted by applicable law and as set forth in the notice section of this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed and delivered as of the date first written above.

VIE LUXE INTERNATIONAL, LLC

By: _Daniel Benedict_
Name: Daniel Benedict
Title: Member

Executive

Exhibit C

# SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT
### OF
## VIE LUXE INTERNATIONAL, LLC

THIS SECOND AMENDED AND RESTATED OPERATING AGREEMENT (this "**Agreement**") of VIE LUXE INTERNATIONAL, LLC (the "**Company**"), dated as of June 9, 2006, is entered into by and between MARJORIE GUBELMANN RAEIN ("**Raein**"), with an address at 50 East 77th Street, New York, New York 10021, and DANIEL BENEDICT ("**Benedict**"), with an address at 3 East 78th Street, New York, New York 10021.  Raein and Benedict are each individually referred to as a "**Member**" and are sometimes collectively referred to as the "**Members**".

WHEREAS, the Company was formed as a New York limited liability company pursuant to the New York Limited Liability Company Act (as the same may be amended from time to time, the "**Act**"), by the filing of Articles of Organization with the Secretary of State of the State of New York on March 24, 2004, and pursuant to that certain Operating Agreement of the Company, of even date therewith, made by Raein as the sole member of the Company (the "**Original Agreement**"); and

WHEREAS, the Company has entered into that certain Membership Interest Acquisition Agreement, dated as of May 1, 2004, with Benedict (the "**Membership Interest Acquisition Agreement**"), whereby, among other things specified therein, Benedict acquired a membership interest in the Company in consideration of services to be performed by him for the Company; and

WHEREAS, in connection with Benedict's admission as a Member of the Company, the Members entered into an amendment and restatement of the Original Agreement, dated as of May 1, 2004 (the "**First Amended and Restated Agreement**"); and

WHEREAS, the Company requires additional capital to pay existing expenses and to expand business operations and Raein is willing to provide such additional capital subject to various terms and conditions; and

WHEREAS, in connection therewith, the Members desire to effect certain changes in the manner in which the business and management of the Company will be conducted and in their respective rights and obligations as members of the Company;

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the First Amended and Restated Agreement is hereby amended and restated in its entirety as follows:

286557-4-W

1.    **Term; Dissolution.**    The Company shall continue in existence until the occurrence of any of the following events:

(a)    The sale of all or substantially all of the assets of the Company; or

(b)    At the sole written election of Raein if the amount of Raein's Unreturned Capital (as hereafter defined) has not been reduced to zero by December 31, 2011; or

(c)    The unanimous written election of the Members to dissolve the Company or, following the death, incompetence, withdrawal, insolvency or bankruptcy of a single Member, the written election of the remaining unaffected Member(s).

The death, incompetence, withdrawal, insolvency or bankruptcy of a single Member shall not dissolve the Company, but the occurrence of any of such events with respect to both Members (for example, the occurrence of the death of one Member followed by a bankruptcy of the second Member) shall dissolve the Company upon the occurrence of any such event with respect to the last of the Members to be so affected.

2.    **Purposes.**    The Company may engage in any purpose and conduct any activity permitted to be engaged in or conducted by a limited liability company under the Act including, but not limited to, the production, sale and distribution of body lotions, perfumes and candles.

3.    **Percentage Interests.**    Effective as of the date of this Agreement, the percentage interests of the Members in distributions, profits and losses of the Company ("**Percentage Interests**") shall be as follows:

Raein        90%
Benedict    10%.

4.    **Contributions.**

(a)    Initial Capital Contributions. As of the date immediately prior to the date of this Agreement, Raein has contributed cash in the aggregate amount of $405,000 to the Company. Within three business days following the execution and delivery of this Agreement, Raein shall contribute an additional $200,000, in cash, to the Company. The total amount contributed by Raein shall be reflected from time to time in Exhibit A, as the same may be amended from time to time. Benedict is not obligated to contribute any cash or property to the Company, and has acquired his membership interest in the Company pursuant to the Membership Interest Acquisition Agreement.

(b)    Additional Contributions. Each Member may, but is not obligated to, contribute additional amounts of cash as capital to the Company with the prior approval of the other Member, in such amounts at and such times as the Members determine. Additional contributions shall be reflected from time to time in an amendment to Exhibit A, designated successively as Exhibits A-1, A-2, and the like, specifying the date of the amendment and

reflecting total capital contributions by the Member to such date and the Members' Percentage Interests.

(c)    Failure to Make Contributions.  In the event that Racin fails to contribute any amount required to be contributed as provided in Section 4(a) hereof within ten days after the date the amount was to be contributed, then and in such event, notwithstanding Section 7(b)(xvii) hereof, Benedict shall have the power to cause the Company to bring suit to enforce Racin's obligation under Section 4(a).

(d)    No Interest on Capital; No Right to Demand Return of Capital.  No Member shall receive any interest on any capital contribution to the Company unless the Members shall unanimously agree otherwise.  No Member shall have the right to demand a return of his or her contributions or the right to demand to receive property other than cash for his or her membership interest.

5.    **Allocations.**  Profits and Losses shall be determined and allocated to the Members as provided in Exhibit B hereto.

6.    **Distributions.**

(a)    Manner of Distributions.  Except as provided in Section 10 (relating to distributions following a dissolution of the Company), when made, all distributions shall be made to the Members as follows:

(i)    First, to all Members, pro rata, in proportion to their Unpaid Tax Distribution Amounts, until the Unpaid Tax Distribution Amounts of all the Members are reduced to zero;

(ii)    Second, to Racin until her Unreturned Capital is reduced to zero; and

(iii)    Finally, to all Members, pro rata, in proportion to their respective Percentage Interests.

"**Unpaid Tax Distribution Amount**" means, with respect to each Member, as of any date on or after January 1st of a calendar year and on or before March 31st of such calendar year, an amount (but not less than zero) equal to the excess of (i) the aggregate sum of the Tax Distribution Amounts for each calendar year commencing with 2004 and ending with the last preceding year, over (ii) the aggregate amount of cash distributed to the Member before such date pursuant to Section 6(a)(i).  As of any date on or after April 1st of a calendar year and on or before December 31st of such year, the Unpaid Tax Distribution Amount shall equal an amount (but not less than zero) equal to the excess of (i) the aggregate sum of the Tax Distribution Amounts with respect to the Member for each calendar year commencing with 2004 and ending with such current calendar year, over (ii) the aggregate amount of cash distributed to the Member before such date pursuant to Section 6(a)(i).  "**Tax Distribution Amount**" means, with respect to each Member, for any calendar year, an amount (but not less than zero) equal to forty percent (40%) of the

excess, if any, of (i) the taxable income of the Company allocated to the Member attributable to (A) Profits allocated to the Member pursuant to Section B-3(c) of Exhibit B for such calendar year and (B) any amounts allocated to the Member pursuant to Section B-8(b) of Exhibit B, over (ii) the sum of any Losses previously allocated to the Member pursuant to Section B-4(a) of Exhibit B for all prior calendar years (expressed as a positive number), but only to the extent that such Losses have not previously been taken into account in determining the Tax Distribution Amount for any earlier calendar year.  "**Unreturned Capital**" of Racin means, as of any date, the sum of any and all capital contributions made by Racin through such date pursuant to Sections 4(a) and 4(b), reduced by the sum of all distributions heretofore made by the Company to Racin pursuant to Section 6(a)(ii) hereof.

(b)    Permitted Advances of Distributions.    During each calendar year, the Members may advance funds to the Members out of amounts expected to be distributed to them pursuant to Section 6(a)(i) for or with respect to such calendar year, at such times and in such amounts as individual Members require funds to pay estimated taxes.  Such distributions shall be treated as advances recoverable from future distributions from the Company and, to the extent such advances to a Member exceed the distributions to which the Member is entitled under Section 6(a)(i) for the calendar year and have not been recovered from any other distributions, such advances shall be repaid by the Member to the Company within 105 days after the end of the calendar year.

(c)    Withholding Taxes.    In the event that the Company is required to deposit or pay any tax on behalf of a Member with respect to the taxable income of the Company allocable to such Member for any calendar year, such deposit or payment shall be treated as an advance recoverable from future distributions of cash to the Member.  To the extent that such advances to a Member for a calendar year exceed the cash distributable to the Member for such year, and have not been recovered from any other distributions of cash, such advances shall be repaid by the Member to the Company within 105 days of the end of the calendar year.

7.    **Management.**

(a)    General; Benedicts' Responsibilities.    Except as otherwise expressly provided in this Agreement, the full powers of the Company shall be exercised by or under the authority of the Members, each of whom shall have full power acting alone to manage the Company's affairs, act on behalf of the Company, have authority to execute and deliver deeds, agreements, instruments or other documents for the Company and otherwise bind the Company, except as provided in Section 7(b) and Section 7(c) hereof.  Benedict shall devote substantially all of his business time and energies to the following aspects of the Company's business (**"Benedict's Primary Responbilities"**):

(i)    Product development and design;
(ii)    Production and fulfillment management;
(iii)    Sales, with a specific focus on department store sales;
(iv)    Public relations and marketing;
(v)    Management of the Company's participation in, and set up, of trade shows; and

     (vi)     In-store training in marketing and sale of Company products.

     (b)     <u>Actions Requiring Unanimous Consent of Members</u>.  Notwithstanding anything to the contrary in this Agreement or in the Act, the following actions may not be taken without, and shall require, the prior written approval of all of the Members:

     (i)     To option, sell, mortgage, pledge, transfer, grant a security interest in or otherwise dispose of all or substantially all of the assets of the Company; and

     (ii)     To merge the Company with, or consolidate the Company into, another Person (as defined below) which is not an Affiliate (as defined below); and

     (iii)     To borrow money, to issue debentures or other debt securities, or to incur, assume or guarantee indebtedness, in one transaction or a group of contemporaneous, related transactions, exceeding $20,000; and

     (iv)     To enter into, modify, waive any right the Company has under or terminate any lease, contract, agreement, license or other arrangement pursuant to which the Company will (A) incur any actual or contingent obligation or liability exceeding $20,000 in the aggregate in any year, or (B) receive payments exceeding $20,000 in the aggregate in any year; and

     (v)     To enter into, modify, terminate or waive any right the Company has under any contract, agreement or other arrangement with any Affiliate of a Member, notwithstanding whether or not such agreement or arrangement would otherwise be described under clause (iv) above or (vi) below; and

     (vi)     To purchase or otherwise acquire assets whether in one transaction or a group of contemporaneous, related transactions, for an amount exceeding $10,000, or outside of the ordinary course of business; and

     (vii)     To pay a fee to or otherwise compensate, or to issue an additional membership interest to, any Member in consideration of such Member personally guaranteeing any Company debt, or pledging or mortgaging personal assets as security for any Company debt; and

     (viii)     To pay a fee, guaranteed payment or salary, bonus or incentive compensation for management or any other services to any Member or any Affiliate of any Member not expressly provided for

or granted under this Agreement or the terms of the initial employment or other agreements entered into by the Company with such Person, provided that the foregoing limit shall not apply to reimbursement of expenses incurred by a Member in the performance of services for the Company pursuant to Section 7(c) hereof; and

(ix)    To hire or terminate any employee of the Company who is not a Member, to appoint any person as an officer of the Company and designate the scope of his authority, and to determine the amount of compensation payable to any officer or employee of the Company; and

(x)     To determine the amount of reserves to be established or maintained by the Company, to determine the timing and amount of distributions to be made to Members, and to make any loans or advances to any Members or affiliates of any Members, provided, however that in making such determinations the Members shall not unreasonably withhold, delay or condition their consent or approval; and

(xi)    To accept any contribution to the capital of the Company (other than pursuant to Section 4(a) hereof), to sell, grant, issue or enter into an option or other agreement to grant or issue, any membership interest in the Company, or issue any interest in Company revenues, capital, profits, or losses, or to admit any Person as a Member of the Company other than a transferee pursuant to Section 9 hereof; and

(xii)   To determine whether to accept, and to determine the value of, any property contributed by any Person to the Company; and

(xiii)  To form a subsidiary, and to acquire any securities of, or any equity or beneficial ownership interest in, any other Person;

(xiv)   To make any election relating to the tax treatment of the Company, or any of its income, gains, expenses, deductions, credits or other tax attributes for federal or state income tax purposes, including but not limited to electing the Company's method of accounting and electing to treat the Company as an association taxable as a corporation for federal income tax purposes; and

(xv)    To incorporate the Company; and

(xvi)   To apply for or consent to the appointment of a receiver, trustee or liquidator of a substantial part of the Company's assets or property,

or make a general assignment for the benefit of creditors, or file a voluntary petition in bankruptcy or petition or an answer seeking reorganization, or make a plan with creditors or take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute or admit the material allegations of any petition filed against the Company in any proceeding under any such law; and

(xvii)  To select, hire or terminate the Company's accountants or attorneys; and

(xviii)  To commence any lawsuit or arbitration proceeding or other proceeding for the resolution of disputes, or to settle or compromise any claim or litigation, or admit the material allegations of any complaint or proceeding (civil, criminal or administrative) filed against the Company; and

(xix)  To select the place at which the Company's books and records shall be kept or to relocate them, to select the Company's bank or banks and to determine the terms of the Company's banking practices, pursuant to Sections 7(d) and 7(e) hereof; and

(xx)  To amend this Agreement; and

(xxi)  To voluntarily dissolve or liquidate the Company, except as otherwise provided in Section 1 hereof; and

(xxii)  To take any other action that is specifically described in this Agreement as requiring the approval or consent of "the Members", or which is described as to be taken by "the Members."

