UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
VIE LUXE INTERNATIONAL, LLC AND MARJORIE :
GUBELMANN RAEIN, :
: 08 Civ. 5023 (LAP)(GWG)
                              Plaintiffs, :
:
          v. : **AFFIDAVIT OF**
: **JULIE BEDARD**
DANIEL BENEDICT, DANIEL BENEDICT DESIGN, INC. :
AND MICHELE BROWN, :
:
                              Defendants. :
------------------------------------------------------------------ X

STATE OF FLORIDA     )
                         : ss.
COUNTY OF Palm Beach )

I, Julie Bedard, being duly sworn deposes and says:

       1.       I am the CFO at Constellation, LP, the Gubelmann family holding company, which provides financial, accounting and tax services for the Gubelmann family and its businesses. I have an accounting and finance background and am a Certified Public Accountant licensed in Florida. I have personal knowledge of the facts set forth herein.

       2.       I advised Marjorie Gubelmann Raein, in or about late 2003 and early 2004, in connection with her plans to start Vie Luxe International, LLC ("Vie Luxe" or the "Company").

       3.       Initially, after Vie Luxe was formed in 2004, the extent of my involvement with the Company was to ensure the Company's tax returns were completed and to field requests from Daniel Benedict ("Benedict") for additional funding for the Company, to relay those requests to Ms. Gubelmann, and to release Ms. Gubelmann's funds to Vie Luxe after obtaining her approval.

4. Benedict was in charge of running the Company on a day-to-day basis. This included marketing, design development, as well as managing the production of the Company's products and managing inventory.

5. Ms. Gubelmann originally authorized $150,000 in funding for the Company based on Benedict's projections of the amount of capital needed to launch the business. Nevertheless, in 2004 and 2005, Ms. Gubelmann approved the release of funds well in excess of that amount, and by 2006, had put a total of $405,000 into the Company.

6. During the first two years of the Company's operations, it experienced losses of approximately $186,831 in 2004 and approximately $178,239 in 2005.

7. In or about 2006, I was asked to review the Company's operations and finances. At that time, the Company was struggling financially and was on the verge of bankruptcy.

8. During my review, I met and spoke with Benedict several times, in addition to reviewing the Company's financial information. I discovered that there were numerous production and fulfillment management issues that were being mishandled by Benedict. I made recommendations as to how Benedict could resolve and prevent these problems in the future. I also highlighted the inventory issues and the Company's lack of adequate capital. It had become apparent to me that the Company had been undercapitalized since its inception because the initial capital projections Benedict provided were inadequate.

9. Throughout 2006, there were continued problems with vendors and production issues, and the Company again lost money in 2006. I became increasingly concerned about the state of the Company's inventory at year end 2006.

10. In early 2007, I spoke with Benedict about the Company's inventory situation. He informed me that the Company had run out of inventory at year end due to production problems and was unable to meet the holiday demand. When I asked Benedict to identify the products that the Company had run out of at holiday time, he said he did not know.

11. A physical inventory count, however, indicated that the Company had almost $300,000 in inventory in its warehouse. I asked Benedict why there was so much inventory on hand at the end of 2006. His only answer was that it was there to cover January 2007 demand.

12. When I analyzed the inventory count, however, I discovered that Benedict had not stocked inventory to cover the January 2007 demand. Rather, the Company was stocking unsellable inventory, and critical operating capital was tied up in these dead assets. For example, the amount of slow moving inventory on hand had actually grown from 2005, and the Company was stocking items that it did not even sell, including over 2,600 boxes for products that it did not, and had never, sold. This unusable inventory was eating up scarce operating capital that could have been used to purchase items that would make the Company money.

13. I met with Benedict in about March 2007 to discuss these production and inventory issues to try to help him manage the business properly. During our meeting, I learned that he had never previously put together an inventory projection to help him properly order Vie Luxe inventory. He had just been "winging it."

14. This attitude was illustrative of Benedict's inability to manage the Company properly. While I tried to help him organize the inventory and plan for the future, he did not take my advice.

15. In winter 2007, the holiday orders were again mis-timed, and the Company again failed to meet the holiday demand because it did not have the correct inventory on hand to fill customer orders.

16. In late 2007 and early 2008, I had additional communications with Benedict about the disastrous state of the Company's finances, its need for additional capital, and his compensation.

17. The Company had again lost money in 2007. We later confirmed that the Company's net loss for 2007 was approximately $90,000.

18. At the same time as the Company was losing money, it continued to carry substantial inventory that simply did not sell. In fact, the Company maintained almost $342,000 in inventory at year end – and it still could not fill customer orders properly. This was because Benedict had ordered the wrong inventory, and had failed to properly manage the production of sellable products, even though I had previously raised this very issue to him several times.

19. Benedict had failed to meet the goals set forth in the Second Amended Operating Agreement of Vie Luxe International, LLC (the "Second Operating Agreement"). Accordingly, he was not eligible for an increase in his 2008 compensation and Ms. Gubelmann did not authorize such a raise. Instead, he was offered the opportunity to earn additional equity in the Company in lieu of a raise. He rejected this proposal.

