UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____X

VIE LUXE INTERNATIONAL, LLC and                    Docket # 08 CV 5023 (LAP)
MARJORIE GUBELMANN RAEIN
                        Plaintiffs,

     -against-                                    AFFIDAVIT OF
                                                     MICHELE BROWN
DANIEL BENEDICT,
DANIEL BENEDICT DESIGN, INC.
and MICHELE BROWN,
                        Defendants.
_____X

COUNTY OF NEW YORK     )
                                  ) ss:.
STATE OF NEW YORK       )

       MICHELE BROWN, being duly sworn deposes and says the following under penalties of perjury:

1. I am a named defendant in the above captioned action and am fully familiar with the facts and circumstances giving rise to this action.

2. I make this Affidavit in opposition to the allegations and statements contained in the First Amended Complaint and in Opposition to Plaintiffs' Order To Show Cause and request for injunctive relief.

3. In order for the Court to understand why injunctive relief is inappropriate, it is best to explain how I came to know the parties and became an employee of Vie Luxe.

4. I met Daniel Benedict in 1998 when we both worked for Slatkin & Company. Slatkin is a home fragrance business that produces products similar to those sold by Vie Luxe. In fact, I understood that Vie Luxe was created by Ms. Gubelmann and Daniel to be a competitor to Slatkin.

5. At Slatkin & Company, I was a salesperson. I also developed business contacts with buyers for high end boutiques to purchase candles and other home fragrance products. These purchaser clients were worldwide. Over the many years that I developed and maintained these relationships I came to know my buyers on both a personal and professional level. Those friendships are the bedrock of my personal and professional life and have endured changes in my employment from Slatkin to Vie Luxe to present day. They are the "book" that I bring to any employer, and I developed them long before any

        job or non-solicitation agreement with Vie Luxe.

6. Daniel Benedict was the Creative Director for Slatkin and was recognized as one of the main driving forces of their creative business. He would attend all company management meetings and was the pitch man who would develop relationships with high end retailers and private label clients. Those clients included Saks, Bergdorf Goodman, Neiman Marcus, Gracious Home, Zitomer's, Gumps, Stanley Korshak, and Harrod's. In all, there were approximately 1200 active accounts that Daniel and I helped develop while employed at Slatkin.

7. Daniel and I would travel together frequently as we attended trade shows, pitched clients, and cultivated vendor relations with those people that provided such services as boxes, candle wax, fragrances, wicks, glass containers, and the like.

8. Daniel and I spent large blocks of time together on those road trips and at trade shows and we developed an "adoptive" type relationship where I was like a second mother and he like a son. Our familial-like relationship and commitment to each other as colleagues have led us to work together whenever possible as we are really a family. I find that my success in many ways has been tied to the successes of Daniel.

9. In 2002, I was promoted at Slatkin to Vice President of Sales. I was very happy in my role. Daniel and I continued to serve Slatkin well in our efforts.

10. In 2004, Slatkin was experiencing financial trouble. I became concerned for the long term security of the company and my financial well being. Daniel told me about conversations with his very good friend, Marjorie Gubelmann, who had been asking him to organize a competitor company to Slatkin, which would enter into the home fragrance market selling candles and other luxury scent items.

11. I told Daniel that I thought it was a good idea for him to pursue as he and Ms. Gubelmann were very close friends. Daniel continued his conversations with Ms. Gubelmann and a company was subsequently formed. At Slatkin, he was not restricted or restrained by a non-compete clause. (Upon review of the employment contracts submitted to the Court as Exhibits A and B of the Order To Show Cause, neither Daniel nor I have been constrained by a non-compete clause by Vie Luxe).

12. In the Spring of 2004, the financial condition at Slatkin worsened. My concerns grew deeper. It was clear by May, 2004, that Slatkin was not going to recover anytime soon from its financial problems, so I resigned.

13. Around that time, Ms. Gubelmann and Daniel spoke with me about employment opportunities at Vie Luxe. In those conversations, Daniel and Ms. Gubelmann made it clear that she wanted me to come on board as I had the knowledge of and relationships with the buyers in the boutique stores that purchased Slatkin products.

14. Ms. Gubelmann made it very clear that she particularly wanted me to provide her with information about the names, contact information, accounts, locations, distributors, and vendors of Slatkin so that Daniel could use this information to advance the Vie Luxe brand and pursue a market share previously enjoyed by Slatkin.

15. I explained to her that this type of information is not really confidential in this business and anyone using a basic internet search engine could acquire information about Slatkin's customers and distribution lists by going to a competitor's website and seeing who carries the products in what locations and so forth.

