**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____X

VIE LUXE INTERNATIONAL, LLC and                    **Docket # 08 CV 5023 (LAP)**
MARJORIE GUBELMANN RAEIN
                        Plaintiffs,


        -against-                                  AFFIDAVIT OF
                                                   DANIEL BENEDICT
DANIEL BENEDICT,
DANIEL BENEDICT DESIGN, INC.
and MICHELE BROWN,

                        Defendants.
_____X


COUNTY OF SUFFOLK            )
                             ) ss:.
STATE OF NEW YORK            )


        DANIEL BENEDICT, being duly sworn deposes and says the following under penalties
of perjury:

1.      I am a named defendant in the above captioned action and am fully familiar with the
        circumstances described herein.

2.      I make this Affidavit in opposition to the allegations and statements contained in the First
        Amended Complaint and in Opposition to Plaintiffs' Order To Show Cause and request
        for injunctive relief.

3.      With the Court's indulgence, I feel morally compelled to express my disbelief about the
        events that have come to pass in recent months before I can even address the
        misstatements and mis-characterizations that are in the Amended Complaint and Order
        To Show Cause.

4.      The Court needs to be aware that there is no claim of a non-competition clause in this
        case. We deal with very limited non-solicitation agreements. I have not violated any of
        the non-solicitation provisions, with the very unusual exception of having hired Michele
        Brown. She was terminated immediately upon issuance of the Temporary Restraining
        Order herein. By accepting my limited offer of employment, Michele did not violate her
        non-solicitation agreement. However, in an abundance of caution and out of respect for
        the Court's restraining order, I told Michele that until this is straightened out, she cannot
        work for me. These circumstances are laid out in detail below.

5.      I have not violated the non-solicitation provisions. The only activities of mine that are

brought into question by Marjorie are my current private label work and my discussions with W Hotels and Calvin Klein. Both of these are Private Label clients. Both were brought to Vie Luxe by me. The reason I feel free to deal with these Private Labels is because Marjorie and Julie both stated unequivocally to me and Michele Brown that with me gone, Vie Luxe was not going to pursue private label business. Indeed, Private Label was offered to me by them around the time of my wrongful termination. These clients of Vie Luxe have been abandoned by Vie Luxe. This made sense to me because without me the Private Label business could not be serviced by Vie Luxe. Private Label accounted for less than 20% of Vie Luxe business and required a tremendous amount of time and hand-holding not to mention creative design expertise for which I was the sole person responsible. I also knew that these Private Label businesses did not want to work with Vie Luxe without me. Therefore, my present work with Private Label cannot and does not violate the non-solicitation clauses.

6.     Since Vie Luxe did not intend to work with Private Label and Private Label did not intend to work with Vie Luxe, there is no possibility that my efforts would take any business away from Vie Luxe. Furthermore, I was advised by my attorney that my termination was illegal. I could, under the agreements, only be fired for cause. Vie Luxe had no grounds for cause. The claims of manufactured cause were both false and factually insufficient to warrant my termination. Among the counter-claims to be filed with my Answer to the Complaint is a cause of action for wrongful termination. Having breached our contract itself, Vie Luxe cannot seek enforcement of other contractual provisions, because Vie Luxe has unclean hands and should be estopped.

7.     As a matter of fact, Vie Luxe cannot point to a single restriction within the non-solicitation agreements that my work with Private Label actually violated. After my termination, the Private Labels began calling me to ask what was going on and who and how they were going to be serviced. I responded the same to all of the many inquiries: I no longer work there; you should direct all your inquiries to Vie Luxe, I am sure that they will make good on any outstanding bills. Then I hung up. Some of the Private Labels (Calvin Klein and W Hotels among them) called back and asked me if I would work for them because they had no confidence in Vie Luxe without me. When it became clear to me that I would not be taking work away from Vie Luxe, I began discussions with Private Labels under the aegis of my new company, Daniel Benedict Design Inc.

8.     I presently have understandings with both Calvin Klein and W Hotels. If I am forced to abandon these possibilities, as Vie Luxe has, neither of these clients would come to Vie Luxe, because there is no one of experience left at Vie Luxe in whom the Private Labels have confidence. Indeed, upon information and belief, Vie Luxe last week made its first hire. Prior thereto, what little work was being done was handled by one of Marjorie's nannies on a part-time basis.

9.     Vie Luxe had no trademarks, patents, copyrights, or other proprietary intellectual property and certainly no trade secrets that were known to me. The goods produced by Vie Luxe during my term (there have been no goods produced by Vie Luxe since I left) were all of

generic types. All of the rights to the Private Label goods belonged, of course, to the
Private Labels and not Vie Luxe.

10.    As the Court will learn below, this is the first time that I did not give up my salary or
       majority of my equity as I was forced to do in the past merely because Marjorie again
       threatened to shut the company down if she did not get her way.

11.    It saddens me greatly when I look back upon the years of friendship and camaraderie that
       I enjoyed with Marjorie Gubelmann. Until just a few short months ago when I was
       wrongly blamed and wrongfully terminated by Vie Luxe, Marjorie was one of my closest
       friends. We were inseparable as close friends and confidantes. We spent time with each
       other's families, we vacationed together, and we aspired to be business partners to
       establish a luxury product and brand name. It saddens me terribly as I miss her friendship
       and yet I am truly disappointed in her. I miss her because we had such high hopes for
       each other and Vie Luxe. The brass ring of all that we hoped for with Vie Luxe was and
       is within reach. We would have achieved that which we set out to do in only four short
       years. All that we wanted for each other in this project was thwarted the moment that I
       was made the scapegoat for blame and moves were wrongfully made to terminate me.
       That leads me to the abject disappointment I have in Marjorie. Ms. Bedard, Marjorie and
       I all consulted and collaborated to come up with systems and solutions to deal with the
       non-creative issues that arose for Vie Luxe. I was the person solely responsible for
       product design and creation. There was nothing unusual about the issues with which our
       business was confronted (including the inventory issue discussed below), and there was
       nothing unusual about the systems and solutions that we three collaborated on and
       devised to deal with them - they were all part and parcel of any startup business,
       particularly a startup business of this nature and in our industry. Vie Luxe had cleared the
       start up hurdles and became rooted with vendors and clients and was on verge of real
       success. The only thing that was unusual was that I was suddenly blind sided in March of
       this year being accused of mismanaging Vie Luxe and later sued on that mistaken belief.

12.    There was no issue of mismanagement at all. In the end of 2007, I had developed an
       economic model with Julie Bedard for 2008 that showed that the Company could
       continue to run itself without further cash infusion from Marjorie or others. That model
       was signed off on by Julie and in fact she spoke very positively about the forecast after
       having reviewed my proposal. See, Exhibit A, attached. Part of that model allowed for
       my earned salary increase based upon gross sales and product growth achieved in 2007.
       That formula for the salary increase had been agreed upon by all of us about a year or so
       earlier. The 2007 sales figures were gathered and analyzed in January, 2008, and I
       believed that I had met all of the benchmarks that we had set out to accomplish thereby
       entitling me to the increase. Under the agreed upon models mentioned above, Vie Luxe
       could have afforded the increase without resort to an infusion of cash. However, it seems
       that Marjorie had already decided in her head to not honor our prior agreements and
       refused to permit Vie Luxe to pay me that which I had rightfully earned.

13.    Marjorie did not want to put more money into the Company despite the fact that

profitability was on the immediate horizon and she also did not want me to earn my
rightful salary despite the fact that I had accomplished that which was agreed upon
earlier. I could not yet again take another salary or equity cut even in the face of yet
another threat from her to close the company.