For all purposes of this Agreement, a **"Person"** means any natural person or corporation, partnership, limited liability company or other entity, and an **"Affiliate,"** means, as to any Member, any Family Member (as defined below) or any entity in which the Member and/or any Family Members of the Member directly or indirectly (x) own 50% or more of the interests in the entity, or (y) exercise control over the entity. **"Family Member"** as to any Member means the parents, spouse, children (including natural and adopted children and stepchildren), and grandchildren (natural and adopted) of the Member, and the spouse of any such child or grandchild, and any trust for the benefit of the Member and one or more of such persons.

(c)  Financial Controls; Chief Financial Officer.

(i)  CFO.  Notwithstanding Section 7(b)(ix) or any other provision of this Agreement, the Members hereby agree that the Company shall promptly hire a person selected and approved solely by Raein to serve as chief financial officer of the Company (the

"CFO"), with compensation in an amount determined solely by Raein. The CFO shall perform the duties customarily associated with such position as well as any other tasks specifically requested by Raein and shall report to Raein or an individual expressly designated by Raein.

(ii)    Significant Financial Decisions Requiring Approval.    The following decisions or actions shall not be made or undertaken without the prior approval of Raein or the CFO:

(A)    Pricing or re-pricing of Company products, including discounts and rebates;

(B)    Pricing of any private labeling of Company products; and

(C)    Any other decision or action which may be reasonably anticipated to result in the incurrence of Company expenditures in excess of $5,000.

(iii)    Expenditures in Excess of $5,000 Require Approval.    The incurrence by or on behalf of the Company of any obligation or expenditure after the date hereof in excess of $5,000 for any single item or in the aggregate for a group of related items shall require the prior approval of either the CFO or Raein, including, but not limited to, the execution of purchase orders, the incurring of obligations for the purchase of raw materials or other goods or assets, travel, or trade shows or events. Notwithstanding Section 7(f) or any other provision of this Agreement, Raein may require that the Company will not issue any check for an amount in excess of $5,000 or group of related checks exceeding, in the aggregate, $5,000 without the signature of the CFO in addition to that of Benedict or Raein.

(d)    Compensation.

(i)    Except as provided in Sections 7(d)(ii) and 7(d)(iii) hereof, the Members shall not be paid or receive any fees, salaries or other compensation for the performance of their management responsibilities under this Agreement. However, the Company shall reimburse the Members for any reasonable, direct, out-of-pocket expenses paid to third parties incurred in connection with the management of the Company (including the exercise of approval authority under Section 7(b) hereof); provided, however, that (i) no Member shall incur expenses in excess of $500 for which it expects reimbursement without the prior approval of the other Member, and (ii) the Member shall present copies of bills, receipts, invoices or other reasonable evidence that such amounts have been paid or incurred by the Member.

(ii)    Subject to Sections 11 and 12 hereof, and so long as Benedict is devoting substantially all of his business time to the management and conduct of the business of the Company as required by Section

7(h) hereof, effective June 1, 2006, Benedict shall be paid at the rate of $103,200 per annum for his services for the Company, payable in equal semi-monthly installments. Such payment shall be treated as a "guaranteed payment" under Section 707(c) of the Internal Revenue Code of 1986, as amended (the "**Code**"). Benedict acknowledges that he is required to pay self-employment taxes with respect to such payment.   Payment shall be subject to all applicable withholding and other taxes.  .  Benedict's right to receive payment for services pursuant to this Section 7(d)(ii) shall cease (i) as of the effective date of the termination of Benedict's services pursuant to Section 12 hereof and (ii) if Raein's Unreturned Capital has not been reduced to zero by December 31, 2011.

(iii)    Subject to Sections 11 and 12 hereof, and so long as Benedict is devoting substantially all of his business time to the management and conduct of the business of the Company as required by Section 7(h) hereof, Benedict will be entitled to an increase in salary in each calendar year 2007 through 2011 if he meets the applicable financial goal for such year as specified in, and in accordance with, Schedule 7(d)(iii) hereof. Salary increases from and after December 31, 2011 shall be determined by Raein in her sole and absolute discretion.

(e)    Books and Records; Reports.  True and correct books of account with respect to the operations of the Company shall be kept by the Members at such place as shall be designated by the Members. Any Member shall have the right to examine, or have its duly authorized representative examine, the books of account of the Company at any reasonable time. The Company shall prepare and provide to each Member, within 15 days after the end of each month except December, monthly financial statements of the Company, including a balance sheet, income and cash flow statements, for the preceding month, in each case using generally accepted accounting principles consistently applied. The Company shall also provide, within 90 days after the end of each calendar year, unaudited, compiled financial statements of the Company, prepared by the Company's accountants using generally accepted accounting principles consistently applied.

(f)    Banking.  All funds of the Company shall be deposited in the Company's name at such banks or other financial institution and in such account or accounts in the name of the Company as shall be designated by the Members. The funds in such accounts shall be used solely for the business of the Company. Withdrawals from, or checks drawn upon, such accounts shall require the signature of such person or persons as are designated by the Members from time to time, and may specifically require the signature of each Member, as the Members determine.

(g)    No Annual Meeting Required. The Company may, but is under no obligation to, hold any annual meeting of Members.

(h)  Time; Other Interests.  Benedict shall devote substantially all of his business time to the management and conduct of the business of the Company.  Raein shall devote such time as she deems appropriate to fulfill her responsibilities hereunder, at such time or times as she deems advisable in her sole discretion.  Raein and any person or entity who is an Affiliate of Raein may engage or hold interests in other business ventures of every kind and for her or the Affiliate's own account, regardless of whether she or such Affiliate shall have an interest in, be employed by or act as a consultant for business ventures that are in competition with the business of the Company.  Benedict and any person or entity who is an Affiliate of Benedict may hold passive investment interests in other business ventures for his or the Affiliate's own account, provided that neither he nor such Affiliate shall have an interest in any company or business venture that is or which can be reasonably be expected to be in direct or indirect competition with the business of the Company; provided, however, that the foregoing restriction shall not prevent Benedict from owning up to two percent of the stock or other beneficial interests in any publicly traded company that engages in competition with the Company.

(i)  Limitations on Power of Members.  Except as expressly set forth in this Agreement, no Member shall, directly or indirectly, in his capacity as a Member, (i) withdraw from the Company or require the Company to purchase his membership interest, (ii) dissolve, terminate or liquidate the Company, (iii) petition a court for the dissolution, termination or liquidation of the Company, or (iv) cause any property of the Company to be subject to the authority of any court, trustee or receiver (including suits for partition and bankruptcy, insolvency and similar proceedings).

8.    **Liability; Indemnification.**

(a)  No Personal Liability to Third Parties.  Except to the extent required by the Act or other applicable law or as expressly provided in this Agreement, as amended from time to time, all debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company and no Member shall have any personal liability for any such debt, obligation or liability of the Company solely by reason of being a Member or exercising management authority as a Member.

(b)  Indemnification.  To the fullest extent permitted by the Act, the Company hereby agrees to indemnify and hold harmless each Member from and against any and all claims, liabilities, damages, losses, costs and expenses, including, without limitation, (i) amounts paid in satisfaction of judgments, in compromises and settlements, or as fines and penalties and (ii) reasonable counsel fees or other costs and expenses of investigating or defending against any claim or alleged claim by a third party, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Member by reason of any act performed or omitted to be performed by the Member in connection with the business of the Company, excluding claims, liabilities, or damages, losses, costs or expenses with respect to claims between Members or between Members and the Company ("**Excluded Claims**"); provided, however, that indemnification under this Section 8(b) shall be available only if (i) the Member acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the Company, (ii) the action (or inaction) of the Member did not constitute fraud, gross

negligence, willful misconduct or a breach of fiduciary duty by such Member and (iii) with respect to any criminal action or proceeding, the Member had no reason to believe that his conduct was unlawful. The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere shall not, of itself, create a presumption that the Member's conduct constituted fraud, gross negligence, willful misconduct or a breach of fiduciary duty. The satisfaction of any indemnification and any saving harmless pursuant to this Section 8(b) shall be limited to Company assets and no Member shall be personally liable on account thereof.

(c)     Survival. The rights to indemnification provided by, or granted pursuant to, this Section 8 shall continue as to a Member who has ceased to be a Member and shall inure to the benefit of the successors, executors, administrators, legatees and distributes of such person.

9.     **Assignment.**

(a)     General. Except as specifically provided in Section 9(b), (i) no Member may sell, assign, pledge, grant a security interest in or otherwise transfer all or any portion of his membership interest in the Company (including, but not limited to, a transfer of an economic interest in the Company), and (ii) no transferee or assignee may be admitted as a member of the Company, in each case without the prior written approval of the other Member of the Company, the granting or withholding of which shall be in the other Member's sole and absolute discretion. Unless otherwise agreed in writing by the non-transferring Member, a transfer of a membership interest or any portion thereof shall not convey any rights to manage the business or affairs of the Company, and the transferee shall either own merely an economic interest in the Company (if the other Member has not approved admission as a member) or shall be a non-managing Member (if the other Member has approved admission as a member but not the transfer of management rights). Any transferee shall, as a condition to being admitted as a member, execute a signature addendum to this Agreement agreeing to be bound by the terms and conditions of this Agreement.

(b)     Certain Permitted Transfers of Economic Rights.

(i)     Transfers by Operation of Law. The Company and the non-transferring Member will recognize and respect as valid any transfer of a membership interest or portion thereof that occurs by operation of law, such as a transfer to the Member's estate upon the Member's death or a transfer to a trustee in bankruptcy upon the filing of a voluntary petition in bankruptcy of a case in bankruptcy; provided, however, that such transfer will only effect a transfer of the economic rights associated with the transferred interest, and the transferee will not be admitted as a member of the Company unless the non-transferring Member consents to such admission in his or her sole and absolute discretion, nor will the transferee succeed to or possess any management or approval rights. A Member's **"economic rights"** are the Member's rights to receive distributions (in the Member's capacity as a Member) and allocations of Profits and Losses, or items of income, gain, loss and expense, as provided herein.