20. At all times I communicated my concerns about the state of the business and its future to Ms. Gubelmann. I also relayed to her my conversations with Benedict. Accordingly, she was fully apprised of the Company's dire financial circumstances, as well as Benedict's cavalier attitude towards managing the Company.

21. In or about March 2008, Ms. Gubelmann decided that Benedict's services for and membership in the Company should end because of his gross mismanagement of Company affairs, specifically production and fulfillment management. I sent Benedict a letter on March 26, 2008 informing him of his termination for Cause, outlining the reasons why he failed to perform his production and fulfillment management duties satisfactorily – echoing the discussions that Ms. Gubelmann and I had with him numerous times over the past two years. The letter also gave him the opportunity to cure the production and fulfillment management problems within 15 days, as provided in the Second Operating Agreement. A copy of this letter is attached as Exhibit A.

22. Benedict did not cure the problems. Accordingly, his termination for Cause was effective as of April 10, 2008, which I confirmed to him by letter of even date. A copy is attached as Exhibit B. Vie Luxe instructed him to return Company property from Benedict, and reminded him of his obligations under the Membership Agreement.

23. Following Benedict's termination for Cause, we discovered that he continued to be in touch with Vie Luxe clients regarding candle orders. For example, on April 15, 2008, just five days after his termination for Cause, the Company received correspondence to Benedict's old Vie Luxe email address (which was also copied to Benedict's personal email address) regarding an order placed by the W Hotels, a private label client.

24. Benedict was not authorized to communicate with Vie Luxe clients regarding their Vie Luxe orders anymore, and he was restricted from soliciting new business on his own behalf from Vie Luxe clients by the restrictive covenants contained in his Membership Acquisition Agreement. Accordingly, on April 16, 2008, I sent to him, on behalf of the

Company, an email instructing him to cease and desist all such contact. A copy of that email is attached as Exhibit C.

_____
Julie Bedard

Sworn to before me this
19th day of June, 2008

_____
Notary Public

JUDITH WRIGHT SIBULKIN
MY COMMISSION # DD 640664
EXPIRES: March 9, 2011
Bonded Thru Notary Public Underwriters

6

# Exhibit A

Vie Luxe International LLC
38 East 57th Street 14th Floor
New York, NY 10021

March 26, 2008

**BY FEDEX**

Mr. Daniel Benedict
3 East 78th Street
New York, New York 10021

Termination Notice - Vie Luxe International, LLC

Dear Mr. Benedict:

On behalf of Marjorie Gubelmann Raein, I write to give you notice under Section 12(iv) of the Second Amended and Restated Operating Agreement of Vie Luxe International, LLC, dated as of June 9, 2006 (the "Operating Agreement") that Vie Luxe International, LLC ("Vie Luxe" or the "Company") is hereby giving you notice that it intends to terminate your services for the Company for Cause on account of your failure to adequately perform the production and fulfillment management duties set forth under Section 7(a)(ii) of the Operating Agreement.

As you have been advised in writing and verbally periodically over the course of the past two years, you have not adequately managed the inventory of the Company. The situation has gotten steadily worse. The Company continues to carry far too much inventory, a significant part of which is un-sellable, and this is tying up an unacceptable amount of working capital that is needed to keep Vie Luxe a going concern. You have also failed to address the inventory management system, as you have been told to do on prior occasions.

You have fifteen (15) days to cure the foregoing failures. If they are not cured within that time period, your membership in Vie Luxe will end and you will receive a payment representing your 50% of the fair market value of your interest determined as provided in Section 11(c) of the Operating Agreement.

During the cure period, we remind you of your continuing obligations to comply with your fiduciary duties to Ms. Gubelmann and the Company as well as the provisions of Article III of the Membership Interest Acquisition Agreement dated May 1, 2004.

Of course, this letter is subject to the Company's and Ms. Gubelmann's rights and remedies, all of which are respectfully reserved. Accordingly, the Company is not waiving any right to terminate your services for Cause for reasons in addition to those set forth above should it determine that there are additional grounds to do so.

Very truly yours,

Julie Bedard

# Exhibit B

**VIE LUXE INTERNATIONAL LLC**
**38 EAST 57th STREET 14th FLOOR**
**NEW YORK, NY 10021**

**BY FEDEX**

April 10, 2008

Mr. Daniel Benedict
Vie Luxe International LLC
38 East 57th Street 14th Floor
New York, NY 10022

Dear Daniel:

You were notified of the Company's intention to terminate your services with Vie Luxe for Cause on March 27, 2008. Since then, your attorney, Arnie Herz, has sent two emails. In the first, dated March 27, 2008, Mr. Herz requested additional information regarding Vie Luxe's inventory problem caused by your mismanagement on the basis that such information was needed for you to cure the Cause problem. In the second, dated March 31, 2008, Mr. Herz claimed that the problem was cured on the basis of certain inventory statistics he set forth in the communication. We have considered Mr. Herz's emails but they do not in any way change the company's determination that Cause exists to terminate your services. Rather, his communications further demonstrate that you do not have an adequate handle on the inventory problems facing the company and have caused us greater concern about the extent of the problems. Mr. Herz requests information that you should know given your responsibilities for the Company. His emails are also rife with inaccuracies regarding the current inventory levels and the historical facts regarding this severe problem.