16. Ms. Gubelmann was very intent on obtaining this information. It became clear that she had no prior business experience and did not have access to any particular market; that instead she was going straight to Slatkin's established client base. To legitimize my own book of client contacts, she instructed me to go to the Slatkin database and printout as much information about the boutiques, contact people, distribution channels, etc., and I did so in a way so that it would not appear as though I had absconded from Slatkin with confidential information, but rather utilized publicly available information. I knew that amassing and providing this information to Gubelmann to be a condition of my employment offer from her. Essentially, it was nothing but a recreation via the internet of the "book" of business of my contacts and knowledge with which I would be walking into Vie Luxe.

17. Those relationships that Daniel and I nurtured over the years at Slatkin are the very source of our success both individually and for our employers. We bring those relationships to the table which is one of the greatest assets sought by employers. That is understood industry wide and is no different than stockbrokers or other sales fields where people cultivate and utilize relationships to drive sales and profits. (The fact that my book of business would stay mine should I leave Vie Luxe was understood completely by Ms. Gubelmann at the time Vie Luxe hired me and also 7 weeks later when I signed my non-solicitation agreement on July 20, 2004). See, Exhibit B to Ms. Gubelmann's Affidavit in Support of the Order To Show Cause.

18. Those contacts and relationships that grew over the years are genuine friendships upon which I draw not only for sales and commissions, but for support and comfort, particularly at times like these where I am unemployed and dealing with a dire family health crisis. I do not believe that my reliance upon my business friends in this manner in any way implicates my non-solicitation agreement.

19. Without relationships like those and the ability to carry those contacts with me wherever I go, I would never have been a successful saleswoman for Slatkin or Vie Luxe.

20. Because of my professional abilities and contacts with the boutique buyers and the information about the Slatkin operation and purchasers, I was offered a job at Vie Luxe. I started as a saleswoman at Vie Luxe on June 1, 2004 with a base salary and commission fee structure.

21. I believe that I performed very well as a saleswoman for Vie Luxe and I continued to nurture solid boutique relationships which established the Vie Luxe brand as a prominent luxury item.

22. Daniel, as President of Vie Luxe, was very professional and successful in developing the luxury retail presence through his relationships previously established at Slatkin with Saks, Bergdorf Goodman, Neiman Marcus, Gracious Home, Zitomer's, Gumps, and Stanley Korshak. Additionally, he was able to establish a private label business with Calvin Klein, W Hotels and others where they would design a candle and have Vie Luxe manufacture it under their private label.

23. The boutique and large retail store sales as well as those of private label steadily grew over the years that I was at Vie Luxe. That success was directly due to the efforts and leadership of Daniel Benedict. Daniel worked tirelessly to develop the brand. Each year the sales improved and I believe that the corresponding expenses or losses in any given year were rapidly decreasing.

24. In return for my efforts, I enjoyed some base pay increases and earned greater commissions as the progress of Vie Luxe continued.

25. At no time do I believe that Daniel mismanaged Vie Luxe or acted in a way that was contrary to the interests of the company. At all times, he and I were devoted to the company and he was devoted to his personal friendship with Ms. Gubelmann.

26. Daniel and I did what we did best: we went to trade shows, called upon old contacts, and forged alliances with old vendors in efforts to take Vie Luxe from a mere name to a status symbol. In my belief, from a practical, not legal perspective, Ms. Gubelmann wrongly terminated Daniel. Vie Luxe was showing marked improvement in 2007 and the sales had exceeded all prior years. It is my understanding that the losses for 2007 were negligible as compared to prior years and that there was a lot of promise for 2008. I have been in this industry for a long time and have not seen anyone accused of mismanagement after demonstrating sales increases year after year, a testament to the fact that a debut brand name was making a real presence on the market. I was familiar with the most minute details of Vie Luxe and do not believe that it was underperforming when they tried to fire Daniel.

27. Terminating Daniel was a bad business decision as far as I can see. Like at Slatkin, Daniel Benedict was and is the face of Vie Luxe. He is the man who gets in front of purchasers and contacts and makes the business come to fruition with retail and private label orders. Daniel has also nurtured and is responsible for all of our positive vendor relationships and the very favorable terms we get with all of our vendors (which are atypical for a business our size).

28. Ms. Gubelmann rarely came to the office and could not and cannot replicate the success

of Daniel with his contacts. No one for that matter will. They are his book and the source of his success that he carries with him from employer to employer.

29. Ms. Bedard is located in Florida and is not well equipped to run a business like Vie Luxe. I am sure she is very talented, but she is not in the business of luxury home fragrance sales and therefore cannot try to fire Daniel and then claim that he has damaged the goodwill of the Company because of his termination. I have never heard Daniel say anything disparaging to third parties about his situation or his experiences with Vie Luxe and its efforts to terminate him. Nor have I seen him engage in any behavior that would undermine or affect the goodwill of Vie Luxe. Instead, I have fielded and been privy to phone calls from vendors that came in after his termination, who were looking to him for security and payment, no longer confident in the company now that Daniel was gone. On these occasions, I know Daniel to have instructed them that he was not able to make representations on behalf of Vie Luxe and that the vendor should contact Ms. Gubelmann directly but he stated he was sure that she would make good on any debts that might be owed. No disparaging words were uttered and no maligning of the reputation or goodwill of Vie Luxe or Ms. Gubelmann was undertaken. It is unknown whether the Vie Luxe vendors/creditors were paid after I overheard these calls.