14.    As an example, on June 8, 2006, Julie responded to an email I had written her proposing
       that in exchange for the raise that I rightfully deserved, I reduce my equitable share by
       75% in the company from 40% to 10% as a means to ease the financial strains that they
       were facing. She responded that:

              "I totally understand your point that your hard work, expertise, and relationships
              are valuable to the company and have been instrumental at getting the brand to the
              market place. Along with Marjorie's financial contribution and her contacts, the
              company wouldn't be here without your efforts."

              "At this point I do understand if you cannot accept the terms offered. The
              Gubelmanns, and Marjorie, are prepared to not invest if it is not on their terms. If
              you have to find a position with another organization the family will understand. I
              guess this means that at this point the company will have to shut down and we
              will need to come up with a liquidation plan...."

              "I guess you and will have to touch base about a possible liquidation [if you do
              not accept terms proposed by Gubelmanns and Marjorie]".
       See, Exhibit B, attached.

15.    I had earned my increase for 2007 and I finally stood up for myself and persisted in my
       requests that it be awarded to me. Because she was willfully breaching our agreements to
       honor my salary and rightfully earned increase and was also unwilling to invest further,
       the company was and is floundering, not because of anything that I did, but simply
       Marjorie's choice to pull out the economic supports before we finally achieved our
       objective. Without the funds that Marjorie agreed to pay me, Vie Luxe was and is not
       viable. However, Marjorie must live with that choice that she made. It is unfair and
       inaccurate to blame me for its demise which could otherwise have been prevented and the
       prominence of the Vie Luxe brand saved. Without me there the Company cannot be
       competitive in the market place, but that was not my choice. That must fall squarely on
       the shoulders of Marjorie.

16.    I never mismanaged Vie Luxe. I gave it my all. In fact, in the last year, the company was
       showing marked improvement from my efforts as with all previous years since inception.
       Sales had grown from $197,532 in 2004, to $670,045 in 2005, to $1,172,299 in 2006, to
       $1,346,051 in 2007, and by the time I left in April, 2008, sales for the first few months
       were experiencing double digit increases over plan. In other words, sales almost
       quadrupled in three years. This feat should not be underrated given the mission of Vie
       Luxe: to create, market, compete, and establish a new luxury brand name that would be
       carried by the most established retailers and private label clients in the world. That is to

say, to conceive, develop, and market a product to Saks, Bergdorf Goodman, Harrods, Neiman Marcus, and other such premier retailers, which in turn generates the prestige and prominence of the Vie Luxe brand name.

17.    I accomplished that and then some. Those retailers and private label businesses were the book that I brought to Vie Luxe from my previous employer, Slatkin & Company, knowing that I could get an audience with buyers in my efforts to get them to carry Vie Luxe products. The buyers opened their doors to me only because of the prior relationship that I established with them during my work with previous employers. I will explain that more fully below.

18.    But, I must emphasize again for the Court that Vie Luxe, a mere idea in 2004, has made it to its March, 2008 position of burgeoning success almost completely due to my creative design ideas, marketing, and hard work. That was what Marjorie hired me to provide the company and I did it and did it well. Look at the sales, look at the prestigious specialty stores that carry Vie Luxe products, and look at the continued cachet of the brand that drive consumer sales. It was not an easy task to get there, but I brought Vie Luxe to the prominence that very few people could have. That is the success that Marjorie understood had to come first before the books might be in the black. That was a sacrifice she knew, understood, and wanted to make going into this. I delivered all that I promised. Vie Luxe was about to break even, and it was enjoying a wealth of recognition and prestige as a status symbol. That was the mission that Marjorie and I set out to accomplish and I think we did. In the luxury brand name market, profitability always follows close on the heels of the establishment of the brand name. That day has come. That day is almost gone because Marjorie did not want to stick with it any more.

19.    So I am left to conjecture as to why I have really been scapegoated here despite the fact that I delivered all that was requested of me. I know that I fulfilled my end of the bargain and Marjorie did not. But, I wish her well in life, she deserves it after many of the things that have befallen her in life and her marriage.

20.    Clearly, based on the allegations of this lawsuit that are designed to smear my reputation as a professional, the fences are beyond mending. We need to move forward with our lives without malice towards each other. All that I ask from this Court is that which is mine: my reputation, my book of business which I brought to Vie Luxe, and my rightful share of the value of the company.

21.    I thank the Court for its patience but the foregoing was a necessary context to understand the human dynamics of this case and to gain a greater insight into my arguments against injunctive relief. Let me now explain how I came to know the parties and became an employee of Vie Luxe.

22.    I first met Marjorie Gubelmann at a birthday party thrown for me in 1998. At that time I was working in the sales department at Ralph Lauren focusing on the "Purple Label" clothing collection. We saw each other at different social events and our friendship

slowly grew.

23.  In 1998, I landed an opportunity to work as Creative Director with The Slatkin Company, which is a prominent home fragrance business that has a large market share of this field. As Creative Director, I conceived and designed fragrances, scented candles, scented body care products, and other such items which fall under the umbrella of home fragrances. My duties were also to develop markets for these products by literally cold calling buyers for high end retail chains like Saks, Bergdorf Goodman, Gumps, Nieman Marcus, Gracious Home, Zitomer, Stanley Korshak, and other notable stores. I also developed the private label clients who would order special made products through Slatkin and put their own brand name on it to sell exclusively in their own stores. I was very successful at establishing these relationships and getting Slatkin products placed with those retail and private label sources. As with Vie Luxe, I was the face that was associated with the product because I was the main creative developer and pitchman.

24.  As Creative Director my duties also included the development of vendor relationships. In the home fragrance business that means finding the best and most cost effective company to create the candle, wicks, glass containers, boxes, tubes, fragrance and everything else that goes into a candle or body cream. The difficulty of the position is not locating vendors for each elemental task of assembling the product. Instead, it is cultivating a personal relationship with a vendor who understands your focus and needs, stays current with your ordering needs, is willing to produce limited quantity products, and who independently tries to forecast your sales such that they can present you with options to produce your products in greater bulk for a cheaper per unit price.

25.  During that time, I developed an excellent working relationship with Lewis Klein of Klein Industries which produced all of the packaging for Slatkin products. Lewis had a good understanding of the products, especially the candle line. He was very effective at meeting the packaging and delivery needs of Slatkin and the private label clients.

26.  While at Slatkin I also worked closely and extensively with my co-defendant, Michele Brown. Michele targeted sales to the boutique stores and was outstanding at it. By the time I left in 2004, due in no small part to the efforts of Michele and me, Slatkin had more than 1200 active accounts for its home fragrance line.

27.  As our friendship grew over the years, Marjorie was continually impressed by my abilities to build the Slatkin brand, increase the sales channels and private label clients, and develop new products and packaging to keep the brand fresh and alive.

28.  In late 2003 or early 2004, Marjorie approached me with an idea she had to start her own luxury home fragrance company that would directly compete against Slatkin and attempt to move in on that market share. Because other than talking to me Marjorie had no knowledge or experience in business, let alone in home fragrances, she said that she wanted me to develop products that would market to the high end retail crowd and would develop a coveted brand. She asked if I was willing to leave Slatkin with my book of

business and vendor contacts and join her in the newly formed, Vie Luxe. I expressed interest and asked her about also developing a private label presence. She was eager to do so.

29.    Marjorie had no experience in business and was very open about that fact with most everyone. She knew that I was uniquely qualified to help her achieve that goal. It was not just that I had the book and contacts to make it come to fruition, it was also that I was her friend: I had integrity, honesty, sincerity, and determination to make this happen not only professionally, but personally.

30.    On May 1, 2004, we cemented our commitment to each other with the Membership Interest Acquisition Agreement. See Exhibit A to Order to Show Cause. That agreement contained the non-solicitation agreement at issue in the preliminary injunction request. I was not allowed the opportunity to have counsel review the contract, but more significantly, I relied on Marjorie's friendship and statement that these agreements were technicalities.