(ii)     Permitted Transfers. A Member may sell, assign or otherwise transfer all or any portion of the economic rights in his, her or its membership interest in the

11

Company to a Permitted Transferee (defined below) without the consent of any other Member, provided, however, that (i) the other Member shall receive at least 10 business days' prior written notice of the proposed transfer and a copy of the proposed agreement or document effecting the assignment or transfer, which shall be in form and substance reasonably acceptable to the other Member, which form shall, however, be deemed acceptable unless the notified Member notify the transferring Member of their specific objections to such form within that time period, (ii) a copy of the executed document or instrument effecting the transfer promptly after execution and delivery of that document or instrument shall be delivered to the Company, and (iii) in the case of Benedict, Benedict shall retain at least a Percentage Interest of at least 20% in the Company. A Permitted Transferee shall not become a substitute Member with respect to the transferred interest except as provided in <u>Section 9(a)</u>.

    (iii) <u>Permitted Transferees</u>. A "**Permitted Transferee**" is (i) any Family Member; (ii) any trust for the sole benefit of one or more Members and/or one or more the Member's Family Members; or (iii) any testamentary trust of a Member or other beneficiary under the Member's last will and testament; provided that any such transferee execute an instrument reasonably satisfactory to the other Member of the Company (A) restricting transferability and issuance of the interests in such entity so that such interests may not be transferred or issued to Persons other than Permitted Transferees, and (B) providing that any transfer or issuance of interests in such entity to a Permitted Transferee is subject to the conditions of this <u>Section 9</u>, to the extent applicable. A "**Family Member**" of a Member is any of the parents, spouse, children (including natural and adopted children and stepchildren), grandchildren and descendants of the Member and the spouse of any such child, grandchild or other descendant.

  10. **Liquidation.**

    (a) <u>Liquidation Distributions</u>. Following dissolution of the Company in accordance with <u>Section 1</u> above, the Company's business shall be wound up and the Company liquidated, in a manner designed to preserve or realize the fair value of the Company's assets. The proceeds of the liquidation shall be distributed in the following manner:

    (i) first, to the payments of the expenses of liquidation;

    (ii) second, to pay the debts and obligations of the Company, excluding debts owing to Members;

    (iii) third, to the establishment of any reserve which the Members shall deem reasonably necessary for contingent or unforeseen liabilities;

    (iv) fourth, to repayment of any outstanding debts to Members; and

    (v) finally, to the Members in accordance with the terms of <u>Section 6(a)(ii)</u> and then <u>Section 6(a)(iii)</u>.

(b)    Payback of Tax Distributions.   If (i) after any final distribution in liquidation of the Company, Raein has any Unreturned Capital, and (ii) Benedict has received any distributions pursuant to Section 6(a)(i) ("Tax Distributions"), then Benedict shall pay to Raein, within 30 days after such final distribution, an amount equal to Raein's Unreturned Capital, not to exceed the total amount of Tax Distributions that he has received.  Any such payments shall be treated as capital contributions made by Benedict to the Company and a distribution by the Company to Raein pursuant to Section 10(a)(v) hereof.

## 11.    Redemption of Membership Interests Upon Death or Disability.

(a)    In General.    Upon the death or Disability of a Member, the estate of the deceased Member or the Disabled Member (or his authorized representative), as applicable, shall be obligated to sell, and the Company shall be obligated to purchase, such Member's membership interest at the purchase price set forth in Section 11(b).  A Member shall be deemed "**Disabled**" hereunder if, as a result of the Member's incapacity due to physical or mental illness, the Member shall have been absent or otherwise unable to perform the Member's duties hereunder in substantially the same manner as previously provided for a period of 90 consecutive days, or a period or periods aggregating more than 120 days in any six consecutive month period. The term "**Disability**" shall have a correlative meaning.  Each Member agrees to submit to reasonable medical examinations as may be necessary to determine whether a Disability exists, pursuant to reasonable requests which may be made by the other Member from time to time, and agrees that a copy of the medical report concerning such examination will be promptly provided to the requesting Member.

(b)    Purchase Price.   The purchase price of the membership interest of a deceased or Disabled Member shall be an amount equal, (i) in the case of a deceased Member, to the greater of (A) the net proceeds (including any return of unearned premiums) collected by the Company on any life insurance carried in respect of the deceased Member (the "**Life Insurance Proceeds**"), or (B) the fair market value of such Member's membership interest, determined as provided in Section 11(c), and (ii) in the case of a Disabled Member, the fair market value of the membership interest, determined as provided in Section 11(c).

(c)    Determination of Fair Market Value of Membership Interest.  Within 15 days after (i) of the issuance of letters testamentary to the executor(s) of the deceased Member, (ii) the Disability of the Member (or, if such Disability is of a nature that the Member requires a representative, of the appointment of a personal representative), or (iii) the termination of Benedict's services pursuant to Section 12 hereof (each a "**Mandatory Seller**"), as applicable, the Company, acting by the remaining Member, shall appoint an appraiser to value the membership interest of the Mandatory Seller, by written notice to the other (the "**Appraiser Selection Notice**").  The appraiser shall be a reputable appraiser with at least five years of experience in valuing interests in operating companies of the approximate size and scope of business as the Company. If the appraiser selected by the Company is not reasonably acceptable to the executor, Disabled Member or his or her representative or to Benedict (in the case of termination of Benedict's services pursuant to Section 12 hereof), as applicable, such party (the "**Seller Representative**") shall notify the Company of such fact, in writing, within 15 days after receiving the Appraiser Selection Notice (a "**Rejection Notice**").  The Company and the Seller

Representative shall then make a good faith reasonable effort to agree upon an appraiser. If such parties have not agreed, for any reason, upon a mutually acceptable appraiser within 30 days after the Company receives the Rejection Notice, the parties shall submit the selection of the appraiser to an arbitrator in accordance with Section 11(d). The appraiser shall have access to the books and records of the Company for purposes of making his appraisal, and the remaining Member and Seller Representative will cooperate with the appraiser and provide him with information that he reasonably requests to render his appraisal. In determining the value of the membership interest, the appraiser shall (i) value such interest taking into account that the Mandatory Seller will no longer be associated with or providing services to the Company, rather than assuming that the value of such interest will be the same immediately prior to and immediately after such disassociation, and (ii) exclude the amount of any life insurance proceeds and consider only the cash surrender value of the life insurance policy as of the date immediately before the date as of which the membership interest is to be valued (the date of death, Disability or the termination of services pursuant to Section 12 hereof, as applicable). The Company shall bear and pay the expenses of the appraiser. The appraiser shall deliver a written report to the remaining Member and the Mandatory Seller setting forth his finding of the fair market value of the membership interest, with supporting analysis, within 30 days of the date commissioned (the "Report"). The fair market value of the membership interest for purposes of Sections 11 through 14 hereof this shall be the fair market value as set forth in the Report.

(d)     Arbitration.  In the event of any dispute regarding the selection of an appraiser pursuant to Section 11(c) (a "Dispute"), then upon written notice, specifying the claims, the basis thereof and the relief sought, given by the initiating party to the other party, the Dispute will be resolved by binding arbitration in New York, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect, as modified by this Section 11(d). A decision by the arbitrators will be final and binding on the parties and may be filed with any court having jurisdiction over the parties or their property as a basis of declaratory or other judgment or the issuance of execution, including, but not limited to, any state or federal court in the State of New York. The Dispute will be resolved by a panel of 3 neutral arbitrators to be selected as follows: each party will select one arbitrator within 15 days of the receipt of notice from the initiating party with respect to the commencement of the arbitration of the Dispute, and the two arbitrators so selected will choose a third arbitrator within 10 days after their appointment. The arbitrators shall schedule a hearing as soon as possible taking into consideration the matters at issue. All hearings shall be scheduled on consecutive days to the extent possible. The action of a majority of the arbitration panel will govern all actions by the panel, and the arbitrators will render their decision promptly but in no event more than 45 days after the conclusion of submission of evidence. The arbitration award will be in writing and will specify factual and legal basis for the award. Each party will pay the fees and expenses of the arbitrator selected by it and one-half of the reasonable fees and expenses of the third arbitrator. All other fees and expenses of each party (including, without limitation, reasonable attorneys' fees) incurred in connection with the arbitration or to enforce this Agreement will be paid as determined by the arbitrators, who shall have discretion to award such fees and expenses as part of the arbitration award.

(e)     Insurance.  The Company shall have the right, but not the obligation, to purchase insurance on the life of any Member. The Company will not purchase any insurance on

the life of a Member except upon the approval of both Members. The Company shall be the sole owner of the policies issued to it and may apply any dividends declared and paid on the policies to the payment of premiums. Each Member agrees to cooperate with the Company in seeking to obtain insurance on such Member's life, by submitting to any reasonable medical examinations, providing blood and/or urine samples, providing relevant health or medical information and otherwise timely taking such steps as may be reasonably required in connection with the application for such insurance.

12.    **Redemption of Membership Interest of Benedict Upon Termination of Services for Cause.** Benedict's services for the Company may be terminated by the Company, acting for this purpose solely by Member Racin, for Cause (as hereafter defined) upon written notice to Benedict setting forth a reasonable description of the grounds on which the Company believes Cause exists (the "**Termination Notice**"). Termination of Benedict's services for Cause shall be effective immediately upon receipt by Benedict of the Termination Notice unless otherwise specified therein. Any one of the following shall constitute grounds for termination of Benedict for cause hereunder ("**Cause**"):

(i)    the commission by, or indictment or conviction (including a plead of nolo contendere) of, Benedict for (A) a felony or (B) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud ("indictment," for these purposes, meaning an indictment, probable cause hearing or any other procedure pursuant to which an initial determination of probable or reasonable cause with respect to such offense is made); or

(ii)    gross negligence, willful misconduct of, or violation of law by, Benedict with respect to a matter that affects the Company, its business or prospects; or

(iii)    alcohol or drug addiction or other substance abuse disorder; or

(iv)    the failure by Benedict to perform adequately a material part of Benedict's duties, which is not cured to the reasonable satisfaction of the Company (acting for this purpose solely by Racin) within 15 days after the delivery of written notice by the Company to Benedict setting forth the reasons for the Company's intention to terminate for Cause; or

(v)    breach by Benedict of any of Benedict's obligations under Sections 3.01, 3.02, 3.03 or 3.04 of the Membership Interest Acquisition Agreement (imposing service, confidentiality and nonsolicitiation restrictions) or Section 7(h) of this Agreement or Benedict's Executive Confidentiality Agreement with the Company; or

(vi)     the willful engaging by Benedict in conduct which in the reasonable judgment of Racin is materially injurious to the Company, its business or prospects; or

(vii)    breach by Benedict of Section 4.01 of the Membership Interest Acquisition Agreement (imposing exclusive service obligations on Benedict), or the acceptance by Benedict of employment with any other Person or other voluntary termination by Benedict of his services for the Company.

Notwithstanding the foregoing, Cause for terminating Benedict's services for the Company shall not exist under subparagraphs (iv) or (vii) above if, at the time of the event described in subparagraph (vii) or the time notice would otherwise be sent out pursuant to subparagraph (iv), the Company owes Benedict more than $14,885 under Section 7(d)(ii). All compensation and benefits (if any) payable to Benedict by the Company shall terminate on the date of termination of Benedict's services. The purchase price of Benedict's membership interest if and when Benedict is terminated for Cause pursuant to this Section 12 shall be 50% of the fair market value of his membership interest determined as provided in Section 11(c).