We have also now reviewed Mr. Herz's third email, dated April 9, 2008, in which he proposes that rather than terminate your services, the company be dissolved because you have determined that it is not a profitable venture in 2008. This proposal is hereby rejected.

In early 2006 the company was in dire financial trouble and in danger of declaring bankruptcy as a result of poor inventory management and oversight on your part. Marjorie agreed to invest an additional $300,000 in the Company at that time. At your insistence, you were given a generous salary and incentive program, but you made no capital commitment. You promised at that time to fix the inventory problems the Company had encountered previously. That has not happened.

Throughout the remainder of 2006 and in 2007 and again in early 2008 you and I had several conversations regarding the inventory and production problems. Although it was *your job*, not mine, in early 2007 I analyzed the 2006 year-end inventory in detail. We discovered that the company was carrying in excess of $80,000 in slow moving and un-sellable box inventory. In discussions with Lewis Klein, the box vendor, he placed blame on your shoulders stating that you did not use purchase orders and quite frequently called and placed telephone orders for immediate delivery which placed undue pressure on his warehouse and staff. Throughout 2007

we discussed options to realize some value from the box surplus. You have never satisfactorily addressed this point.

During the 2006 holiday season you admitted to several production problems that inevitably placed the company in a position of not meeting the holiday demand yet again as in past years of operations. When I finally received the year-end physical inventory counts I was shocked to see the inventory value at close to $300,000.

In 2007 the company encountered more production problems. I expressed concern sometime in October 2007 that we would yet again miss the holiday selling season. In November 2007 you admitted to many production problems. The company's 2007 year-end inventory was approximately $340,000 – an unacceptable level given the $100,000 of backorders as of December 31, 2007 (a number you have provided via Mr. Herz). The backordered items represent 8.5% of the 2007 Vie Luxe brand sales and the cost of these backorders represents approximately 12% of the inventory on hand at year end. To reiterate, these inventory levels are unacceptable.

The inventory moves too slowly. It always has and you have not been successful at improving this statistic. Since 2004, the company's inventory turnover rate has averaged 1.6 times per year—this rate is inadequate for a company of this nature.

As I have stated to you many times in the past, the company needs a qualified and experienced operations person to correct the production and inventory management issues. In February 2008, when I asked you if you would be comfortable with hiring an operations employee you stated that "no one can run this company but me" and you refused to forego your potential salary increases, take the position as Creative Director and Founder and take a greater equity stake that would potentially allow the company to hire a qualified operations employee.

In sum, over the last 2 years, you have been given numerous opportunities to solve the production and inventory problems that have placed an unacceptable drag on the availability of working capital for the company. While it may be acceptable to you to run a company that generates just barely enough to pay your salary (if that), it is absolutely unacceptable for there to be cash flow problems that impede the Company's growth and its ability to repay its current working capital line of credit with HSBC as well as for Marjorie to have made no return on her $700,000+ investment, which is now worth substantially less than that.

We therefore regret to inform you that your services with the Company are hereby terminated for Cause effective immediately. You are hereby requested to promptly return all Company property, including but not limited to the company issued laptop computer and all software including design software, office keys, the building elevator key, the company American Express card, all copies (including drafts) of any documentation or information (however stored), relating to the business of Vie Luxe, its clients or prospective clients. In addition, in returning the company laptop, we advise you that nothing should be deleted therefrom prior to its return.

We also take this opportunity to remind you of your restrictive covenants with the Company as set forth in Article III of the Membership Interest Acquisition Agreement dated as of May 1, 2004 in respect of Confidentiality and Non-Solicitation.

Enclosed is a letter setting forth your right to continue your health insurance with the company at your cost.

Sincerely,

*Julie Bedard* (signature)

Julie Bedard

Enclosure

# Exhibit C

## Julie Bedard

**From:** Julie Bedard
**Sent:** Wednesday, April 16, 2008 3:58 PM
**To:** Daniel.benedict@yahoo.com
**Subject:** Vie Luxe

Daniel,

It has come to our attention that you have continued to communicate with Vie Luxe customers after your services were terminated on April 10, 2008. We have evidence that you communicated with Matt Gabree of W Hotels yesterday, April 15, about an order with Vie Luxe. Please be advised that you are not authorized to represent Vie Luxe and that you should cease all business contacts on its behalf immediately. If there are any inquiries made to you regarding Vie Luxe business, you should be forwarding them to me. We trust your improper communications will cease. However, please be advised that we are reserving all legal rights and remedies in this regard.

    Julie Bedard