30. Firing Daniel in and of itself is damage to Vie Luxe and a detriment to the goodwill created by Vie Luxe under Daniel's tenure. Purchasers and private label customers who have known him for years are unlikely to do business with strangers who do not have a sense of what it takes to run a successful company that can deliver quality goods to them. Vendors with whom relations had been cultivated for several years prior to Vie Luxe are unlikely to continue relationships with a Company that refuses to pay them or makes little effort to give some sort of assurances that payment would someday come. Daniel was the person who could do all that for Vie Luxe. Because of his relationships and honorable reputation in the industry, vendors gave Daniel very favorable terms, uncharacteristic of a business this size. The vendors believed in Daniel and wanted to support him. Daniel had credibility with all of them. That allowed Vie Luxe to continue operating with vendors even when they were cash strapped. I don't believe that Ms. Gubelmann or Ms. Bedard have the same power to assuage vendors as Daniel did and that is the real damage to the goodwill that Vie Luxe presently experiences. That is why I also think it unwise of Ms. Gubelmann and Ms. Bedard to have attempted to fire Daniel when the Company's success was at hand in April, 2008.

31. Daniel was excellent at what he did and he managed the business well. To say he mismanaged the Company denigrates and tarnishes he who made Vie Luxe a recognizable luxury brand through his efforts, abilities, reputation and connections.

32. I was overseas when Daniel was supposedly terminated on April 10, 2008. My first day back in the office was April 16, 2008. On that day I was greeted by Ms. Gubelmann (who typically only came in once a month at best, and this time, hadn't been to the office in months), Ms. Bedard (who had flown in from Florida, for one of a mere handful of appearances she ever made in the office in 4 years), and a consultant, based in California,

named Andrew Donchak, who ostensibly was going to run the company.

33. It was readily apparent in a matter of minutes that the future of Vie Luxe was doomed. Mr. Donchak asked me what it takes to make a candle and dumbfoundedly I had to reply: wax, a wick, a candle mold or container, and an optional fragrance. Donchak's fundamental lack of understanding of what it took to produce a Vie Luxe product made it clear that the Company's demise was now at hand. If he did not know how a candle was made there was going to be no way for him to understand how to build the relationships with individual vendors that provided those very elements that are present in each Vie Luxe candle.

34. In one conversation that I had with Ms. Gubelmann she informed me that she was not interested in pursuing the private label clients that Daniel had developed and that Vie Luxe was going to focus on my boutique customers and retail chains. Nor was she sure she was interested in keeping the business going.

35. At one point Ms. Gubelmann also stated that she was not going to be developing any new products and instead would be dropping and getting rid of Vie Luxe product lines. Having watched her callously turn on Daniel, her best friend of 10 years, I feared that she, who had no true personal relationship or allegiance to me, would do so as well. This interaction removed all doubt that it was in my best interest to leave as I did not want to get bogged down in a company that was petering out and had no opportunity for further growth or sales.

36. As a professional saleswoman of over 30 years experience, I thought the new direction and intended focus of Vie Luxe with Donchak at the helm was anathema to my career and long term financial security. Therefore, I gave notice that I intended to resign a week later.

37. When I informed Mr. Donchak of my decision he asked: "Do you realize that if you leave, there is no company?" I stated that my decision was regretful, but that I felt it was in my best interest to move on.

38. During that week between April 16-April 23, 2008, I was prepared to educate Ms. Gubelmann, the bookkeeper, Cheryl Williamson, or anyone else about the boutiques and accounts that I had established for Vie Luxe, the contact information for each account, and the status of things. I was more than a bit surprised that no one approached me to make any serious inquiries about the commercial accounts that I had managed. While this information would be obtainable through the Company's Quickbooks system, or even the internet, there was a distinct lack of serious inquiry from Donchak, or Ms. Bedard, or Ms. Gubelmann about the business that was being left by me. I recall that at that point Ms. Williamson was only handling accounts receivables and was not allowed to engage in matters with warehouses or facilitate any sales efforts.

39. At one point, Ms. Gubelmann did ask me if I would stay longer and I politely declined as

        I saw no opportunity to build further sales for a company that for all intents and purposes appeared like it was winding down. In mulling it over, I quickly concluded that I would not likely grow (or even maintain) my sales and my commissions were at risk, as the company may not be around long enough to fulfill orders.