31.    Michele Brown and I were the only employees of the company to start. That left me not only with all the duties of Creative Director (all product design, resourcing, packaging, and development) but also the responsibilities to handle all of the inventory issues, bookkeeping, product development, public relations, and marketing for all of Vie Luxe.

32.    I spent the first few months developing ideas and mock ups of the products that we would carry and take to market for retail and private label sales. Graphic Vision Group, with which I previously worked at Slatkin and I brought with me to Vie Luxe, helped me develop mock ups for the initial products. These mock ups and media kits were sent or carried by Michele and me to purchasers to generate interest and sales in the Vie Luxe products that were going to establish a new home fragrance luxury brand and target the market share previously enjoyed by Slatkin. It was not until later in the Fall of 2004 that we actually began to produce and ship orders. Although Marjorie was always welcome to participate, her actual contribution to these development efforts was negligible.

33.    Approximately 98% of the clients that Vie Luxe started out with were originally customers of Slatkin. Marjorie had no real plan to develop or create referral business. My contacts and customers (and Michele Brown's boutique network) became the back bone of Vie Luxe's business and success.

34.    Ultimately, Marjorie did manage to get some public relations exposure for the brand including Departures Magazine and Vogue, and she did bring Nancy Corzine and Carolina Herrera to the table and made a few personal referrals for the business. Those accomplishments had little impact upon the annually increasing sales of Vie Luxe products. The sales were the direct results exclusively of my efforts and those of Michele Brown.

35.    Business relations and networks were expanded by the efforts of Michele Brown and me

both by personal travel to the buyers, as well as attending trade shows on behalf of Vie Luxe, where we sold the candles, bath salts, and body creams I had created.

36.  From day one Marjorie made it very clear that she wanted to enjoy the novelty of owning Vie Luxe and pushing a limited number of contacts that she had to purchase the candle line. In the beginning she expressed some interest in the operation but quickly made it clear that she was not interested in coming to the office or participating in the marketing strategies or management of the company. In 2004, Marjorie would pop in for a few minutes two or three times a week, mostly to pick up candle samples to hand out to her personal friends or give away in limited quantity as gift bag presents at small society events. Her interest waned rather quickly and a few visits a week turned into a visit every few weeks. By late 2007, she was stopping in just once a month, more to commiserate with me over her ensuing divorce and custody battle than out of any interest in the business. Her involvement fast reduced from the occasional referral and attempts at PR pitches to mere (and very sporadic) email correspondence as a means to drive public relations. More often than not, Marjorie would have me draft her correspondence for her as she knew little of what to say about the products or the business.

37.  Julie Bedard worked as the family accountant for the Gubelmanns in Florida. She had no real business experience and none in home fragrances. Despite Marjorie's lack of participation in the day to day workings of Vie Luxe, Ms. Bedard and I spoke several times a week about various aspects of the business and marketing strategies.

38.  Because all Vie Luxe expenditures necessarily flowed through Ms. Bedard, it was impossible to engage in any expenditure over $5000 without first consulting her and obtaining her personal approval. See, Exhibit C, Pg. 8, ¶7(c)(iii). Nearly all expenses that now are complained of by Marjorie were personally reviewed and approved by Julie Bedard ahead of time. One such expenditure related to Klein Industries.

39.  As stated above, Klein Industries produced all of the packaging for Slatkin products. Marjorie had always expressed her appreciation for the aesthetics of the packaging designs I developed and wanted to bring Klein on board to produce the packaging boxes and handle the wholesale transactions of Vie Luxe products. Because of my personal relationship to Lewis Klein I was able to bring him as part of my book. Large vendors like Klein are reluctant to have accounts with small start up companies. For them there are concerns that a business like Vie Luxe will not have orders large enough to be profitable, and they fear that the start up company may not have the cash to pay for the order by the time it is produced. Because of our years of doing business together, Lewis agreed to take Vie Luxe on as an account despite those expressed concerns.

40.  A serious problem arose with Klein Industries around the end of 2006 when Lewis, unbeknownst to me, and without any authorization from Vie Luxe, produced large number of extra boxes creating a surplus inventory. I was unaware of this situation until months after because Klein did not immediately submit a bill for this run. It should be noted that Klein also warehoused all of our goods. In short, Klein was critical to Vie Luxe's ability

to meet sales orders.

41.    Klein explained that it was in his own interest to forecast Vie Luxe sales for the months to
       come so that there would be a surplus of boxes to allow him to meet the growing demand.
       His rationale in part was that the production for Vie Luxe would be absorbed over ensuing
       months and he was going to have very few opportunities to stop production of a
       competitor line to in order to run a second order of Vie Luxe boxes should demand exceed
       the supply he had on hand.  From his perspective, he was not only assisting Vie Luxe in
       meeting his rough estimate of future sales and demand, but he was also making his product
       more inexpensively for Vie Luxe by running a surplus order.

42.    It should be understood that across the industry it is extremely common for a company to
       maintain a surplus.  For a large scale client such as Slatkin, a surplus far greater than the
       one we were running is on hand to deal with surges in demand.  Demand can be in the
       form of a run on retail sales, donations to charitable gift bags, or free samples distributed
       to prospective retail purchasers.  The surplus is always consumed in time.  When it is not
       consumed because a product line is not moving as well as others, manufacturers like
       Slatkin and the like liquidate their excess inventory through bulk sales to stores like TJ
       Maxx which retail only surplus goods obtained from other retailers and manufacturers.
       There is always a secondary market for surplus goods though I believe that we would not
       have had to resort to that for Vie Luxe to rid itself of the excess inventory in time.

43.    The problem that Klein's surplus created was the bills that he submitted for the
       unauthorized box run.  When I received those bills I immediately contacted Lewis Klein
       and Julie Bedard. Extensive conversations were held amongst us three.  Klein explained
       that he independently forecasted sales for Vie Luxe products and took it upon himself to
       run the surplus order because it would ultimately be cheaper to produce the boxes as one
       bulk lot rather than smaller separate orders.  Those conversations culminated in Bedard
       approving payment of the bills and my seeking a credit from Klein for future product
       fulfillment.  It was clear at the end of this episode that the problem was due to a well-
       intentioned vendor's unilateral decision to give Vie Luxe more inventory that it needed at
       the time.  This problem would be avoided in the future by having Klein clear all inventory
       decisions through me in advance.

44.    Another one of the solutions that Bedard, Klein and I developed to avoid a future
       inventory problem and to streamline business was to purchase a server that allowed for a
       direct link into Klein's computer system so that we could order and monitor all of their
       production to avoid such a surplus situation again.

45.    We did not have a bookkeeper for the first year of business to monitor something like the
       Klein surplus situation. In 2006, Bedard and Marjorie both told me that they thought I was
       juggling too much responsibility, and, therefore, was spread too thin, so they authorized
       me to hire a much needed bookkeeper. Patricia was the first of several bookkeepers to
       come on board. She came to us through a connection of Marjorie's and lasted about six
       months until she was fired.  She was replaced by Karen, who was hired by Julie Bedard,

who made it only about 2 months. As per Julie, we then started to hire out of a temporary agency whose placements, with the exception of Susan Marinelli, managed to wreak havoc upon our Quickbooks accounts where all of our vendor and purchaser records and contact information are stored. Marinelli ultimately received full time employment elsewhere not long after temping for us. I finally placed an ad on Craigslist and found Cheryl Williamson who started as a temp and was offered a full time position with Vie Luxe from March, 2007 - June, 2008 (I understand that my attorneys have contacted Cheryl but she is unwilling to discuss much due to a confidentiality agreement that she recently signed with Vie Luxe upon her departure). Cheryl has also left Vie Luxe as of June, 2008.

46.    With Cheryl in charge of bookkeeping and inventory, I was able to direct my focus again to product development and retail/private label clients. This was done with the approval of both Marjorie and Bedard.