13.    **Manner of Payment of Purchase Price.**

(a)     Payment.    In the case of the purchase of a deceased Member's membership interest in accordance with Section 11, payment shall be made on the Closing Date (as defined below) to the deceased Member's estate as follows: (i) entirely in cash in a lump sum equal to the amount of the Life Insurance Proceeds, if any, and (ii) if the amount of Life Insurance Proceeds is less than 25% of the total purchase price of the membership interest (such percentage amount, the "**Initial Payment**"), the amount which, when added to the Life Insurance Proceeds, equals the Initial Payment, in cash, and (iii) a promissory note for the balance of the purchase price as provided below. In the case of the purchase of a Disabled Member's membership interest in accordance with Section 11, and in the case of the purchase of Benedict's membership interest pursuant to Section 12 hereof, payment shall be made on the Closing Date to the Disabled Member (or his or her personal representative), or Benedict, as applicable, at the option of the Company, either entirely in cash in one lump sum or by delivery to such Person of : (p) a certified or bank check payable to such Person in an amount equal to the Initial Payment; and (q) a promissory note ("**Note**") in the principal amount of the balance of the purchase price, bearing interest from the Closing Date at an annual rate equal to one percentage point above the base rate of J.P. Morgan Chase, N.A., or any successor thereto (fixed on the Closing Date). The principal balance shall be due and payable in three (3) equal annual installments commencing with the first anniversary of the Closing Date. Accrued interest under the Note shall be payable with each installment of principal. The Note may be prepaid at any time by the Company without penalty and shall become immediate and payable upon the occurrence of any of the following: (w) dissolution of the Company; (x) sale or other disposition of all or substantially all of the assets of the Company; (y) the Company applying for or consenting to the appointment of a receiver, trustee or liquidator of a substantial part of its assets or property, making a general assignment for the benefit of creditors, filing a voluntary petition in bankruptcy or petition or an answer seeking reorganization, making a plan with creditors or take advantage of any

bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute or an answer admitting the material allegations of any petition filed against it in any proceeding under any such law; or (z) any proceeding against the Company seeking reorganization, arrangement, composition, adjustment, liquidation, dissolution or similar relief under the present or any future Federal Bankruptcy Act or other applicable Federal or state statute, law or regulation is filed and remains undismissed or continues unstayed and in effect for any period of 60 days.

(b)    Closing.  The closing of any purchase of a membership interest pursuant to Section 11 or Section 12 shall be held:

(i)    In the event of the death of a Member, the later of (A) 90 days following the death of the Member, or (B) 10 days following the date letters testamentary are issued to the executor of the estate with respect to the purchase of a membership interest from an estate, or (C) 10 days following the determination of the purchase price of the membership interest pursuant to Section 11 hereof (with respect to the purchase of a membership interest from a deceased Member, the "Closing Date");

(ii)    In the event of the Disability of a Member, the later of (A) 90 days following the date the Member's Disability is determined, or (B) 10 days following the determination of the purchase price of the membership interest pursuant to Section 11 hereof (with respect to the purchase of a membership interest from a Disabled Member, the "Closing Date"); or

(iii)    In the event of a redemption of Benedict's membership interest following the termination of his services pursuant to Section 12, within 90 days following the date of such termination (with respect to the purchase of Benedict's membership interest pursuant to Section 12, the "Closing Date").

Notwithstanding the foregoing, the Closing Date shall in no event be earlier than the date that is 30 days after the date that the value of the membership interest is determined pursuant to Section 13(c) above.  At closing, the selling Member, his or her executor or other legal representative or Benedict shall assign and transfer the membership interest in the Company pursuant to an assignment in form and substance reasonably satisfactory to the other Member (which assignment shall contain a representation by the seller that the same has full legal title to the membership interest being transferred and that such interest has not been previously sold, assigned, transferred, pledged or otherwise encumbered).  If the membership interest of the seller is encumbered by any lien or security interest, the seller shall either cause the removal of such lien or termination of the security interest prior to its sale to the Company or make arrangements reasonably acceptable to the Company to have such lien or security interest released or terminated on the Closing Date upon direct payment to the secured creditor or lien holder out of amounts to be paid by the Company to the seller at such time.

(c)    Pledge; Restrictions on Distributions.  Payment of the Note shall be secured by a pledge by the entire membership interest of the remaining Member in the Company.  The pledged membership interest shall be free and clear of any other liens or encumbrances, other than restrictions imposed by this Agreement or by federal and state securities laws.  The

pledge agreement shall be in form and substance reasonably acceptable to the payee of the Note, but shall provide that (i) the pledgor retains the management and economic rights associated with the pledged interest so long as there is no default under the Note, (ii) the pledge has the rights of a secured creditor under the New York Uniform Commercial Code, and (iii) the purchaser of the pledged membership interest at a sale of the pledged membership interest effected in accordance with the New York Uniform Commercial Code shall automatically be admitted as a member of the Company upon purchase, unless the purchaser elects otherwise. In no event shall the remaining Member's aggregate payments pursuant to the preceding sentence exceed an amount equal to the excess, if any, of (i) the amount of distributions received by such Member (and any additional Members) from the Company during the period that the purchase price (and interest thereon) remains unpaid, over (ii) the sum of (A) one hundred and twenty nine thousand dollars ($129,000) and (B) the amount distributable to the Member pursuant to Section 6(a)(i) hereof.

        (d)    Specific Performance. Each Member agrees that the Company and the other Member may compel the specific performance of the Member's obligations under Sections 11 through 14. Each Member agrees that it will be obligated to pay the legal fees, arbitration and court or other enforcement costs incurred by the Company or the other Member in enforcing their rights under such Sections.

        (e)    No Amendment Without Creditor's Consent. During the period from the Closing Date until all sums owed the selling Member (or his estate or representative, as applicable) under Section 13 have been paid in full, none of Sections 6, 10, 13 or 14 shall be amended without the prior written consent of the selling Member, his or her executor or personal representative, as applicable.

14.    **Certain Tax Matters Relating to Redemptions.**

        (a)    Character. In the case of the purchase of the Membership Interest of a Member pursuant to Section 11 or Section 12, then the payment of such purchase price shall be considered a liquidating distribution made in exchange for the Member's interest in Company property under Section 736(b)(1) of the Code. If the Capital Account of the Member is less than zero as of the Closing Date, any deemed distribution pursuant to Section 752(b) of the Code shall also be treated as a liquidation payment pursuant to Section 736(b) of the Code.

        (b)    Allocation of Income.

        (i)    In the case of the purchase of the Membership Interest of a deceased Member pursuant to Section 11, the deceased Member's share of the Profit or Loss (and any items of income, gain, loss, deduction or credit) shall be determined on the basis of an interim closing of the books of the Company as of the date of death of the deceased Member. Except as provided in Section 14(a), no Profit or Loss (or any items of income, gain, loss, deduction or credit) shall be allocated to the deceased Member, the estate of the deceased Member or any beneficiary thereof, for any period commencing after the date of death of the deceased Member. No amendment or modification shall be made to this Agreement with respect to any allocation of Profit or Loss (or items of income, gain, loss, deduction or credit) to the extent such amendment or modification would be effective for any period (or part thereof)

ending on or prior to the Closing Date for the purchase of the membership interest of the deceased Member.

(ii)    In the case of the purchase of the membership interest of a Disabled Member pursuant to Section 11, the Disabled Member's share of the Profit or Loss (and any items of income, gain, loss, deduction or credit) shall be determined on the basis of an interim closing of the books of the Company as of the date of the Member's Disability. Except as provided in Section 14(a), no Profit or Loss (or any items of income, gain, loss, deduction or credit) shall be allocated to the Disabled Member for any period commencing after the Effective Date of Disability of the Disabled Member. No amendment or modification shall be made to this Agreement with respect to any allocation of Profit or Loss (or items of income, gain, loss, deduction or credit) to the extent such amendment or modification would be effective for any period (or part thereof) ending on or prior to the Closing Date for the purchase of the membership interest of the Disabled Member.

(iii)    In the case of the purchase of the membership interest of a Withdrawing Member pursuant to Section 12, Benedict's share of the Profit or Loss (and any items of income, gain, loss, deduction or credit) shall be determined on the basis of an interim closing of the books of the Company as of the termination date of Benedict's services. Except as provided in Section 14(a), no Profit or Loss (or any items of income, gain, loss, deduction or credit) shall be allocated to Benedict Member for any period commencing after Benedict's termination date. No amendment or modification shall be made to this Agreement with respect to any allocation of Profit or Loss (or items of income, gain, loss, deduction or credit) to the extent such amendment or modification would be effective for any period (or part thereof) ending on or prior to the Closing Date for the purchase of Benedict's membership interest.

15.    **Benedict's Option to Acquire Additional Membership Interest**.  If Benedict has caused the Company to fully satisfy all of the financial goals set forth in Schedule 7(d)(iii) for each of the years 2006 through and including 2011, Benedict will have the non-assignable, one-time option (the "**Option**") to purchase from the Company an additional five percent (5%) membership interest in the Company at the fair market value of such an interest as determined in accordance with the procedure set forth in Section 11(c) hereof.  The Option shall be exercised by delivering written notice of his intention to purchase the additional membership interest specified in such notice pursuant to this Section 15 hereof to Raein (the "**Exercise Notice**"); provided, however, that Benedict's right to exercise this Option shall expire if not exercised by delivery of the Exercise Notice on or before December 31, 2012.  However, this expiration date may be extended by Raein by written notice to Benedict, in her sole and absolute discretion. Within 15 days of receipt of the Exercise Notice, Raein shall appoint an appraiser and deliver the Appraiser Selection Notice as required by Section 11(c) hereof, and the parties shall then follow the procedure set forth in Section 11(c) hereof to determine the fair market value of the membership interest to be purchased by Benedict. Benedict shall tender the purchase price of the membership interest to the Company, at Benedict's option, in cash, by delivery of a promissory note containing, among other things, the provisions set forth below, in form and substance reasonably satisfactory to Raein, or a combination of cash and the promissory note. Such payments shall be made within 75 days after the appraiser delivers its written report setting forth the value of the interest.   The promissory note shall require monthly payments, be self-

amortizing, have a term of no more than five years determined by Racin, bear interest at the prime rate of JP Morgan Chase Bank (or successor thereto) prevailing at the time the promissory note is delivered, and be subject to offset by any amounts that the Company owes Benedict from time, to the extent and in the manner that Racin determines in her sole discretion. Upon receipt of the funds, Exhibit A shall be modified to increase Benedict's Percentage Interest by the applicable percentage points acquired. If Benedict fails to deliver the purchase price within the 75 day period, his right to acquire the additional interest shall automatically expire without notice. Benedict agrees to execute and deliver such agreements or instruments as the Company may reasonably require in order to effect the purchase of the membership interest pursuant to this Section 15.

16.     **Miscellaneous.**

(a)     Governing Law; Consent to Jurisdiction. This Agreement is governed by and shall be construed in accordance with the internal laws of the state of New York, excluding its rules applicable to conflict-of-laws. Each of the parties (i) irrevocably consents and agrees that any legal or equitable action or proceeding arising under or in connection with this Agreement may be brought in any Federal or state court in the County of New York, State of New York, (ii) by execution and delivery of this agreement, irrevocably and unconditionally submits to the jurisdiction and venue of such courts, and (iii) agrees that any action brought against such party may be commenced by service of process by any method permitted by applicable law and as set forth in the notice section of this Agreement.

(b)     Notices. All notices, demands, offers or other communications required or permitted by this Agreement shall be in writing and shall be sent by prepaid registered or certified mail, return receipt requested overnight delivery service, or by hand delivery, and addressed to the other party hereto at such party's address set forth above as the same shall be amended from time to time, and shall be deemed given upon the date of delivery.

(c)     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, representatives, successors and permitted assigns.

(d)     Severability. If any provision of this Agreement shall be determined to be unlawful or unenforceable to any extent, such provision shall be deemed to be severed from this Agreement and every other provision of this Agreement shall remain in force and effect.

(e)     Waiver. The waiver by any Member of any matter provided herein shall be effective only if made in writing and signed by such Member. Delay by any party in enforcing any of its rights under this Agreement or as a member of a limited liability company under applicable law shall not constitute a waiver of the party's right to enforce that right or of its right to any remedies with respect to a breach of this Agreement or of applicable law. The failure of any party to this Agreement to enforce any of its terms, provisions or covenants shall not be construed as a waiver of the same or of the right of such party to enforce the same. Waiver by either party hereto of any breach or default by the other party of any term or provision of this Agreement shall not operate as a waiver of any other breach or default.