40. It saddens me that Ms. Gubelmann, who up until just a few months ago, would say that Daniel was a genius and that the company could not continue without him, is now claiming that he mismanaged the company especially when it was on the brink of flourishing. The claim smacks of dishonesty and lack of accountability.

41. There was just no real choice left for me to make and I resigned effect April 23, 2008.

42. As I did when I left Slatkin, I let my contacts and friends know that I was no longer going to be in the employ of Vie Luxe and that I would not be handling their accounts any further. As many were personal friends, I let them know that I would contact them again someday. I do not believe that the communications attached as exhibits to the Order To Show Cause were a solicitation or in violation of my employment agreement with Vie Luxe.

43. After I left Vie Luxe, Daniel Benedict asked me to come work for him with his company, Daniel Benedict Design Inc. While I have been successful as a salesperson, I do not have great financial reserves that would allow me to consider retiring. I accepted the position on the belief that I could continue to excel at my profession by working with Daniel and that he would be able to provide me with an income in the not too distant future. Daniel and I were a team long before Vie Luxe, and I wanted that to continue.

44. In agreeing to work for him I did not believe that I violated my non-solicitation agreement with Vie Luxe. I did not solicit him for employment or make an employment offer to him. I was not privy to his employment contract and had no idea whether he was constrained in any way from making an employment offer to me. It seemed ok as Daniel and I were practically family and had been a team prior to Vie Luxe, and Ms. Gubelmann accepted that Daniel and I would come on board as a team bringing with us our contacts, connections, and know-how that has made us and Vie Luxe successful in the home fragrance business.

45. While Daniel and I discussed salaries and so forth, no money had been earned by his company and I have not been paid for any work having to do with Daniel's new company. I was however offered health insurance and I understand that Daniel put me on his company policy.

46. With regard to the injunction sought against me, I deny that I have in any way violated my non-solicitation agreement. I should not be constrained by a dispute that is essentially between Daniel and Ms. Gubelmann.

47. I was not permitted a chance to have counsel review that Vie Luxe agreement before I was required to sign it.

48. Contrary to representations made to this Court, I have not violated my non-solicitation agreement in any way.

49. After the Court hearing the other day and the Court's granting of the Temporary Restraining Order, Daniel informed me that though he was wrongfully and unlawfully terminated, it could be interpreted as though he violated his own non-solicitation agreement when he offered me a job. Therefore, our professional relationship was terminated that same day. That fact was communicated to Ms. Gubelmann's attorneys.

50. I know not of what compels Ms. Gubelmann to bring litigation to terminate my long term friendship with Daniel or to prevent me from earning a living with clients with whom she has never had any interaction. I will abide by any order of this Court, but I must say that the litigation seems very mean spirited for a woman that wanted to basically pack up shop and quit the luxury brand and markets that Daniel and I spent four years developing. She has no genuine concern for all that was created for her or those that she employed. That was abundantly clear when she came to the office only every few weeks and only to receive personal mail and make phone calls to her divorce attorneys out of ear shot of her soon to be ex-husband. Those are not the actions of a person concerned for the well being of her company; those are the actions of a person who does not know the value of what she once had and realizes only too late the value now that she effectively drove Daniel and me out.

51. As a result of my termination, I am caught in a terrible bind with regard to the restraining order and potential injunctive relief. If Mr. Benedict cannot continue to employ me then I cannot remain on his group plan health insurance. I fear that the Daniel Benedict Design Inc. policy, which is less than a month old, is too recently issued to qualify me for COBRA under that plan. I am particularly concerned since there will be no group to insure to get that group rate that Daniel had obtained for the two of us. In accepting the health insurance, I cancelled my rights to COBRA from Vie Luxe. Consequently, this restraining order and potential injunction could have extreme financial impact upon me forcing me to go out and buy an individual insurance policy if I cannot remain under Daniel's coverage. At my age and state of health, coupled with my present state of unemployment and limited financial resources, I cannot describe such negative impact of this TRO as anything short of catastrophic which could drive me to financial ruin in very short time.

52. I understand that Daniel has not yet informed his insurance carrier of this situation. I understand that he is waiting for the Court to either instruct him how to proceed under these circumstances or issue a directive to Vie Luxe to put me back on under their policy so I may revert back to COBRA coverage under them.

53. I wish that the Court take my health insurance dilemma into account ahead of the late July

hearing and fashion an order that either modifies the restraining order to at least let Daniel Benedict Design to continue to carry me as an employee for health insurance purposes, or instruct Vie Luxe to put me back onto their company policy until such time that I can be converted over to a COBRA policy issued through their carrier.

_____
MICHELE BROWN

Sworn to me on this the
1st Day of July, 2008

_____
Notary Public

DAVID C. HOLLAND
NOTARY PUBLIC, State of New York
No. 02HO5085544
Qualified in New York County
Commission Expires 9-28-1999
9/17/2010