47.    While there was still surplus inventory, we were moving forward with sales and things were starting to look promising for Vie Luxe as evidenced by the emails referred to immediately below. The luxury brand had been created. Michele and my marketing efforts helped create the cachet for the brand. The nearly $1 million dollars, (a 675% increase) increase in sales between 2004 and 2007 demonstrated that accomplishment.

48.    Without a doubt there were stressful times and setbacks to Vie Luxe that had to be dealt with. These were not issues of mismanagement, but issues that confront any business that is just starting out particularly one of this nature. Hurdles were eventually overcome as we collectively discussed the issues and solutions.

49.    At no time was there any indication from them that they believed I was causing problems or that I was mismanaging Vie Luxe. There were never any critiques or complaints that put me on notice that Marjorie or Julie were in anyway dissatisfied with my work. In fact, it was just the opposite as evidenced by the accolades I consistently received and the emails excerpted below which cover the period through early 2008. How would I possibly interpret these to be warnings about mismanagement when these emails are partially congratulatory and spoke to the future.

50.    To digress for a moment, when sales were low, but the Company had not lost any money, it was determined by Marjorie and Bedard that I had in fact met the stated benchmarks in 2006 and was entitled to and received a $46,800 raise.

51.    I believed that I had reached the benchmarks for 2007 (the gross sales figures for which were calculated in early 2008) and was entitled to an additional $22,500 salary increase based upon that same 2006 projections and agreement. Again, let me just say that I was no longer willing to sacrifice again my salary or equitable share in the company since I had previously taken a $29,000 pay cut and a 75% reduction in my equitable share in the company in spite of yet more threats from Marjorie to close the company in order to get me to knuckle under to her terms.

52.   The issues that broke out in Vie Luxe were never about my professional talents and
      management skills, to the contrary, it was plain and simply about my salary and a well
      deserved raise. Nothing more.

53.   This lawsuit is just a fabrication to cover up Marjorie's unwillingness to pay me what I
      was entitled to. That is clearly evidenced in the emails cited below.

54.   During the course of our discussions in late 2007 and early 2008, I received many
      commendations both verbal and in writing from both Marjorie and Julie about all that I
      had done for the company and the praise that they felt I deserved for my successes.

55.   On December 13, 2007, Bedard emailed Marjorie and carbon copies me about our
      discussed planning strategy for upcoming year 2008, and said:

      "There is no doubt that no one works harder at the business than Daniel (Michele comes a
      close second!) And he deserves a fair and reasonable compensation for his services
      provided to the company;...."

      "That's it in a nutshell...many great things are happening for Vie Luxe and we definitely
      have momentum on our side; however, we must be realistic as many mistakes have been
      made in the past that will take us time to work through. I am cautiously optimistic about
      the company's future and feel much better now about things than I did just one week ago."
      *See, Exhibit A, attached.*

56.   In an email dated January 30, 2008, Bedard credited me when she stated:

      "There are of course great things that have happened to the company as a direct
      result of your efforts...for example, the fact that the name Vie Luxe is truly
      recognizable as a brand of luxury products...or the fact that this license agreement
      may end up providing the cash the company so desperately needs...or the fact that
      the receivable collection period has declined from 76 days to 45 days...or the fact
      that we finally have a qualified bookkeeper that produces quality work, which
      allows us to perform proper financial analysis on the company's operations...or the
      fact that private label does always seem to come through at the end of the day.
      These are all great things and Marjorie and I know the company is in store for more
      great things in the future."

      "If the above recommendation to keep your salary at the current level with equity
      earn outs is not acceptable to you than [sic] Marjorie understands that you need to
      do what is right for your personal financial situation. Marjorie believes in this
      company and believes in you, but the last thing she wants is for you to be working
      in a situation you are not comfortable with. She cannot run the company without
      you so if you cannot stay with Vie Luxe she is willing to close the company so you
      can both go your separate ways with no hard feelings."

> "Daniel no one is trying to say you are not "worth" what you want to be paid...in fact you are worth more than that! However, this is about the economics of the business at this time and what the business can afford."

*See, Exhibit C, attached.*

57.  On February 11, 2008, Marjorie herself wrote:

> "If indeed you did believe in this company you would know it would return so much more than this little [$22,500] salary increase [that you believe you are entitled to]. However your salary is a drain on our cash flow that is why we suggested an equity increase for your future salary increases, as it would help grow the company and reward you as owning more of the baby you created and believed in."

> "So not to create ill will, I would like to close Vie Luxe immediately and collect the receivables and pay our debts to end properly."

> "I loved doing this project and think it was amazing what we achieved in 3 years...."

*See, Exhibit D, attached.*

58.  Clearly, the issues in those emails were not related to blame for surplus or other management issues. It was solely about money and the strong arm techniques of the Gubelmann family and Marjorie to force me to relinquish 75% of my equitable stake in Vie Luxe so that they would consider infusing money to save the brand that finally was bearing fruit.

59.  I don't know what really was the reason for attempting to terminate me. After all, I did give up the 75% equitable share that they demanded to infuse Vie Luxe to keep it going. But, to fabricate cause for termination from a series of exalting emails is unconscionable and violates the terms of my employment contract. See, Exhibit C, Pg. 15, ¶12 "Redemption of Membership Interest of Benedict Upon Termination Of Services For Cause", and ¶16(b) "Notices". Nonetheless, they forced me out by wrongfully terminating me.

60.  I do not believe that Vie Luxe could have lawfully terminated me. Under the Second Amended and Restated Operating Agreement, I cannot be terminated if the Company owes me more than $14,885. See, Order To Show Cause, Exhibit C, Pg. 16, ¶12. Monies still owed to me include a $10,000 loan that I made to Vie Luxe some time ago and the $22,500 salary increase for meeting the 2007 projections as set forth in our 2006 agreement. There are additional expenses in excess of $5000 not recited here for which I have never been reimbursed.

61.  Near the end, I had a hunch that I was going to be targeted for termination because I wanted to be paid that which was due to me and was unwilling to accept all of the harsh

financial terms being forced upon me as I had acquiesced to previously. Therefore, I attempted to remove personal information and email from the computer that were not the concern of the Company. These included emails from my life partner, correspondence with personal friends, family matters, and the like. My best recollection is that nothing of any consequence was deleted from my computer that could not be retrieved from the Company's server, or Quickbooks, or from Klein Industries.

62.     I was informed on April 10, 2008 that I was officially terminated by Vie Luxe for alleged mismanagement. Ironically, at that time I was asked by Bedard if I would stay on with Vie Luxe to handle their private label business because they were not interested in pursuing it on their own! It is absurd for them to claim that I was the reason for their lack of success and yet ask me to continue on with their affairs. That is just one of the many inconsistencies that Marjorie has tried to hide from the Court.

63.     All my personal and professional email was downloaded onto my computer. There were many on there when I started to suspect that I was being targeted for wrongful termination. I started to delete my personal emails and may have deleted emails that relate to the business of Vie Luxe. The majority of the information was left intact in my computer and in the email program.

64.     My intent was one of convenience, not that of malice directed towards the Company. I believed that all of the information that was important to Vie Luxe regarding clients and vendors and artwork could easily be found in the main server at Vie Luxe as well as in the Quickbooks system and with the server at Klein Industries.

65.     My intention was not to destroy the emails or Vie Luxe's access to that information as alleged by Marjorie in ¶3(I) of her Affidavit In Support of the Order to Show Cause, but simply to remove personal information from the purview of the company that it had no right to. In retrospect, I should have taken the time to remove individual emails and contacts, but it did not seem a big deal to me at the time.   All of it should still be on their computer server today.

66.     All of the professional contact information for the purchasers, vendors, and private label clients including the item numbers, descriptions, costs and so forth was located in the Quickbooks account maintained by Vie Luxe and could be retrieved without any difficulty by Julie Bedard and the bookkeeper despite the fact that it was not immediately available on my computer.