286557-4-W                                    20

(f)    Entire Agreement; No Oral Modifications. This Agreement sets forth the entire agreement and understanding of the Members and supersedes all prior agreements or understanding, whether oral or written, between the parties with respect to the subject matter of this Agreement. This Agreement may only be amended by a writing signed by both Members and designated as an amendment or modification of this Agreement; provided, however, that any Member may amend this Agreement to reflect changes in the amount of the Members' capital contributions through the date of such change in Exhibit A.

(g)    Independent Advice From Counsel. The Members acknowledge that each has been encouraged to consult, and has consulted to the extent he or she deemed advisable, independent legal counsel of his or her choice with respect to the advisability of executing this Agreement and the terms hereof.  Each Member acknowledges that he or she has read this Agreement, executes it voluntarily with a full understanding of its significance and consequences, and that there shall be no presumption that this Agreement shall be construed against either party in the interpretation thereof.

(h)    Payment of Legal Fees.  The legal fees and expenses incurred before July 31, 2004 in connection with the organization and formation of the Company, including but not limited to preparation, negotiation and/or filing of the Company's Certificate of Formation, this Agreement and the Membership Interest Acquisition Agreement, and any legal advice rendered in connection therewith (but expressly excluding any legal fees and expenses incurred personally by Benedict in connection therewith), shall be paid one-half by Raein, personally and not in her capacity as a Member of this Company, and one-half by the Company.

(i)    Counterparts.  This Agreement may be executed in one or more counterparts and by facsimile, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
MARJORIE GUBELMANN RAEIN

_____
DANIEL BENEDICT

## SCHEDULE 7(d)(iii)

Salary Increases for Benedict if Financial Goals are Met

| Financial Goal: | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| Sales growth rate | 50% | 20% | 50% | 50% | 45% | 30% |
| Sales | $1,000,000 | $1,200,000 | $1,800,000 | $2,700,000 | $3,915,000 | $5,089,500 |
| Minimum Profit Margin % | 50% | 50% | 50% | 50% | 50% | 50% |
| Net Income | breakeven | $28,000 | $166,900 | $454,370 | $883,284 | $1,274,605 |

Cash position must be positive in all years (meaning that the Company does not need a capital infusion in the form of equity. Use of the HSBC line of credit (or any other line of credit extended by any financial institution from time to time is allowed, however).

| If all four goals are met: | | | | | | |
|---|---|---|---|---|---|---|
| Current Salary | $103,200 | $150,000 | $172,500 | $198,375 | $222,180 | $244,398 |
| Following Year Salary | $150,000 | $172,500 | $198,376 | $222,180 | $244,398 | $268,838 |
| Salary % increase for following year | 45.35% | 15% | 15% | 12% | 10% | 10% |

Schedule 7(5)(iii)

2l6557-4-W

For purposes of this Schedule 7(d)(iii), the following terms have the meanings ascribed below:

**Sales:** Revenue recorded in accordance with the accrual method of accounting as a result of selling the Company products to customers.

**Cost of Goods Sold:** All costs incurred in accordance with the accrual method of accounting directly attributable to the production of goods sold.

**Gross Profit:** Sales less Costs of Goods Sold.

**Profit Margin:** Gross Profit divided by Sales.

**Net Income:** Gross Profit less general, administrative and all other expenses incurred in accordance with the accrual method of accounting.

If Benedict does not meet the stated goal in any year, his salary will not increase. For example, if he does not meet the goal for 2006, then his salary for 2007 will be the same as his salary for $2006 (namely, $103,200). If, having failed to meet the prescribed goals for a prior year, he then meets the stated goal for the next year, then his salary will increase by the salary increase percentage listed in the above table for the following year. For example, if he does not meet the goals for 2006 (and his salary therefore remains at $103,200 for 2007) but he meets the goals for 2007, then his salary for 2008 will increase by 15%, to $118,680.

286557-1-W

Schedule 7(b)(iii)

**EXHIBIT A**

<u>Capital Contributions of the Members</u>
(as of May 1, 2004)

| <u>Name:</u> | **Capital Contributions to Date:** | **Percentage Interests:** |
|---|---|---|
| Marjorie Gubelmann Racin | $30,000 | 60% |
| Daniel Benedict | $-0- | 40% |
| TOTAL | $30,000 | 100% |

286557-4-W                              Exhibit A

**EXHIBIT A-1**

<u>Capital Contributions of the Members</u>
(as of June 9, 2006)

| <u>Name</u>: | **Capital Contributions to Date:** | **Percentage Interests:** |
|---|---|---|
| Marjorie Gubelmann Raein | $405,000 | 90% |
| Daniel Benedict | $-0- | 10% |
| TOTAL | $405,000 | 100% |

**EXHIBIT A-2**

Capital Contributions of the Members
(as of June __, 2006)

| Name: | Capital Contributions to Date: | Percentage Interests: |
|---|---|---|
| Marjorie Gubelmann Raein | $605,000 | 90% |
| Daniel Benedict | $-0- | 10% |
| TOTAL | $605,000 | 100% |

## EXHIBIT B

### Allocations of Profits and Losses

Section B-0.    Definitions.

**Assignee**:  A Person to whom all or any portion of a membership interest has been transferred in accordance with this Agreement and who has not been admitted as a Member.

**Capital Transaction**:    A transaction in which the Company (i) sells, exchanges or otherwise disposes of all or any part of its property, including a sale or other disposition pursuant to a condemnation, (ii) receives proceeds of any financing or refinancing, whether or not secured by Company assets, to purchase, construct, replace, rehabilitate or improve property or repay any existing loan(s), (iii) receives the proceeds of property damage insurance, or (iv) any other transaction of the Company that, in accordance with generally accepted accounting principles consistently applied, is considered capital in nature.

**Carrying Value**:  Carrying Value means, with respect to any asset, the adjusted basis for federal income tax purposes of the asset, except as follows:

(i)  The initial Carrying Value of any asset contributed to the Company shall be the fair market value of the asset on the date of such contribution, as determined by the Members;

(ii)  The Carrying Values of the Company's assets shall be adjusted to equal their respective fair market values upon any election by the Company pursuant to Regulations Section 1.704(b)-1(b)(2)(iv)(f) to adjust the Members' Capital Accounts to reflect a revaluation of Company assets;

(iii)  If the adjusted basis for federal income tax purposes of any asset acquired by the Company is determined by reference to the adjusted basis for federal income tax purposes of any other asset of the Company, the Carrying Value of the acquired asset shall be determined by reference to the Carrying Value of the other asset, rather than by reference to its adjusted basis for federal income tax purposes; and

(iv)  The Carrying Value of an asset of the Company distributed to a Member shall be adjusted to equal the fair market value of the asset on the date of distribution as determined by the Members.

If the Carrying Value of an asset is determined or adjusted pursuant to clauses (i), (ii) or (iii), such Carrying Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes except that depreciation deductions shall be computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

286557-4-W

B-1

**Regulations**:   The permanent and temporary regulations, and all amendments, modifications and supplements thereof, from time to time promulgated by the Department of the Treasury under the Code.

Section B-1.   Taxation of Company; Capital Accounts.

(a)   Taxation; Fiscal Year. It is the intention of the Members that the Company be classified as a partnership for purposes of federal and state income tax law.  The Company's fiscal year shall be the calendar year.

(b)   Capital Accounts.   A separate capital account ("**Capital Account**") shall be established and maintained on the books of the Company, in accordance with provisions of Regulations section 1.704-1(b)(2)(iv) (including specifically (but without limitation) Regulations section 1.704-1(b)(2)(iv)(f)), for each Member.  The Capital Account of each Member (a) shall be credited with (i) the amount of any cash contributed (or deemed contributed) by such Member to the capital of the Company and the Carrying Value of any property contributed by such Member to the Company (net of any liability secured by such property that the Company is considered to assume or take subject to under Code section 752), (ii) allocations to such Member of items of income and gain pursuant to this Agreement, and (iii) such Member's share of any other items required to be credited to such Member's Capital Account under Regulations section 1.704-1(b)(2)(iv), and (b) shall be debited with (i) the amount of cash distributed to such Member and the Carrying Value of any property distributed to such Member (net of any liability secured by such property that the Member is considered to assume or take subject to under Code section 752), (ii) allocations to such Member of items of deduction and loss pursuant to this Agreement, and (iii) such Member's share of any other items required to be debited from such Member's Capital Account under Regulations section 1.704-1(b)(2)(iv). In the event the Carrying Values of Company assets are adjusted pursuant to the terms of this Agreement, the Capital Accounts of the Members shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Company recognized gain or loss equal to the amount of such aggregate net adjustment and such gain or loss was allocated to the Members pursuant to the appropriate provisions of this Agreement.  The foregoing Capital Account definition and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such regulations.

(c)   Capital Account Deficit.  Except as provided in Section 10(b), no Member with a deficit in its Capital Account shall be obligated to restore such deficit balance or make a capital contribution to the Company solely by reason of such deficit.

Section B-2.   Determination of Profits and Losses.     For purposes of this Agreement, the profit ("Profit") or loss ("Loss") of the Company for each calendar year shall be the net income or net loss of the Company for such year as determined for federal income tax purposes (including for this purpose in such net income or net loss all items of income, gain, deduction or loss that are required to be separately stated pursuant to Section 703 of the Code), but computed with the following adjustments:

286557-4-W                                B-2

(a)     Without regard to any adjustment to basis pursuant to Section 743 of the Code;

(b)     By including as an item of gross income any tax exempt income received by the Company;

(c)     By treating as a deductible expense any expenditure of the Company described in Section 705(a)(2)(B) of the Code;

(d)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account instead depreciation, amortization or other cost recovery deduction computed in accordance with Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     In the event that any asset of the Company is distributed in kind to a Member or there is a liquidation of the Company pursuant to Section 10, the difference between (i) an amount equal to the Carrying Value of such asset on the date of such distribution and (ii) the fair market value of such asset on that date, as determined by the Members in their reasonable judgment, shall be taken into account as a gain or loss for purposes of computing Profits or Losses;

(f)     Gain or loss resulting from any disposition of an asset by the Company from which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Carrying Value of the asset (after adjustment for depreciation (or amortization) determined under subsection (d) above), notwithstanding that the adjusted basis for federal income tax purposes of such asset differs from its Carrying Value; and

(g)     After making the special allocations (if any) required or permitted by Section B-8.

The amounts of the items of income, gain, loss or deduction of the Company to be specially allocated pursuant to Section B-8 shall be determined by applying rules analogous to those set forth in subsections (a) through (f).

Section B-3.    Allocation of Profits.    The Profit of the Company for each calendar year in which the Company has a Profit shall be allocated among, and credited to the Capital Accounts of, the Members in accordance with the following order of priority:

(a)     First, to the Members who received allocations of Losses for earlier calendar years pursuant to Section B-4(c), pro rata, in proportion to the cumulative amount of those Losses previously allocated to them, until those Members have received cumulative allocations of Profits pursuant to this Section B-3(a) for the current calendar year and all prior calendar years equal to the cumulative amount of Losses allocated to them pursuant to Section B-4(c) for all prior calendar years;

(b)     Second, to the Members who received allocations of Losses for earlier calendar years pursuant to Section B-4(b), pro rata, in proportion to the cumulative amount of those Losses previously allocated to them, until those Members have received cumulative allocations of Profits pursuant to this Section B-3(b) for the current calendar year and all prior calendar years equal to the cumulative amount of Losses allocated to them pursuant to Section B-4(b) for all prior calendar years;

(c)     Thereafter, to the Members, pro rata, in proportion to their respective Percentage Interests.

Section B-4     Allocation of Losses.     The Loss of the Company for each calendar year in which the Company has a Loss shall be allocated among, and charged to the Capital Accounts of, the Members in accordance with the following order of priority:

(a)     First, to the Members who received allocations of Profits in earlier calendar years pursuant to Section B-3(c), pro rata, in proportion to the cumulative amount of Profits previously allocated to them, until those Members have received cumulative allocations of Losses pursuant to this Section B-4(a) for the current calendar year and all prior calendar years equal to the cumulative amount of Profits allocated to them pursuant to Section B-3(c) for all prior calendar years;

(b)     Second, to the Members who have positive Capital Accounts, pro rata, in proportion to the respective amounts of their positive Capital Accounts, until the Capital Accounts of those Members are reduced to zero; and

(c)     Thereafter, to the Members, pro rata, in proportion to their respective Percentage Interests.