67.     All production logos, designs, dielines and so forth for Vie Luxe and private label clients were stored with Klein Industries and with other vendors and not on my computer as these companies did the technical artwork. Marjorie and Bedard knew that information was accessible through Klein and yet mischaracterize their affidavits to make it seem as if it was solely available on my computer.

68.     It is claimed by Marjorie in ¶3(ii) of her Affidavit that I failed to return all company

property to Vie Luxe. That is untrue. When I retained Mr. Kennedy he instructed me to return all company property in my possession which I immediately did.

69.    The Court is being misled by ¶3(iii) of Marjorie's Affidavit as I did not use proprietary information while working with past Vie Luxe private label clients. The intellectual property of the designs, fragrances, logos, artwork, packaging, etc, all belong to the private label client, not Vie Luxe. Vie Luxe would have no right or claim to be able to market any of those products because they were the exclusive creations of the private label client. Vie Luxe only facilitated the creation by utilization of my connection to the vendors. The actual wax and fragrance configurations are not patented or considered "proprietary information" as this is information readily available to the industry and to other competitors. In fact, the wax formulations are the exclusive intellectual property of Smith Mountain Industries who is a vendor for both Slatkin and Vie Luxe.

70.    As for ¶3(v) of Marjorie's Affidavit, I did not "associate" with Michele Brown to launch a company. We are like family and have always watched out for each other. We have been a team close to 10 years and I was the one that brought Michele from Slatkin & Company to Vie Luxe and in light of our long term relationship I felt an obligation for her well-being, job security, and stability. I learned that Michele had resigned from Vie Luxe, because it became clear that Marjorie was going to drop the private label business and had no plan about how to lead the company; nor did Donchak, who ostensibly was brought on board to replace me.

71.    I asked Michele if she wanted to join me in the business that I was starting called Daniel Benedict Designs. I told her that I could not pay a salary right now as I was still putting the company and client base together, but I wanted her to come on board so that she would have a job and health insurance under my plan.

72.    Michele and I envisioned Daniel Benedict Designs to enter the home fragrance market not just as a candle company, but with its own lines of soaps, colognes, perfumes, and the like which were not pursued by Vie Luxe. We spent a fair amount of time developing different logo mock ups, packaging designs, and public relations campaigns in anticipation of a future product launch.

73.    Immediately after the Court's issuance of the Temporary Restraining Order, I terminated Daniel Benedict Design Inc.'s relationship with Michele so as to be compliant with the TRO. I had my attorneys inform Marjorie's counsel of that fact.

74.    I do not believe that other than trying to keep my long time associate (and practically family member) Michele Brown safe and secure that I have violated any term of my non-solicitation agreement contained in Section 3.04 of my Membership Interest Acquisition Agreement (Exhibit A to Order To Show Cause). That section prevents my solicitation of any customer or potential customer of Vie Luxe (3.04(b)) or perform any services for any customer or potential customer that is similar to that of the company (3.04 ( c)).

75.    In short, I believe I have not solicited any Vie Luxe customers in violation of that agreement. Rather, Vie Luxe vendors contacted me after I left to get assurances of payment. I referred them all to Marjorie saying that she would handle these matters and that I thought she would make good on any outstanding bills. Those vendors asked me what my plans were and I later informed them of Daniel Benedict Design. I did not solicit the calls, I did not solicit business or prompt any further inquiry into the products and services that I could provide. When asked, I informed them of what Daniel Benedict Design was going to undertake.

76.    In the case of W Hotels and Calvin Klein, both being private label clients of mine with Vie Luxe, I had been contacted directly by both after my departure from Vie Luxe. These contacts, which are discussed above and below, have been brought to the attention of Marjorie's counsel and a proposal on how to deal with the situations has been put to them about these two clients.

77.    On April 15, 2008, W Hotels contacted me directly asking for my assistance to help in resolving problems that they were having working with Marjorie. I told them that I would not be able to help them with that problem and that they would have to contact Marjorie directly. They later contacted me and asked if I would be able to fulfill a private label order for them as they did not desire to continue in a relationship with Marjorie. Since they had solicited me, and I am not bound by a non-compete clause, I informed them that I am able to provide the products they seek. They then asked me to design the product and make the necessary preparations to fulfill the order. I have designed the product and have made subsequent arrangements to have the order produced and packaged by the vendors that I originally brought as part of my book of business from Slatkin to Vie Luxe.

78.    Not long ago I was also contacted directly by Calvin Klein who expressed difficulty and a lack of confidence in Vie Luxe's ability to fulfill a potential order for them. They asked me about Daniel Benedict Designs and I informed them of my future plans. They then asked if I could help them produce a new private label product. Since they had solicited me and asked for me to service them, I agreed to hear their needs and design the product for them and have made preliminary arrangements to have the product made and packaged with my vendors that I have worked with since Slatkin.

79.    Neither the W Hotel or Calvin Klein orders have been fulfilled.

80.    While I do not believe that I violated my obligations under the non-solicitation agreement, in an excess of caution, I have had my attorneys contact Marjorie's attorneys about these two clients and have suggested a proposal on how both my company and Vie Luxe might deal with them. My proposal is to have Daniel Benedict Design continue to resource, design, and fulfill the orders that have been tentatively placed, and DBD and Vie Luxe split the profits equally from the two transactions. By handling the situation this way, these clients, who are important to both Vie Luxe and Daniel Benedict Design, are able to get the products they desire. Should the proposal be rejected or the Court find that I have somehow violated the terms of my non-solicitation agreement, then their business will be

permanently lost to some competitor like Slatkin and the goodwill and reputations of our companies will irreparably suffer. That seems a fair solution to an immediate problem as the production dates are fast at hand and occur prior to the Court's scheduled hearing on July 23, 2008.

81.    The Court has been deliberately misled by Marjorie. In fact, Daniel Benedict Designs, Inc. is not utilizing confidential proprietary: client information, candle formulations and scents, or packaging designs made for individual clients or other trade secrets as it originally was concerned during oral argument last week. See, Transcript, June 24, 2008, pgs. 27-28.

82.    Vie Luxe's client and vendor information came from me and Michele when we brought it over from Slatkin. The candle formulations and components are the exclusive intellectual property of Smith Mountain and other vendors, not Vie Luxe. The scents have been used by competitors long before they were assimilated into a Vie Luxe candle. All of this information about how to make a Vie Luxe candle, its formulation, and it clients, vendors, and distributors, is all available on the internet to someone who knows how to look for it. Vie Luxe has no patent on its product formulations and has not sought copyright protection for its designs. None of this would be considered trade secrets because of its public availability which downplays the Court's quotation of and reliance upon B.U.S.A. Corp. v. Ecogloves, 2006 WL 3302841 at *2 (SDNY, January 31, 2006) which states that:

> "[A] trade secret is any formula, pattern, device, or compilation of information which is used in one's business and which give [the owner] an opportunity to obtain an advantage over competitors who do not know or use it."

See, Transcript, June 24, 2008, pgs. 27-28.

83.    Here, the information that I possessed was what I brought to them as part of my book from Slatkin. There was nothing that gave me a competitive edge over Vie Luxe because they had all of that information readily available to them from my files at the office and the Quickbooks which Bedard had 24 hour a day access to. Competitors, like me, Slatkin, and a host of others, know where to go to find out who produces, packages, and sells, and purchases the retail and private label goods. Therefore, the Court has been misled by accusations that I am in possession of and exploiting trade secrets of Vie Luxe.

84.    It is significant to note that there is no non-compete agreement between Vie Luxe and me. My establishing a company that competes with Vie Luxe in the candle market (I hope to develop several products in categories not currently engaged in by Vie Luxe) does not leave Vie Luxe at a disadvantage as claimed by Marjorie in ¶5 of her Affidavit. What hobbles her is the inexperience of both Bedard and her in that they have no idea how to run the Company despite the fact that all of the information and relationships are right at their finger tips.