Section B-5     Elections.     In the event of a transfer of all or part of a membership interest because of sale (excluding a redemption pursuant to Sections 11 or 12), the Company shall, if requested by the transferee, make the election described in Section 754 of the Code. Any other elections or determinations required or permitted to be made by the Company under the Code or Regulations shall be made by the Members in their sole and absolute discretion, except as otherwise provided in this Agreement.

Section B-6     Income Tax Allocations.     Except as otherwise provided herein, the Company's profits, gains and losses for federal income tax purposes, and each item of income, gain, loss or deduction entering into the computation thereof, shall be allocated among the Members in the same proportions as the corresponding "book" items are allocated pursuant to this Exhibit B.

Section B-7    Transfers During Calendar Year.    In the event of the transfer of all or any part of a membership interest at any time other than the end of a calendar year (excluding any redemption pursuant to Section 11 or 12), the share of Profit or Loss (in respect of the membership interest so transferred) shall be allocated between the transferor and the transferee in the same ratio as the number of days in the calendar year before and after such transfer.  This Section B-7 shall not apply to Profit or Loss from Capital Transactions or to other extraordinary nonrecurring items.  Profit and Loss from Capital Transactions shall be allocated on the basis of the Members' Percentage Interests on the date of closing of the sale and extraordinary or nonrecurring items of gain or loss shall be allocated on the basis of the Members' Percentage Interests on the date the gain is realized or the loss incurred, as the case may be.  If during any calendar year the Percentage Interests of the Members are adjusted by any amendment to this Agreement, the share of Profit or Loss of the Company for such calendar year which is to be allocated among the Members in proportion to their Percentage Interests shall be allocated among the Members in the same manner as provided in this Section B-7 in the case of a transfer of a membership interest.

Section B.8    Special Allocations to Comply with Section 704 Regulations.

(a)    General Rule.    Notwithstanding the provisions of Section B-4, if the allocation of a Loss to a Member for any calendar year pursuant to Section B-4 would cause or increase a negative balance in the Member's Adjusted Capital Account on the last day of the calendar year, then the portion of the Loss that would have such effect shall instead be specially allocated among the Members who have positive balances in their Adjusted Capital Accounts on the last day of the calendar year.  The Loss to be specially allocated pursuant to the preceding sentence shall be allocated among the Members referred to in the preceding sentence, pro rata, in proportion to their respective Adjusted Capital Accounts.

(b)    Gross Income Allocation/Qualified Income Offset.    If, at the end of any calendar year, one or more Members would otherwise have a negative balance in their Adjusted Capital Accounts, then income and gain for such calendar year (and, if necessary, subsequent calendar years) shall be allocated as quickly as possible among all Members who have such negative balances in their Adjusted Capital Accounts, pro rata, in proportion to their respective negative balances to the extent necessary to eliminate such negative balances as of the end of such calendar year; provided that an allocation pursuant to this Section B-8(b) shall be made only if and to the extent that such Member would have such a negative balance in the Member's Adjusted Capital Account after all other allocations provided for in this Exhibit B have been tentatively made as if this Section B-8(b) were not a part of this Agreement.  The allocations referred to in this paragraph shall be interpreted and applied, inter alia, to satisfy the requirements of Regulations Section 1.704-1(b)(2)(ii)(d)(3).

(c)    Adjusted Capital Account.    The term "Adjusted Capital Account" shall mean the amount of a Member's Capital Account (determined before the special allocation to be made pursuant to this subsection, but after making all other adjustments to Capital Account for the calendar year with respect to contributions, allocations and distributions), whether positive or negative, reduced by reasonably expected adjustments described in Regulations Section 1.704-1(b)(2)(ii)(d)(4) and by reasonably expected allocations of loss and deduction described in

Regulations Section 1.704-1(b)(2)(ii)(d)(5) and reasonably expected distributions described in Regulations Section 1.704-1(b)(2)(ii)(d)(6), and increased by the amount of the Member's "risk of loss" (as defined in Regulations Section 1.752-2(b)) with respect to the recourse liabilities of the Company and the Member's share of the minimum gain of the Company as determined and calculated in accordance with Regulations Section 1.704-2. Nonrecourse deductions shall not be specially allocated.

(d)     Section 754 Adjustments. In any case where an adjustment to the adjusted basis of any Company asset pursuant to Sections 734(b) or 743(b) of the Code is required (pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations 1.704-1(b)(2)(iv)(m)(4)), to be taken into account in determining Capital Accounts because of a distribution to a Member in complete liquidation of the Member's interest in the Company, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated (i) among the Members in accordance with their interests in the Company in the event that an adjustment is required under Regulations Section 1.704-1(b)(2)(iv)(m)(2), or (ii) among the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(e)     Curative Allocations. The term "**Regulatory Allocations**" shall mean the allocations set forth in Section B-8(a) through Section B-8(b). Offsetting special allocations of Company income, gain, loss or deduction shall be made so that, after such offsetting allocations are made, each Member's Capital Account is, to the extent possible, equal to the Capital Account such Member would have had if the Regulatory Allocations were not included in this Agreement.

(f)     Winding Up and Related Matters. If, upon the winding up of the Company, the amount of the distribution to a Member pursuant to Section 10 does not equal his Capital Account immediately before such distribution (after the tentative allocation of Profit or Loss and special allocations of income, gain, deduction or loss for such calendar year), then the Members shall make such special allocations of income, gain, deduction or loss necessary to maintain (to the greatest extent possible) equality between the Capital Account of the Member and the amount of the distribution to him or her. The Members may otherwise make such special allocations of income, gain, deduction or loss for any calendar year necessary to maintain equality between the Capital Account of a Member and the amount that would be distributed to such Member if the Company were dissolved, its affairs wound up and its assets distributed to the Members as of the end of such calendar year. For purposes of making allocations for any calendar year pursuant to this Section B-8(f) prior to the dissolution of the Company pursuant to Section 10, the Members may, in their discretion, treat each of the assets of the Company as having a fair market value equal to its Carrying Value as of the end of such calendar year. All allocations made pursuant to this Section B-8(f) shall be made in good faith by the Members.

Section B-9.     Assignees Treated as Members. For all purposes of this Exhibit B and Sections 6 and 10, but for no other purpose, an Assignee shall be treated as a Member and each reference in this Exhibit B and Sections 6 and 10 to the Members shall be deemed to include Assignees.

Section B-10. <u>Tax Matters Partner</u>. Racin shall be the "tax matters partner" of the Company pursuant to Section 6231(a)(7) of the Code (the "<u>Tax Matters Partner</u>"). The Tax Matters Partner shall have the power to prepare and file tax returns for the Company and to manage and control on behalf of the Company any administrative proceeding at the Company level with the Internal Revenue Service relating to the determination of any item of Company income, gain, loss, deduction or credit for federal income tax purposes. In addition, the Tax Matters Partner shall be authorized and required to represent the Company (at the expense of the Company) in connection with all examinations of the affairs of the Company by any federal, state or local tax authorities, including any resulting administrative and judicial proceedings, and to expend funds of the Company for professional services and costs associated therewith. Benedict agrees to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably required by the Tax Matters Partner in connection with the conduct of all such proceedings.

Exhibit D

Vie Luxe International LLC
38 East 57th Street 14th Floor
New York, NY 10021

March 26, 2008

**BY FEDEX**

Mr. Daniel Benedict
3 East 78th Street
New York, New York 10021

Termination Notice - Vie Luxe International, LLC

Dear Mr. Benedict:

On behalf of Marjorie Gubelmann Raein, I write to give you notice under Section 12(iv) of the Second Amended and Restated Operating Agreement of Vie Luxe International, LLC, dated as of June 9, 2006 (the "Operating Agreement") that Vie Luxe International, LLC ("Vie Luxe" or the "Company") is hereby giving you notice that it intends to terminate your services for the Company for Cause on account of your failure to adequately perform the production and fulfillment management duties set forth under Section 7(a)(ii) of the Operating Agreement.

As you have been advised in writing and verbally periodically over the course of the past two years, you have not adequately managed the inventory of the Company. The situation has gotten steadily worse. The Company continues to carry far too much inventory, a significant part of which is un-sellable, and this is tying up an unacceptable amount of working capital that is needed to keep Vie Luxe a going concern. You have also failed to address the inventory management system, as you have been told to do on prior occasions.

You have fifteen (15) days to cure the foregoing failures. If they are not cured within that time period, your membership in Vie Luxe will end and you will receive a payment representing your 50% of the fair market value of your interest determined as provided in Section 11(c) of the Operating Agreement.

During the cure period, we remind you of your continuing obligations to comply with your fiduciary duties to Ms. Gubelmann and the Company as well as the provisions of Article III of the Membership Interest Acquisition Agreement dated May 1, 2004.

Of course, this letter is subject to the Company's and Ms. Gubelmann's rights and remedies, all of which are respectfully reserved. Accordingly, the Company is not waiving any right to terminate your services for Cause for reasons in addition to those set forth above should it determine that there are additional grounds to do so.

Very truly yours,

Julie Bedard

# Exhibit E

**VIE LUXE INTERNATIONAL LLC**
**38 EAST 57th STREET 14th FLOOR**
**NEW YORK, NY 10021**

**BY FEDEX**

April 10, 2008

Mr. Daniel Benedict
Vie Luxe International LLC
38 East 57th Street 14th Floor
New York, NY 10022

Dear Daniel:

You were notified of the Company's intention to terminate your services with Vie Luxe for
Cause on March 27, 2008. Since then, your attorney, Arnie Herz, has sent two emails. In the
first, dated March 27, 2008, Mr. Herz requested additional information regarding Vie Luxe's
inventory problem caused by your mismanagement on the basis that such information was
needed for you to cure the Cause problem. In the second, dated March 31, 2008, Mr. Herz
claimed that the problem was cured on the basis of certain inventory statistics he set forth in the
communication. We have considered Mr. Herz's emails but they do not in any way change the
company's determination that Cause exists to terminate your services. Rather, his
communications further demonstrate that you do not have an adequate handle on the inventory
problems facing the company and have caused us greater concern about the extent of the
problems. Mr. Herz requests information that you should know given your responsibilities for
the Company. His emails are also rife with inaccuracies regarding the current inventory levels
and the historical facts regarding this severe problem.

We have also now reviewed Mr. Herz's third email, dated April 9, 2008, in which he proposes
that rather than terminate your services, the company be dissolved because you have determined
that it is not a profitable venture in 2008. This proposal is hereby rejected.

In early 2006 the company was in dire financial trouble and in danger of declaring bankruptcy as
a result of poor inventory management and oversight on your part. Marjorie agreed to invest an
additional $300,000 in the Company at that time. At your insistence, you were given a generous
salary and incentive program, but you made no capital commitment. You promised at that time
to fix the inventory problems the Company had encountered previously. That has not happened.

Throughout the remainder of 2006 and in 2007 and again in early 2008 you and I had several
conversations regarding the inventory and production problems. Although it was your job, not
mine, in early 2007 I analyzed the 2006 year-end inventory in detail. We discovered that the
company was carrying in excess of $80,000 in slow moving and un-sellable box inventory. In
discussions with Lewis Klein, the box vendor, he placed blame on your shoulders stating that
you did not use purchase orders and quite frequently called and placed telephone orders for
immediate delivery which placed undue pressure on his warehouse and staff. Throughout 2007

we discussed options to realize some value from the box surplus. You have never satisfactorily addressed this point.

During the 2006 holiday season you admitted to several production problems that inevitably placed the company in a position of not meeting the holiday demand yet again as in past years of operations. When I finally received the year-end physical inventory counts I was shocked to see the inventory value at close to $300,000.