85.    It is clear that this lawsuit is manufactured by Marjorie in efforts to hamstring me and Daniel Benedict Design from entering into the home fragrance market with my new and unique products. This is not done to avoid competition. A non-productive company

83.     Here, the information that I possessed was what I brought to them as part of my book from Slatkin. There was nothing that gave me a competitive edge over Vie Luxe because they had all of that information readily available to them from my files at the office and the Quickbooks which Bedard had 24 hour a day access to. Competitors, like me, Slatkin, and a host of others, know where to go to find out who produces, packages, and sells, and purchases the retail and private label goods. Therefore, the Court has been misled by accusations that I am in possession of and exploiting trade secrets of Vie Luxe.

84.     It is significant to note that there is no non-compete agreement between Vie Luxe and me. My establishing a company that competes with Vie Luxe in the candle market (I hope to develop several products in categories not currently engaged in by Vie Luxe) does not leave Vie Luxe at a disadvantage as claimed by Marjorie in ¶5 of her Affidavit. What hobbles her is the inexperience of both Bedard and her in that they have no idea how to run the Company despite the fact that all of the information and relationships are right at their finger tips.

85.     It is clear that this lawsuit is manufactured by Marjorie in efforts to hamstring me and Daniel Benedict Design from entering into the home fragrance market with my new and unique products. This is not done to avoid competition. A non-productive company cannot compete at all. This was done as an act of pure spite to keep me and Michele from working. It is clear that if they cannot make Vie Luxe work with Donchak, it is out of business.

86.     Marjorie and Bedard have fabricated cause to try to force me out of my minority interest in Vie Luxe so that they could control the company. In doing so, they have breached all their fiduciary duties to me as a minority member of the LLC and attempted to rob me of my purse represented by my 10% stake in Vie Luxe. Further, they try to rob me of my good name, established long before our joint venture as a successful Creative Director and manager that gave birth and rise to a new luxury brand in Vie Luxe.

87.     This Court should not be made a party to this type of farce.

DANIEL BENEDICT

Sworn to before me on this
the 1st Day of July, 2008

LISA JONAS
Notary Public, State of New York
No. 4736533
Qualified in Suffolk County
Term Expires _____
June 30, 2011

------ Forwarded Message 1:08-cv-05023-LAP    Document 28-2    Filed 07/01/2008    Page 1 of 3
**From:** Julie Bedard <JulieB@constellationlp.com>
**Date:** Thu, 13 Dec 2007 11:52:18 -0500
**To:** <vmmarcos@yahoo.com>
**Cc:** DANIEL BENEDICT <danielbenedict@vieluxenyc.com>
**Conversation:** Meeting
**Subject:** FW: Meeting

FYI, this is the final results of our meeting....thought this might help you with whatever you are putting together for us!

Thanks and have a great weekend.


Julie Bedard
Constellation LP
1 North Clematis Street
Suite 320
West Palm Beach, Florida 33401
Phone-561-659-4455
Fax-561-655-8707

---

**From:** Julie Bedard
**Sent:** Thursday, December 13, 2007 11:41 AM
**To:** 'Marjorie'
**Cc:** 'DANIEL BENEDICT'
**Subject:** Meeting

Hi Marjorie

I thought I would summarize for you the results of my meeting this week with Daniel regarding Vie Luxe's planning strategy for 2008. (sorry this is so long, but we did discuss many important things that take time to explain).

1.  Daniel and I agreed that a reasonable and conservative growth rate to build into the cash flow model for 2008 is 10%. We are both confident, and I'm sure you will agree, that Michele is more than capable of delivering a 10% growth in boutique sales. One thing that became clear in our cash flow analysis is that the more we grow the more capital the company needs to support operations and inventory production. In a perfect world, we would have capital to build up our inventory. However, the company is not yet in a position to stockpile inventory so we are constrained by our "cash conversion cycle" (this is the time it takes to turn inventory into cash). Since we have to pay for our goods well in advanced of collecting receivables we inevitably have cash deficits in September as we ramp up for the holiday season. At 10% growth our cash is level throughout the year (assuming no shocks to the system) and we should be okay come fourth quarter of 2008 (again, this assumes no shocks such as a call from HSBC!). Managing growth at a reasonable and sustainable level going forward is one of our top priorities.
2.  Our cash flow projections for 2008 do not include any Private Label, which we both believe we will have some but we are not sure how much and when the cash will be received. The cash flow projections reveal that without private label the company can sustain it's self at 10% growth rate without any cash infusion for 2008. Therefore, private label will be the "gravy" that will allow us to achieve other goals, such as building up our inventory and paying off HSBC. The Private Label goal as it stands now is to do at least $200,000 in shipped PL sales by August 2008.

1

3. HSBC-getting this loan paid down is a top priority in 2008. We currently have $20,000 in our cash flow model set aside in a reserve fund to start paying the loan down ($10,000 in January and $10,000 in February). As private label money rolls in, we will set a portion of it aside to fund the HSBC reserve. We have a checking account with HSBC and that's where we will temporarily reserve the funds until such time that we decide to pay down the loan.

4. We cut some expenses from our 2008 budget as follows:

-We discovered that the relationship with Karen in London is not a profitable one for us. We paid her roughly $25,000-$30,000 last year, but we only had $16,000 in sales from Harrods. Although the advertising in Harrods is great we just can not justify paying her anymore. We decided to keep her until the end of this holiday season and then let her go in January.
-Daniel has decided to not do the California gift shows this year, resulting in a $30,000 savings to the company
-We are going to increase our shipping and handling charges to our customers to cover our shipping and handling (it appears that we are losing money on S&H, which in reality we should be making money on S&H!).

1. Daniel is going to have a meeting with Cheryl and Michele to discuss their roles in the company. We are going to get Cheryl more involved in the operations of the business…she will be in charge of purchase orders start to finish (ordering goods, checking status, comparing receiving reports to amounts ordered etc). She will assist Daniel with inventory management, along with my help in predicting inventory demand throughout the year. Cheryl has the time and certainly has the skill to take on these added responsibilities. As far as Michele goes, we are going to try to get her to "let go" of certain things so she can focus on selling, selling, selling. We are going to have Cheryl (and to some extent Susan) pick up some of Michele's current duties that are unrelated to selling. We also decided that a $3,000 raise for Cheryl and a $10,000 raise for Michele is appropriate next year (and has been built into the cash flow projections). Michele has not had a raise in over two years so we know she must be expecting something this year, and lets face it without her we would have no sales to support the company!

2. Daniel is going to introduce a diffuser and a new scent in the voyage collection at the January gift shows. Initially, the diffuser will be produced in our top three scents to see how they sell. We both feel that the diffuser will be a big seller, but we shall see. The new scent, St Barts, will use the cote d azur box so we can use up some of those boxes. We both agree however, that in the future our growth will come from new products as opposed to new scents. We also agreed to cut the body creams and soaps from our product offerings and to standardize our box tops.

3. Daniel and I had lengthy discussions regarding his salary and his agreed upon increase for 2008 should he meet certain metrics in 2007. There is no doubt that no one works harder at the business than Daniel (Michele comes a close second!) and he deserves a fair and reasonable compensation for his services provided to the company; however, it is apparent that although certain goals were met in 2007 our cash is not where we predicted it would be going into the new year due to certain mistakes made along the way, (mostly due to inventory issues) or that were not apparent at the time when his salary was negotiated two years ago. As the time has changed and circumstances surrounding the company have changed I recommend that we restructure his future salary increases into some form of variable cash bonus or even equity payments. This type of structure obviously would be easier on the company's cash flows, especially the equity payouts. Even a cash bonus structure would be easier on the company's cash flows because a bonus is variable and is paid out on specific goals…such as a % of private label sales. Daniel wanted to put more thought into this subject before any decisions were made. We both agreed however that a compensation structure that works for him and the company is best for both parties.