In 2007 the company encountered more production problems. I expressed concern sometime in October 2007 that we would yet again miss the holiday selling season. In November 2007 you admitted to many production problems. The company's 2007 year-end inventory was approximately $340,000 – an unacceptable level given the $100,000 of backorders as of December 31, 2007 (a number you have provided via Mr. Herz). The backordered items represent 8.5% of the 2007 Vie Luxe brand sales and the cost of these backorders represents approximately 12% of the inventory on hand at year end. To reiterate, these inventory levels are unacceptable.

The inventory moves too slowly. It always has and you have not been successful at improving this statistic. Since 2004, the company's inventory turnover rate has averaged 1.6 times per year—this rate is inadequate for a company of this nature.

As I have stated to you many times in the past, the company needs a qualified and experienced operations person to correct the production and inventory management issues. In February 2008, when I asked you if you would be comfortable with hiring an operations employee you stated that "no one can run this company but me" and you refused to forego your potential salary increases, take the position as Creative Director and Founder and take a greater equity stake that would potentially allow the company to hire a qualified operations employee.

In sum, over the last 2 years, you have been given numerous opportunities to solve the production and inventory problems that have placed an unacceptable drag on the availability of working capital for the company. While it may be acceptable to you to run a company that generates just barely enough to pay your salary (if that), it is absolutely unacceptable for there to be cash flow problems that impede the Company's growth and its ability to repay its current working capital line of credit with HSBC as well as for Marjorie to have made no return on her $700,000+ investment, which is now worth substantially less than that.

We therefore regret to inform you that your services with the Company are hereby terminated for Cause effective immediately. You are hereby requested to promptly return all Company property, including but not limited to the company issued laptop computer and all software including design software, office keys, the building elevator key, the company American Express card, all copies (including drafts) of any documentation or information (however stored), relating to the business of Vie Luxe, its clients or prospective clients. In addition, in returning the company laptop, we advise you that nothing should be deleted therefrom prior to its return.

We also take this opportunity to remind you of your restrictive covenants with the Company as set forth in Article III of the Membership Interest Acquisition Agreement dated as of May 1, 2004 in respect of Confidentiality and Non-Solicitation.

Enclosed is a letter setting forth your right to continue your health insurance with the company at your cost.

Sincerely,

Julie Bedard

Enclosure

# Exhibit F

-----Original Message-----
From: Gabree, Matthew [mailto:Matthew.Gabree@starwoodhotels.com]
Sent: Tuesday, April 15, 2008 4:30 PM
To: Daniel Benedict; daniel.benedict@yahoo.com
Cc: Stoeckl, Toni
Subject: Istanbul Votives

Hello Daniel, thanks again for your time today. Can you please ship and
invoice us for 50 of the 3 votive Istanbul sets ASAP. Please advise of
ship date/tracking numbers as well as final pricing.

Regards,
Matt

-----Original Message-----
From: Stoeckl, Toni
Sent: Tuesday, April 15, 2008 12:08 PM
To: Gabree, Matthew
Subject: FW: Invitations

Can you order 50 of the 3-votive Istanbul candles? Delivered to brand
office.

st.regis · w hotels | luxury collection

This electronic message transmission contains information from the
Company that may be proprietary, confidential and/or privileged.
The information is intended only for the use of the individual(s) or
entity named above.  If you are not the intended recipient, be
aware that any disclosure, copying or distribution or use of the
contents of this information is prohibited.  If you have received
this electronic transmission in error, please notify the sender
immediately by replying to the address listed in the "From:" field.

# Exhibit G

**Julie Bedard**

| | |
|---|---|
| **From:** | Julie Bedard |
| **Sent:** | Wednesday, April 16, 2008 3:58 PM |
| **To:** | Daniel.benedict@yahoo.com |
| **Subject:** | Vie Luxe |

Daniel,

   It has come to our attention that you have continued to communicate with Vie Luxe customers after your services were terminated on April 10, 2008. We have evidence that you communicated with Matt Gabree of W Hotels yesterday, April 15, about an order with Vie Luxe. Please be advised that you are not authorized to represent Vie Luxe and that you should cease all business contacts on its behalf immediately. If there are any inquiries made to you regarding Vie Luxe business, you should be forwarding them to me. We trust your improper communications will cease. However, please be advised that we are reserving all legal rights and remedies in this regard.

      Julie Bedard

# Exhibit H

-----Original Message-----
From: LorinChan@ck.com

Date: Mon, 5 May 2008 12:50:30
To:DanielBenedict@vieluxenyc.com
Cc:bentleyhardwick@ck.com, jodishapiro@ck.com
Subject: candle follow-up

Hi Daniel,
It was nice meeting you last week. We're looking forward to working with you
on the new candles. A brief recap and follow-ups:

40th anniversary candle
- Bentley has ordered 4-6 more Vertical Strait (glass) containers - we'll
advise upon receipt and get them over to you
- Daniel to provide scent samples: Gardenia (Diptique), Vetiver Tonka,
Jasmine (clean, grassy version)
- Test for cleaning burning results
- Qty should be approx. 750-1000; Bentley to discuss w/ Visual on their
needs
- Sept timing - target mid Aug. delivery

Holiday candle
- Re-produce black candle (Amber Cassis)
- Qty TBD; Bentley to discuss w/ PR + Visual on their needs
- need to confirm timing - approx. Oct/Nov delivery

Specialty Retail ("SR white label") candle
- Daniel to investigate options (set of votives or single candle) based on a
$25 retail/$10-15 wholesale cost and provide samples
- Consider one of the scents not used for 40th anniversary, or Daniel to
recommend other options
- Packaging should be a matte white box - as reference, paperstock for our
current gift boxes for these stores is: Mohawk Superfine Ultrawhite, 100 lb
text smooth. This is used to wrap the box, we can discuss specifics as we
proceed in development.
- F'08 timing - need to confirm specific date

Let me know if any questions, thanks.


Lorin Chan
 Account Director
 Calvin Klein, Inc.
 205 W. 39th Street - 4 Fl
 New York, NY 10018
 p. 212.292.9472
 f. 212.292.9712
 e. lorinchan@ck.com

# Exhibit I

```
-----Original Message-----
From: "Terry, Tam" <TTerry@metopera.org>

Date: Wed, 16 Apr 2008 13:29:44
To:<danielbenedict@vieluxenyc.com>
Subject: Appt


Daniel
Would you like to meet or set a phone appt?

Tam Terry
Chief Merchandising Officer
The Metropolitan Opera
Lincoln Center
New York, New York 10023
212.799.3100 x2886
tterry@metopera.org <mailto:tterry@metopera.org>
www.metopera.org <http://www.metopera.org>
```

```
-----Original Message-----
From: "Terry, Tam" <TTerry@metopera.org>
```

Date: Fri, 9 May 2008 12:17:17
To:<danielbenedict@vieluxenyc.com>
Subject: hi

Daniel
I am so sorry I was bogged down in interviews yesterday.  I knew you were
here but finished before I could get out to say hello.  Sounds like things
are cooking-Will, I'm sure will advise the details if he hasn't already.  I
wish we could use limestone for a container for future for the everyday
candle-or maybe something based on the terrazzo.  I know, I know-no time.
Once you take it out of the box it should still have some connection to the
brand/house via container or color but guess all we can do on the first run
is logo on the bottom...?

I am so glad to be working with you on this and really value your input!
Hope all is well on other fronts.  I admire your tenacity and know your
positive outlook will help you come through this "challenge" beautifully.
All best,
Tam

Tam Terry
Chief Merchandising Officer
The Metropolitan Opera
Lincoln Center
New York, New York 10023
212.799.3100 x2886
tterry@metopera.org <mailto:tterry@metopera.org>
www.metopera.org <http://www.metopera.org>

# Exhibit J

VIE LUXE INTERNATIONAL, LLC

38 EAST 57TH STREET
NEW YORK, NEW YORK 10022
212.750.8288

# Sales Order

| Date | S.O. No. |
|------|----------|
| 5/27/2008 | 3278 |

| Name / Address |
|----------------|
| W HOTELS<br>C/O PLATFORM CONSULTING GROUP<br>401 WASHINGTON STREET<br>3RD FLOOR<br>NEW YORK, NY  10013 |

| Ship To |
|---------|
|  |

| P.O. No. | Terms | Ship Date | Ship Via |
|----------|-------|-----------|----------|
|  | NET 30 | 5/27/2008 | UPS |

| Item | Description | Ordered | Rate | Amount |
|------|-------------|---------|------|--------|
| VL-WH-001-SP | W Hotel Spring Deluxe without a box | 1,889 | 12.50 | 23,612.50 |
| VL-WH-002-SP | W Hotel Spring Deluxe Candle with a box | 157 | 20.00 | 3,140.00 |
|  | DISTRIBUTION LIST TO FOLLOW.... |  |  |  |
|  | *** REVISED ON 5/28!! *** |  |  |  |
|  | *** PER STEPHEN WERTHER- HOLD<br>PRODUCTION ON THIS ORDER UNTIL FURTHER<br>NOTICE *** |  |  |  |

| | Total | $26,752.50 |
|--|-------|------------|

# Exhibit K

-----Original Message-----
From: "Debbie Jensen" <djensen@customessence.com>

Date: Thu, 5 Jun 2008 07:26:18
To:"Rex Hay (BB)" <rhay@tmo.blackberry.net>
Cc:"Daniel Benedict" <danielbenedict@vieluxenyc.com>
Subject: RE: Daniel Benedict Order


Hi Rex -

I spoke with Daniel & we are changing the name & CE # to "CITRUS FIG CE-106941".  Daniel will send me a revised PO.

Debbie Jensen
Custom Essence, Inc
732-249-6405
-----Original Message-----
From: Rex Hay [mailto:rhay@tmo.blackberry.net]
Sent: Thursday, June 05, 2008 9:12 AM
To: Debbie Jensen
Subject: Re: Daniel Benedict Order

Debra -

No.  He should have his own CE#.  Pleasw check SR #s submitted to DBD, he should have an I # that corresponds to this scent.  Christian may be able to find quickly.

Rex
Sent wirelessly
-----Original Message-----
From: "Debbie Jensen" <djensen@customessence.com>

Date: Thu, 5 Jun 2008 06:00:42
To:"Rex Hay" <rhay@customessence.com>
Subject: Daniel Benedict Order


Hi Rex -

The CE # that Daniel is ordering belongs to Vie Luxe, is that ok?

Debbie Jensen
Custom Essence, Inc
732-249-6405

# Exhibit L

**From:** Melissa Riel [mailto:mriel@kleinindustries.com]
**Sent:** Thursday, June 12, 2008 4:21 PM
**To:** Andrew Donchak
**Cc:** Amanda Melnick
**Subject:** RE: Sabina - order ready for pickup

Hi Guys,

Please disregard this - someone in our office had left me a message and I misunderstood. Sorry for the mix up!

Thanks,
Melissa

**From:** Melissa Riel [mailto:mriel@kleinindustries.com]
**Sent:** Thursday, June 12, 2008 11:28 AM
**To:** Andrew Donchak
**Cc:** Amanda Melnick
**Subject:** Sabina - order ready for pickup

Hi Andrew,

Sabina just called and said they have PO 1001 ready to be picked up and shipped to Smith Mountain. I do not see this PO in the system nor do I see any open PO's for Sabina, and I was under the impression you were probably changing candle companies. Can you please just verify that this should be shipped to Smith Mountain before I arrange the shipment?