4. Daniel and I are going to draft our business plan and we have set end of first quarter 2008 as our goal to have it completed. Matt stated he will critique our plan before we start sending it out to anyone. Since Matt has received an insider look at the company he is the logical choice to do the review. I haven't written a business plan since I was in college, but I've certainly read enough to be able to put something together at least as a start!

5. Initiatives for 2008 include further pursuing the licensing agreements (we both have the license agreement from Power Brands that we are reviewing now) and distributorships for Europe or other parts of the world.

That's it in a nutshell…many great things are happening for Vie Luxe and we definitely have momentum on our side; however, we must be realistic as many mistakes have been made in the past that will take us time to work through. I am cautiously optimistic about the company's future and feel much better now about things than I did just one week ago.

Julie

Julie Bedard
Constellation LP
1 North Clematis Street
Suite 320
West Palm Beach, Florida 33401
Phone-561-659-4455
Fax-561-655-8707


------ End of Forwarded Message

-- Forwarded Message
From: Julie Bedard <jbedard@constellationlp.com>   Document 28-3     Filed 07/01/2008     Page 1 of 2
Date: Thu, 8 Jun 2006 12:26:32 -0400
To: Daniel Benedict <daniel@vieluxenyc.com>
Conversation: talk
Subject: RE: talk

Hi Daniel

Thanks so much for your thoughts. I totally understand your point that your hard work, expertise, and relationships are valuable to the company and have been instrumental at getting the brand to the market place. Along with Marjorie's financial contribution and her contacts, the company wouldn't be here without your efforts.    However, you have made it clear that you cannot take any risk and that you needed and wanted a salary to maintain your lifestyle. As an entrepreneur you cannot expect a guaranteed salary and equity at a point in time when the company is just about to go out of business. Basically, that would put you in the position of participating in only the good times but not the bad.  If the Gubelmanns were to contribute another $300,000 into the company, that would put their investment to date close to $800,000 (with attorney fees Marjorie paid and her share of the HSBC guaranty).  Marjorie did not dilute your ownership when she put money in in the past.  If you recall, her initial promised contribution for 60% of the company was $160,000...she ended up putting in $405,000 without once asking you to give anything up-neither salary nor equity.  An additional $300,000 is no guarantee that the Gubelmanns will ever see a return on their investment-all the financial risk lies with them.  A potential loss of $800,000 is significant and material to anyone, including the Gubelmanns. However, the family is willing to invest further in the company because they believe in the brand and they feel it has tremendous potential to be a market leader. This investment does come at a price to you, but I do not feel it is any different than what a potential outside investor would propose. For arguements sake, assume the Creel's decided to put in significant $...they more than likely would want at least 50 or 60% of the company for this investment, which would dilute you to 15-20%.  Addtionally, you would lose management control and possibly creative control.   The Gubelmanns have offered you 10% with a buyback provision of 5%, bringing you to 15%-along with a guaranteed salary. Again, this seems reasonable for their total $800,000 investment.

At this point, I do understand if you cannot accept the terms offered.  The Gubelmanns, and Marjorie, are prepared to not invest if it is not on their terms.  If you have to find a position with another organization the family will understand.   I guess this means that at this point the company will have to be shut down and we will need to come up with a liquidation plan (don't forgot both you and Marjorie will be expected to honor your share of the loan guaranty, in your case approximately $50,000). Or alternatively, as I stated in the past, if you know of a serious investor who is willing to put money in under reasonable terms please feel free to bring them to the table for discussions.

I will contact Billy and Marjorie and let them know you cannot move forward under their terms. I guess you and I will have to touch base about a possible liquidation.

Thanks,
Julie

-----Original Message-----
From: Daniel Benedict [mailto:DanielBenedict@vieluxenyc.com]
Sent: Thursday, June 08, 2006 11:03 AM
To: Julie Bedard
Subject: RE: talk


Hello,

Thank you for getting all the details on paper. I am sorry that I haven't been able to speak sooner, but the past few days have been crazed and I did really want to put my thoughts on paper.

Please know that equity in the company has been and is a great motivating factor. Having something of my own that I am working to build and grow is the most important thing to me (that's why I was comfortable with my initial salary, and most recently agreed to

reducing that further as a show of faith).

I do feel as though my contributions and work and relationships and expertise are very valuable to this company and certainly worth a fair share, one that is representative of all of my hard work and contributions (though not financial, I do feel as though my contributions and work are as valuable and crucial here).

That said, in recognition of Marjorie's and the Gubelmanns' great faith and new investment, I would like to propose that I decrease my equity from 40% to 20% in the hopes that we can also work something out whereby I can possibly buy back lost equity in due course. As I mentioned, my biggest fear is that as any outside investor comes into the picture my equity will eventually be worth very little.

In addition, I propose that I will remain at my reduced salary until January of 2006. Should we be on or close to sales plan, I would ask that we revisit my salary as we get closer to that date.

I do feel that we have come so far, and are on the threshold of great success.

All the best,
Daniel


From: Julie Bedard [mailto:JBedard@constellationlp.com]
Sent: Thursday, June 08, 2006 10:17 AM
To: Daniel Benedict (E-mail)
Subject: talk


Hi Daniel

I know you are very busy but we really do need to have another conversation....I told Lewis I would call him this week to keep him informed and I don't want to leave him hanging. We should at least come to some verbal agreement in the next day or so. Please call me when you get sometime this morning.

Thanks,

Julie Bedard
Constellation LP
One North Clematis Street
Suite 320
West Palm Beach, Florida 33401
561-659-4455 Phone
561-655-8707 Fax


------ End of Forwarded Message

2

From: June Bedard <juneb@constellationip.com>
Date: Wed, 30 Jan 2008 12:9[3:5]0  1:07-cv-06023-LAP    Document 28-4    Filed 07/01/2008    Page 1 of 4
To: DANIEL BENEDICT <danielbenedict@vieluxenyc.com>
Cc: Marjorie <Marjorie@vieluxenyc.com>

Hi Daniel

I'm sorry it has taken me so long to respond to your email regarding your salary proposal. I needed some time to analyze the latest 2007 financial information to determine if all the goals set in 2006 for 2007 were achieved. I also wanted time to discuss your proposal with Marjorie.

I think you and I may have had a miscommunication in December when we spoke about your salary. My initial thought process was a variable compensation structure or equity earn-outs in *lieu* of an actual cash increase for 2008, and not a combination of the three. A bonus or equity structure in lieu of cash compensation conserves much needed cash for the company…which will allow the company to stay in business and to hopefully grow. Additional guaranteed cash compensation to you strains the already tenuous cash position of the company.

Before we settle on a new compensation structure, we need to determine if you are entitled to a raise in 2008. According to the agreed compensation structure I believe you are not entitled to a cash increase based on the target goals set in 2006.

According to section 7(d)(iii) of the Second Amended and Restated Operating Agreement signed by you and Marjorie on 6/9/06, you are entitled to annual salary increases through 2011 if certain goals as outlined in Schedule 7(d)(iii) are achieved. These goals for 2007 were as follows:

1. Sales growth rate – 20%
2. Sales - $1,200,000
3. Min profit margin – 50%
4. *Net income* - $28,000
5. Cash flow positive-meaning no equity infusion is required at any time during the year (definition stated in the document)

If <u>all</u> of the above goals are met, then you are to receive a salary increase of 15%, or $22,500, bringing your total salary to $172,500. (I know you are working with a schedule that shows a $30,000 increase…but that was your revised schedule you used when negotiating your increase. Your schedule shows that if your salary was to increase by $30,000 in 2008, the company would lose $20,600. Clearly, in no way would Marjorie agree to that proposition. The final agreed upon schedule is attached to the amended operating agreement, which is the document I used for this email and for which I have attached a copy to this email-see attached VL op agreement excerpts).