Thanks,

*Melissa Riel*
*Klein Industries*
*63 Jackson Street*
*Holyoke, MA 01040*
*(P) 413 533 0400*
*(F) 413 533 0411*

# Exhibit M

P1of2

```
-----Original Message-----
From: "UPS Quantum View" <auto-notify@ups.com>

Date: Tue, 17 Jun 2008 15:52:44
To:DANIELBENEDICT@VIELUXENYC.COM
Subject: UPS Ship Notification, Tracking Number 1Z0902950348016274


              <http://www.ups.com/img/1.gif>
   <http://www.ups.com/content/us/en/index.jsx?WT.svl=eBrndMk>
 <http://www.ups.com/img/1.gif>     <http://www.ups.com/img/1.gif>
 <http://www.ups.com/img/1.gif>


 This message was sent to you at the request of Custom Essence to notify you
that the package information below has been transmitted to UPS. The
package(s) may not have actually been placed with UPS for shipment. To
verify when and if the shipment is tendered to UPS and its actual transit
status, click on the tracking link below or contact Custom Essence directly.
  Important Delivery Information
  ----------------
 Message from Custom Essence:
  DANIEL -- VETIVER TONKA BEAN PROJECT WAS SHIPPED AT SMITH MOUNTAIN
 Scheduled Delivery: 19-June-2008
  Shipment Detail                Calvin Klein Scent
 -------------------
 Ship To:
 LYNN CLARK
 SMITH MOUNTAIN
 1000 DILLARD DRIVE
 FOREST
 VA
 245512760
 US


 Number of Packages1
 UPS Service:GROUND
 Weight:1.0 LBS


 Tracking Number:1Z0902950348016274
 <http://wwwapps.ups.com/WebTracking/processRequest?HTMLVersion=5.0&Requester
 =NES&AgreeToTermsAndConditions=yes&loc=en_US&tracknum=1Z0902950348016274>
 Reference Number 1:SMITH MOUNTAIN
 Reference Number 2:LYNN CLARK -- DS
  Click here
 <http://wwwapps.ups.com/WebTracking/processRequest?HTMLVersion=5.0&Requester
 =NES&AgreeToTermsAndConditions=yes&loc=en_US&tracknum=1Z0902950348016274>
 to track if UPS has received your shipment or visit
 http://www.ups.com/WebTracking/track?loc=en_US on the Internet.



 -------------------
```

p 2 of 2

_____2II2II2U8jrhl2VJKjYO3pTjnbppbJObmOjn_____

<https://wwwapps.ups.com/emailEnrollment/signIn?loc=en_US&WT.svl=eBnrMsg>


                    Discover more about UPS:
Visit www.ups.com
<http://www.ups.com/content/us/en/index.jsx?WT.svl=eSubNav>
Sign Up For Additional E-Mail From UPS
<https://wwwapps.ups.com/emailEnrollment/signIn?loc=en_US&WT.svl=eSubNav>
Read Compass Online <http://compass.ups.com?WT.svl=eSubNav>


----------------
            © 2008 United Parcel Service of America, Inc. UPS, the UPS
brandmark, and the color brown are trademarks of United Parcel Service of
America, Inc. All rights reserved.
For more information on UPS's privacy practices, refer to the UPS Privacy
Policy.
Please do not reply directly to this e-mail. UPS will not receive any reply
message.
For questions or comments, visit Contact UPS.

 This communication contains proprietary information and may be
confidential.  If you are not the intended recipient, the reading, copying,
disclosure or other use of the contents of this e-mail is strictly
prohibited and you are instructed to please delete this e-mail immediately.

          Privacy Policy
<http://www.ups.com/content/us/en/resources/service/terms/privacy.html?WT.sv
l=eFooter>
Contact UPS
<http://www.ups.com/content/us/en/contact/index.html?WT.svl=eFooter>

<http://ssdc.ups.com/dcslnrz6vne3g9s37bjvj8khc_2v8x/dcs.gif?dcsdat=121373236
3747&dcsuri=%2F&dcssip=email_rpt.ups.com&pgf_Site=Country&pCC=US&pLL=en&pMai
lDate=06172008&pSA=E-
mail+Template&pSU=Quantum+View+Notify&pPID=ct1_eml_qvn_eml_5shp&pEID=ct1_eml
_qvn_eml_5shp&e_Site=Country>

# Exhibit N

# NYS Department of State

## Division of Corporations

### Entity Information

---

Selected Entity Name: DANIEL BENEDICT DESIGN INC.

Selected Entity Status Information

**Current Entity Name:** DANIEL BENEDICT DESIGN INC.
**Initial DOS Filing Date:** APRIL 21, 2008
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
DANIEL BENEDICT DESIGN INC.
3 EAST 78TH STREET
NEW YORK, NEW YORK, 10075

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# Exhibit O

*p 1 of 2*

**From:** Daniel Cuellar [mailto:danielarea@sbcglobal.net]
**Sent:** Wednesday, April 23, 2008 3:25 PM
**To:** Michele Brown
**Subject:** Re: VIE LUXE

Michelle,

   WHAT??? Call me--please! I hate this--- I was just talking about your line a while ago--- First Slatkin--- now YOU?

Daniel

Daniel Cuellar
Store Director
AREA
5600 Kirby Drive N-5
Houston, Texas 77005
713.668.1668
713.521.3868 FAX
713.898.0020 CELL

----- Original Message ----
From: Michele Brown <michelebrown@vieluxenyc.com>
To: Daniel Cuellar <danielarea@sbcglobal.net>
Cc: michelebrown0202@hotmail.com
Sent: Wednesday, April 23, 2008 2:18:29 PM
Subject: VIE LUXE

Hello Daniel,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe. Daniel Benedict has already left the company.

It has always been a pleasure working with you. I will keep in touch with any future plans.

p 2 of 2

My new email address is michelebrown0202@hotmail.com .

Warmest regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

**From:** LUANN KIRBY [mailto:dewool06@bellsouth.net]
**Sent:** Friday, April 25, 2008 1:27 PM
**To:** Michele Brown
**Subject:** Re: VIE LUXE

Hi Michelle,

I am sorry to hear I have lost you as my contact and "face" with Vie Luxe. I wish you the best of luck ahead and hope to see you again.

Kindest regards,

LuAnn Kirby Jordan

DeWoolfson Fine Linens

----- Original Message -----
**From:** Michele Brown
**To:** LUANN KIRBY
**Cc:** michelebrown030@hotmail.com
**Sent:** Thursday, April 24, 2008 11:57 AM
**Subject:** VIE LUXE

Hello Luann,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

I have enjoyed working with you and will keep in touch as to my future plans. I know we will cross paths again.

Thank you again.

By the way. I think your order was finally shipped today.

Best regards,
Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

**From:** Lenore Elbrecht [mailto:lenore@WHotelsTheStore.com]
**Sent:** Thursday, April 24, 2008 10:48 AM
**To:** Michele Brown
**Subject:** RE: VIE LUXE

Wow, good luck to you!

**From:** Michele Brown [mailto:michelebrown@vieluxenyc.com]
**Sent:** Wednesday, April 23, 2008 1:05 PM
**To:** lenore@platform-ny.com
**Subject:** VIE LUXE

Hello Lenore,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

It was always a pleasure working with you. I will keep in touch with any future plans.

My new email address is michelebrown0202@hotmail.com.

Best regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

-p 1 of 2

**From:** Michele Brown
**Sent:** Friday, April 25, 2008 10:01 AM
**To:** 'H. Shirasawa(DAIDO)'
**Subject:** RE: VIE LUXE

Hello Hiroki,

Thank you for your kind words.

Best regards.
Michele


**From:** H. Shirasawa(DAIDO) [mailto:shirasawa@daido-corp.co.jp]
**Sent:** Thursday, April 24, 2008 11:45 PM
**To:** Michele Brown
**Cc:** Ms. Shimoji; Mr. A.Kawashima
**Subject:** Re: VIE LUXE

Hello Michele,

It is unfortunate that you leave VIE LUXE
and I can't work with you.

I really appreciate your effort that you've worked with Daido.

I'd like to try to sell Vie Luxe products more in Japan.

I wish you every success in your future!

Yours Faithfully,

Hiroki Shirasawa
***********************************************
DAIDO Co., Ltd.  oversea purchase dept
TEL;81-3-3666-3125
FAX;81-3-3669-3893
e-mail; shirasawa.daido-corp.co.jp
http www.daido-corp.co.jp

----- Original Message -----
**From:** M Shimoji
**To:** A.kawashima(DAIDO) ; Dani. Mr. Shirasawa ; Nobuko Maeno
**Sent:** Thursday, April 24, 2008 3:22 PM
**Subject:** Fw: VIE LUXE


----- Original Message -----
**From:** Michele Brown
**To:** M Shimoji
**Sent:** Thursday, April 24, 2008 1:36 AM
**Subject:** VIE LUXE

Hello Maki,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

It was a pleasure working with you and your team. I will keep in touch with any future plans.

My new email address is

Best regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

-p 1 of 2

**From:** Michele Brown
**Sent:** Friday, April 25, 2008 9:56 AM
**To:** 'M.Shimoji'
**Subject:** RE: VIE LUXE

Dear Maki,

Thank you for your good wishes. I will keep in touch as to my future plans.

Thank you again.

Kindest regards,
Michele


**From:** M.Shimoji [mailto:shimoji@daido-corp.co.jp]
**Sent:** Friday, April 25, 2008 1:12 AM
**To:** Michele Brown
**Subject:** Re: VIE LUXE

Dear Michele,

I'm sorry to know that.
I would like to appreciate your efforts you gave me till now.
Thank you and I wish you the best of luck with everything in your new
life! Please let me know if you have any plans in the future.

Best regards,

Maki Shimoji
Daido Co., Ltd.
Overseas Purchase Dept.
3-12 Koamicho Nihonbashi, Chuo-ku,
Tokyo 103-0016 JAPAN
Tel : +81.3.3666.3125
Fax: +81.3.3669.3893

e-mail: shimoji@daido-corp.co.jp
http://www.daido-corp.co.jp/index.html
http://www.daidostar.com

----- Original Message -----
**From:** Michele Brown
**To:** M.Shimoji
**Sent:** Thursday, April 24, 2008 1:36 AM
**Subject:** VIE LUXE


Hello Maki,

*p2of2*

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

It was a pleasure working with you and your team. I will keep in touch with any future plans.

My new email address is michelebrown0292@hotmail.com.

Best regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

**From:** Amanda Melnick [mailto:amandamelnick@vieluxenyc.com] **On Behalf Of** Michele Brown
**Sent:** Tuesday, June 17, 2008 6:03 PM
**To:** Marjorie Gubelmann; Julie Bedard
**Subject:** FW: VIE LUXE--please see added note

Note that she forwarded this email to her personal email (in red right below)

Amanda Melnick
Vie Luxe International LLC
212 704 8589
212 704 8101
amandamelnick@vieluxenyc.com

**From:** Michele Brown
**Sent:** Wednesday, April 23, 2008 12:36 PM
**To:** 'michelebrown0202@hotmail.com'
**Subject:** FW: VIE LUXE

**From:** Michele Brown
**Sent:** Wednesday, April 23, 2008 11:36 AM
**To:** 'M.Shimoji'
**Subject:** VIE LUXE

Hello Maki,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

It was a pleasure working with you and your team. I will keep in touch with any future plans.

My new email address is michelebrown0202@hotmail.com.

Best regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

**From:** Marianne Kixmiller [mailto:marianne@scoopnyc.com]
**Sent:** Wednesday, April 23, 2008 1:33 PM
**To:** Michele Brown
**Subject:** RE: VIE LUXE

Hi Michele,

Would it be ok with us if anything we want basically going this coming round?

Regards,
Marianne

Marianne Kixmiller

**From:** Michele Brown [mailto:michelebrown@vieluxenyc.com]
**Sent:** Wednesday, April 23, 2008 1:24 PM
**To:** Marianne Kixmiller
**Cc:** michelebrown0202@hotmail.com
**Subject:** VIE LUXE

Hello Marianne,

Hope all is well.

Just to let you know that Friday April 25th is my last day at Vie Luxe.

It was always a pleasure working with you. I will keep in touch with any future plans.

My new email address is michelebrown0202@hotmail.com.

Best regards,

Michele

Michele Brown
Vice President of Sales
Vie Luxe International LLC

This e-mail, together with any attachments, is for the exclusive and confidential use of the addressee(s)
and may contain legally privileged information. Any other distribution, use or reproduction without the
sender's prior consent is unauthorized and strictly prohibited. if you have received this message in error
please notify the sender immediately.