According to the financials for 2007 (see attached VL Financials and VL quickbook financials), only two of the

1

five goals were met in 2007:

1. Sales growth rate – actual rate is 14%.  Total 2006 sales (boutiques and PL, less allowances, chargebacks and discounts)= $1,112,644; Total 2007 sales = $1,273,589.  $1,273,589 - $1,112,644 = $160,645/$1,112,644 = 14%.
2. Sales – actual sales for 2007 are $1,273,589, clearly exceeding the goal of $1,200,000.
3. Profit margin – 60% (Sales [includes S&H] $1,346,051 – CGS $537,582 = $808,469 / $1,346,411 = 60%), also exceeding the 50% minimum goal.
4. Net *loss* for 2007 – ($6,370)
5. The company required an additional $50,000 from Marjorie in 2007; therefore, the company was not cash flow positive during the year.

The above figures are based on the latest financial information in Quick books (as of today's date).

The goals and salary increases were instituted to reward you for earning a profit for the company; however, even though the sales goal was achieved in 2007 the company still lost money.  Marjorie paid for this loss with her additional invested dollars.

Daniel, sales growth is really only part of the equation in operating a successful manufacturing business.  We saw this play out in December when we ran different sales growth rates through the financial model.  No matter how much our sales grow, we will need additional cash to operate the business ("it takes money to make money").  So even though you think the 2008 target sales growth is conservative (10%), I say we must hold back our growth so it doesn't exceed the 10% target for 2008 because otherwise we will have a real cash problem that could put the company out of business (we just don't have the operating cash to support a higher sales growth rate).  Where are you going to get the additional operating cash if sales growth is more than the 10%?

Most companies use an operating line of credit during tight cash periods.  We know of course this is not an option for us at this time. The HSBC Line is maxed out and technically in default.  Quite honestly, it is not reasonable for you to receive additional cash compensation until this line is paid off.  HSBC is a priority and should take precedent over paying an owner's salary. As you know, we live in fear of that dreaded call from HSBC that could put us out of business in an instant.

The main reason for Vie Luxe's cash problem is the inventory issue.  This inventory problem has had a greater impact on the company than I think you realize.   Essentially, the slow moving or un-sellable inventory is a drag on the company and has tied up much needed operating cash…cash that could have been used to turn sellable inventory into more cash, which would have bought more inventory…etc. Instead, we have approximately $150,000 invested in a "dead" asset and we have $100,000 borrowed on a line of credit that is in default.

This inventory issue does fall on your shoulders.  Although you have worked hard at the business and have made great strides you still must take responsibility for the inventory issue.  We can place blame on Klein, but ultimately it was your responsibility to manage the relationship with Klein.  The problem was not discovered when the goals were set for the period 2006-2011 (the goals were set in June 2006, I first analyzed the inventory in February 2007, the inventory "mistakes" stem from 2005 and 2006 orders); if the mistake had been apparent in 2006 my recommendation to Marjorie and her decision to put more money in the company would have been different and at that point the company probably would have been closed.  The inventory issue is going to take time to work out, and I'm not sure the company will really ever recover from it---at least not without some type of cash infusion in the company.

Additionally, our inventory management system, although better, is still not up to the level it should be (and we

continually add skus to an already hard to manage system and I'm not just talking about keeping "track" of the items on a spreadsheet. I speak of managing the inventory so we know what to order, when to order, and how much to order.). To have a chance to turn this inventory problem around the company needs the proper inventory management software and a qualified operations manager to manage the inventory. What you and I have been doing will not work for the long term.

When I look at the financials and company ratios (see attached VL ratios) what screams out to me are two things....1) the company needs an equity infusion, or some other cash infusion (for example, through the license agreement) of *minimum* $200,000 and 2) any extraneous shock to the company will probably put the company out of business (for example, HSBC calling the line, or a decline in our sales, or a major increase in our cost of goods sold etc....all things that can happen given today's economic environment).

There are of course great things that have happened to the company as a direct result of your efforts....for example, the fact that the name Vie Luxe is truly recognized as a brand of luxury products...or the fact that this license agreement may end up providing the cash the company so desperately needs...or the fact that the receivable collection period has declined from 76 days to 45 days...or the fact that we finally have a qualified bookkeeper that produces quality work, which allows us to perform proper financial analysis on the company's operations...or the fact that private label does always seem to come through at the end of the day. These are all great things and Marjorie and I know the company is in store for more great things in the future.

We can continue to follow the agreed upon salary schedule going forward, but I don't think that is in the best interest of either party. The 2008 sales growth goal is 50% in the 2006 document...since we are projecting only 10% and in fact must keep growth to that level the salary compensation schedule really is a mute topic. After carefully considering the bonus on private label both Marjorie and I feel focusing on private label alone (by giving you a bonus on those projects) is not in the best interest of the business at this time, although Marjorie is not opposed to paying you a bonus on those projects in the future. The danger to the company is that your main focus will be private label and this could be to the detriment of the normal operations of the company. However, if we hire a qualified operations person to manage the regular Vie Luxe operations and manage the inventory system then a bonus structure for you would work.

At this time, both Marjorie and I feel that maintaining your cash compensation at the current level ($150,000) is more than fair in light of the company's situation and the fact that you did not meet the specified goals in the 2006 document. Marjorie recognizes that you need the ability to earn more and have an incentive to achieve personal and business success, otherwise the relationship just doesn't work for you or for the company. Therefore, Marjorie is willing to give you the ability to earn more equity over time given achievement of certain goals (which we can discuss what those goals will be).

If the above recommendation to keep your salary at the current level with equity earn outs is not acceptable to you than Marjorie understands you need to do what is right for your personal financial situation. Marjorie believes in this company and believes in you, but the last thing she wants is for you to be working in a situation you are not comfortable with. She cannot run the company without you so if you cannot stay with Vie Luxe she is willing to close the company so you can both go your separate ways with no hard feelings.

Please call me so we can discuss this further after you've had a chance to digest all this information in this very long email! Daniel no one is trying to say you are not "worth" what you want to be paid...in fact you are worth more than that! However, this is about the economics of the business at this time and what the business can afford.

Thanks,

Julie Bedard
Constellation LP
1 North Clematis Street
Suite 320
West Palm Beach, Florida 33401
Phone-561-659-4455
Fax-561-655-8707


------ End of Forwarded Message

4

Date: Mon, 11 Feb 2008 15:03:54 -0500
To: Daniel Benedict <danielbenedict@vieluxenyc.com>
Cc: JULIE BEDARD <JulieB@constellationlp.com>
Subject: RE:

Dear Daniel,

Thank you for this letter. I think it just shows that we are on different pages with where we
want to go with this company. It is not about the $22,500 that you feel you "earned". This is
about whether or not you think Vie Luxe is an investment in your future. If indeed you did
believe in this company you would know that it would  return so much more than this little
salary increase. However your salary is a drain on our cash flow that is why we suggested an
equity increase for your future salary increases, as it would help grow the company and
reward you as owning more of the baby you created and believed in.

I asked Julie about inventory and told her  you said that there was no longer a problem as
you sold the boxes to Oscar. She said you were right about Oscar but there was so much more
inventory than just Oscar.

So no to create ill will, I would like to close Vie Luxe immediately and collect the
receivables and pay our debts to end properly.

I think you would be much happier at a large corporation where you were compensated on a
salary basis not entrepreneurial basis.

I loved doing this project and think it was amazing what we achieved in 3 years, and as I
said yesterday I think this is the best route to go as you cannot take risk which is a
condition of ownership.

Marjorie


Vie Luxe
38 East 57th Street
14th Floor
New York, NY 10022

212 750 8288
www.vieluxenyc.com <http://www.vieluxenyc.com/> <http://www.vieluxenyc.com/>


_____

From: Daniel Benedict

1