UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ X
VIE LUXE INTERNATIONAL, LLC AND MARJORIE : 
GUBELMANN RAEIN, :
: 08 Civ. 5023 (LAP)(GWG)
                               Plaintiffs, :
:
                v. : **REPLY AFFIDAVIT OF**
: **MARJORIE GUBELMANN**
DANIEL BENEDICT, MICHELE BROWN AND DANIEL : **RAEIN**
BENEDICT DESIGNS, INC. :
:
                               Defendants. :
------------------------------------------------------------------------ X

STATE OF NEW YORK   )
                         : ss.
COUNTY OF NEW YORK  )

I, Marjorie Gubelmann Raein hereby affirm and declare as follows:

       1.      I am a member of Vie Luxe International, LLC ("Vie Luxe" or the "Company"). I have personal knowledge of the facts set forth herein.

      2.      I submit this Reply Affidavit to address briefly certain statements made in the Affidavit of Daniel Benedict dated July 1, 2008 ("Benedict Affidavit" or "Benedict Aff.") and the Affidavit of Michele Brown dated July 1, 2008 ("Brown Affidavit" or "Brown Aff."). The entirety of Defendants' statements will be addressed in greater detail at the hearing before the Court scheduled for July 23, 2008 (the "July 23 Hearing").

**Defendant Was Properly Terminated For Cause**

      3.      In his affidavit, Benedict claims that his "termination was illegal" because (1) he could not be "terminated [because] the Company owe[d] [him] more than $14,885," purportedly immunizing him from termination under Section 12 of the Second Amended and

Operating Agreement[1] (Benedict Aff. ¶ 60; see Gubelmann Aff, Ex. C) and (2) he could only be fired for cause and "Vie Luxe had no grounds for cause" (Benedict Aff. ¶ 6).  Benedict is wrong.

    4. Benedict's claim that he cannot be terminated because Vie Luxe owes him a $22,500 salary increase, plus an unspecified (and unsubstantiated) $5,000 in additional expenses, also is incorrect.  See id. ¶ 60.  The $14,885 amount to which he cites relates solely to his salary and does not include reimbursements for expenses or loans made to the Company.  See Gubelmann Aff., Ex. C, § 7(d)(ii).  Benedict is not entitled to, much less owed, any amount approaching $14,885 in outstanding compensation.  See id., §§ 7(d)(ii), 12.  His entitlement to a $22,500 salary increase was expressly conditioned upon his meeting "all four [of the] goals" set forth on Schedule 7(d)(iii) of the Second Operating Agreement.  See id., Sched., 7(d)(iii).  Benedict simply ignores those conditions in his affidavit.  Benedict failed to meet the goals, and he was notified of this in a detailed e-mail addressing the performance goals and results for 2007.  A copy of the January 30, 2008 e-mail from Julie Bedard to Daniel Benedict is attached as Exhibit A.  As such, he is not owed any additional compensation from Vie Luxe.

    5. Even if he was entitled to a $22,500 salary increase, and he was not, that amount is for his entire annual compensation and not a lump sum amount.  Pro rating that salary increase for the period up until Benedict was terminated (on April 10, 2008), results in an amount well below the $14,885 threshold that would preclude his termination for cause.  And as to Benedict's $10,000 loan to Vie Luxe, that amount has no bearing on the calculation of the $14,885 amount because it is not related to compensation.  See Gubelmann Aff., Ex. C,§ 7(d)(ii).

    6. Benedict was terminated for cause under the terms of the Second Operating Agreement.  He was expressly responsible for "[p]roduction and fulfillment

---

[1] Capitalized terms have the meaning ascribed to them in Plaintiff's Memorandum of Law in Support of the Motion for a Temporary Restraining Order dated June 23, 2008.

management," which includes management of the Company's inventory. Gubelmann Aff., Ex. C, § 7(a)(ii). As detailed in my prior affidavit and in Julie Bedard's Affidavit in Support of the Temporary Restraining Order, despite repeated written and verbal warnings, Benedict had failed to meet his responsibilities in connection with inventory and production management; causing Vie Luxe cash flow problems that resulting in its inability to turn a profit. See id. ¶¶ 32-35; Bedard Aff. ¶¶ 10, 11, 13, 14, 16; Benedict Aff., Ex. C at 2-3; see also Am. Compl. ¶¶ 26, 39. In fact, Benedict concedes his gross mismanagement of these responsibilities by attributing blame for at least one "serious [inventory-related] problem" to one of Vie Luxe's vendors, Klein Industries. Benedict Aff. ¶ 40. Benedict claims that, "unbeknownst to [him], and without authorization from Vie Luxe, Klein Industries produced large numbers of extra boxes creating a surplus inventory." Id. But Benedict acknowledges that he had the "responsibilities to handle **all of the inventory issues, bookkeeping, product development . . . for all of Vie Luxe**." Id. ¶ 31 (emphasis added). Despite these responsibilities, Benedict admits he "was unaware of this [serious problem] until **months after**" it occurred. Id. ¶ 40 (emphasis added).

       7.     Tellingly, he attempts to shift blame for his failure to carry out adequately his inventory and production management responsibilities to Julie Bedard (who did not work for Vie Luxe and was not responsible for approving the payment of Vie Luxe's bills) and to Cheryl Williamson (who was responsible for bookkeeping and assisted Benedict with inventory management after joining Vie Luxe). See id. ¶ 46. Regardless of his contradictory and unfounded arguments, the Vie Luxe employee responsible for inventory and product management was, at all times, Benedict -- as he concedes. Id. ¶ 31. Benedict's failures alone warranted his termination for cause.

3

**Vie Luxe Did Not, Nor Does It Intend
To, Abandon Its Private Label Clients**

8.  In their affidavits, Benedict and Brown allege that Ms. Bedard and I represented to Defendants that, following Benedict's termination, Vie Luxe was abandoning its Private Label Clients and did not intend to pursue their business. See Benedict Aff. ¶¶ 5, 62; Brown Aff. ¶ 34. That is false. At no point did I nor Ms. Bedard ever make such representations to Defendants. In fact, these statements are directly contradicted by documents submitted to the Court in which Plaintiffs expressly reminded Benedict that he was bound by his obligations under their restrictive covenants with the Company. See Gubelmann Aff., Exs. D, E, G. In particular, Benedict was advised that he was not to communicate or do business with one of Vie Luxe's Private Label Clients, the W Hotel. See id. Ex. G. Moreover, Vie Luxe presently has been servicing and will continue to service its Private Label Clients. Brown certainly was aware of Vie Luxe's intentions in this regard and that Vie Luxe was servicing Private Label Clients following Benedict's termination, as she assisted me with providing services and marketing to one such client, the Plaza Hotel.

**Additional Matters**

9.  The statements in Benedict's affidavit, show his disregard for the clear terms of the agreements he entered into with Plaintiffs. Benedict makes several other substantial admissions justifying the issuance of a preliminary injunction:

- The W Hotels and Calvin Klein are Vie Luxe Private Label customers because they were both private label clients that Benedict developed and serviced while employed by Vie Luxe (see Benedict Aff. ¶ 76; see also Gubelmann Aff., Ex. A § 3.04(b) (defining "Customer" as "any customer that Benedict serviced or learned of while in the employ of the Company"));

4

- Benedict has provided and intends to provide services to Vie Luxe's Private Label clients in clear violation of his restrictive covenants with the Company (see Benedict Aff. ¶¶ 8, 75-80). Benedict's illicit actions have caused Vie Luxe to lose the business of at least W Hotels (which cancelled a significant order with Vie Luxe following his improper contact with W Hotels) and interfered with Vie Luxe's business with its customers and potential customers (including, but not limited to, Calvin Klein) (see Gubelmann Aff. ¶¶ 45, 46, 48), in violation of his restrictive covenants (see id., Ex. A, §§ 3.04(b), (d));

- After learning that he was being terminated for cause, Benedict deliberately and with knowledge that he was unauthorized to do so accessed the Vie Luxe laptop computer and intentionally deleted proprietary Company information from the laptop (Benedict Aff. ¶¶ 61, 63-67). He knowingly accessed Vie Luxe's laptop well after receiving the notice of termination and he cannot sidestep that fact;

- Benedict's excuse for his wrongful conduct is that he deleted files that could be recovered from either the Company's server, its QuickBooks account or from the server of Klein Industries, one of the Company's vendors. Yet, Benedict himself states that the QuickBooks records were in poor condition (id. ¶ 45) and that the Company would have to go to a vendor to recover files -- just magnifying the illegality of his conduct;

- Benedict knowingly hired Brown in plain violation of his restrictive covenants with the Company (id. ¶¶ 4, 70-75); and

- Benedict's careful use of language that he has not "used" or "is not utilizing" Vie Luxe proprietary information, is notable for what he fails to say -- which is to deny that either he or Brown has or maintained such information in their possession, custody or control (id. ¶¶ 69, 81).

10.  Benedict continues to ignore the fact that I have been the financial foundation for Vie Luxe. Since its inception, I personally contributed $705,000 to fund Vie Luxe's operations, including, Benedict's and Brown's salaries for developing, maintaining and servicing Vie Luxe's clients. Benedict contributed nothing, while collecting a generous salary that was funded by my investment in Vie Luxe. My investment far exceeds the miscalculated projection of $150,000 that Benedict represented to me would be needed to fund this business.

Marjorie Gubelmann Raein

Sworn to before me this
July 8th, 2008

Notary Public

JE JUN MOON
Notary Public, State of New York
No. 02MO6033737
Qualified in New York County
Commission Expires Nov. 22, 20~~
APR. 24, 2010

SK 26271 0001 898767

# Exhibit A

**Julie Bedard**

| | |
|---|---|
| **From:** | Julie Bedard |
| **Sent:** | Wednesday, January 30, 2008 12:32 PM |
| **To:** | 'DANIEL BENEDICT' |
| **Cc:** | 'Marjorie' |
| **Attachments:** | VL op agreement excerpts.PDF; VL financials.PDF; VL quickbook financials.PDF; VL ratios0001.PDF |

Hi Daniel

I'm sorry it has taken me so long to respond to your email regarding your salary proposal. I needed some time to analyze the latest 2007 financial information to determine if all the goals set in 2006 for 2007 were achieved. I also wanted time to discuss your proposal with Marjorie.

I think you and I may have had a miscommunication in December when we spoke about your salary. My initial thought process was a variable compensation structure or equity earn-outs in *lieu* of an actual cash increase for 2008, and not a combination of the three. A bonus or equity structure in lieu of cash compensation conserves much needed cash for the company...which will allow the company to stay in business and to hopefully grow. Additional guaranteed cash compensation to you strains the already tenuous cash position of the company.

Before we settle on a new compensation structure, we need to determine if you are entitled to a raise in 2008. According to the agreed compensation structure I believe you are not entitled to a cash increase based on the target goals set in 2006.

According to section 7(d)(iii) of the Second Amended and Restated Operating Agreement signed by you and Marjorie on 6/9/06, you are entitled to annual salary increases through 2011 if certain goals as outlined in Schedule 7(d)(iii) are achieved. These goals for 2007 were as follows:

1. Sales growth rate – 20%
2. Sales - $1,200,000
3. Min profit margin – 50%
4. *Net income* - $28,000
5. Cash flow positive-meaning no equity infusion is required at any time during the year (definition stated in the document)

If <u>all</u> of the above goals are met, then you are to receive a salary increase of 15%, or $22,500, bringing your total salary to $172,500. (I know you are working with a schedule that shows a $30,000 increase...but that was your revised schedule you used when negotiating your increase. Your schedule shows that if your salary was to increase by $30,000 in 2008, the company would lose $20,600. Clearly, in no way would Marjorie agree to that proposition. The final agreed upon schedule is attached to the amended operating agreement, which is the document I used for this email and for which I have attached a copy to this email-see attached VL op agreement excerpts).

According to the financials for 2007 (see attached VL Financials and VL quickbook financials), only two of the five goals were met in 2007:

1. Sales growth rate – actual rate is 14%. Total 2006 sales (boutiques and PL, less allowances, chargebacks and discounts)= $1,112,644; Total 2007 sales = $1,273,589. $1,273,589 - $1,112,644 = $160,645/$1,112,644 = 14%.
2. Sales – actual sales for 2007 are $1,273,589, clearly exceeding the goal of $1,200,000.
3. Profit margin – 60% (Sales [includes S&H] $1,346,051 – CGS $537,582 = $808,469 / $1,346,411 = 60%), also

    exceeding the 50% minimum goal.
4. Net *loss* for 2007 – ($6,370)
5. The company required an additional $50,000 from Marjorie in 2007; therefore, the company was not cash flow positive during the year.

The above figures are based on the latest financial information in Quick books (as of today's date).

The goals and salary increases were instituted to reward you for earning a profit for the company; however, even though the sales goal was achieved in 2007 the company still lost money. Marjorie paid for this loss with her additional invested dollars.

Daniel, sales growth is really only part of the equation in operating a successful manufacturing business. We saw this play out in December when we ran different sales growth rates through the financial model. No matter how much our sales grow, we will need additional cash to operate the business ("it takes money to make money"). So even though you think the 2008 target sales growth is conservative (10%), I say we must hold back our growth so it doesn't exceed the 10% target for 2008 because otherwise we will have a real cash problem that could put the company out of business (we just don't have the operating cash to support a higher sales growth rate). Where are you going to get the additional operating cash if sales growth is more than the 10%?

Most companies use an operating line of credit during tight cash periods. We know of course this is not an option for us at this time. The HSBC Line is maxed out and technically in default. Quite honestly, it is not reasonable for you to receive additional cash compensation until this line is paid off. HSBC is a priority and should take precedent over paying an owner's salary. As you know, we live in fear of that dreaded call from HSBC that could put us out of business in an instant.

The main reason for Vie Luxe's cash problem is the inventory issue. This inventory problem has had a greater impact on the company than I think you realize. Essentially, the slow moving or un-sellable inventory is a drag on the company and has tied up much needed operating cash…cash that could have been used to turn sellable inventory into more cash, which would have bought more inventory…etc. Instead, we have approximately $150,000 invested in a "dead" asset and we have $100,000 borrowed on a line of credit that is in default.

This inventory issue does fall on your shoulders. Although you have worked hard at the business and have made great strides you still must take responsibility for the inventory issue. We can place blame on Klein, but ultimately it was your responsibility to manage the relationship with Klein. The problem was not discovered when the goals were set for the period 2006-2011 (the goals were set in June 2006, I first analyzed the inventory in February 2007, the inventory "mistakes" stem from 2005 and 2006 orders); if the mistake had been apparent in 2006 my recommendation to Marjorie and her decision to put more money in the company would have been different and at that point the company probably would have been closed. The inventory issue is going to take time to work out, and I'm not sure the company will really ever recover from it---at least not without some type of cash infusion in the company.

Additionally, our inventory management system, although better, is still not up to the level it should be (and we continually add skus to an already hard to manage system-and I'm not just talking about keeping "track" of the items on a spreadsheet. I speak of managing the inventory so we know what to order, when to order, and how much to order.). To have a chance to turn this inventory problem around the company needs the proper inventory management software and a qualified operations manager to manage the inventory. What you and I have been doing will not work for the long term.

When I look at the financials and company ratios (see attached VL ratios) what screams out to me are two things….1) the company needs an equity infusion, or some other cash infusion (for example, through the license agreement) of *minimum* $200,000 and 2) any extraneous shock to the company will probably put the company out of business (for example, HSBC calling the line, or a decline in our sales, or a major increase in our cost of goods sold etc.…all things

2/25/2008

that can happen given today's economic environment).

There are of course great things that have happened to the company as a direct result of your efforts....for example, the fact that the name Vie Luxe is truly recognized as a brand of luxury products...or the fact that this license agreement may end up providing the cash the company so desperately needs...or the fact that the receivable collection period has declined from 76 days to 45 days...or the fact that we finally have a qualified bookkeeper that produces quality work, which allows us to perform proper financial analysis on the company's operations...or the fact that private label does always seem to come through at the end of the day. These are all great things and Marjorie and I know the company is in store for more great things in the future.

We can continue to follow the agreed upon salary schedule going forward, but I don't think that is in the best interest of either party. The 2008 sales growth goal is 50% in the 2006 document...since we are projecting only 10% and in fact must keep growth to that level the salary compensation schedule really is a mute topic. After carefully considering the bonus on private label both Marjorie and I feel focusing on private label alone (by giving you a bonus on those projects) is not in the best interest of the business at this time, although Marjorie is not opposed to paying you a bonus on those projects in the future. The danger to the company is that your main focus will be private label and this could be to the detriment of the normal operations of the company. However, if we hire a qualified operations person to manage the regular Vie Luxe operations and manage the inventory system then a bonus structure for you would work.

At this time, both Marjorie and I feel that maintaining your cash compensation at the current level ($150,000) is more than fair in light of the company's situation and the fact that you did not meet the specified goals in the 2006 document. Marjorie recognizes that you need the ability to earn more and have an incentive to achieve personal and business success, otherwise the relationship just doesn't work for you or for the company. Therefore, Marjorie is willing to give you the ability to earn more equity over time given achievement of certain goals (which we can discuss what those goals will be).

If the above recommendation to keep your salary at the current level with equity earn outs is not acceptable to you than Marjorie understands you need to do what is right for your personal financial situation. Marjorie believes in this company and believes in you, but the last thing she wants is for you to be working in a situation you are not comfortable with. She cannot run the company without you so if you cannot stay with Vie Luxe she is willing to close the company so you can both go your separate ways with no hard feelings.

Please call me so we can discuss this further after you've had a chance to digest all this information in this very long email! Daniel no one is trying to say you are not "worth" what you want to be paid...in fact you are worth more than that! However, this is about the economics of the business at this time and what the business can afford.

Thanks,

Julie Bedard
Constellation LP
1 North Clematis Street
Suite 320
West Palm Beach, Florida 33401
Phone-561-659-4455
Fax-561-655-8707

2/25/2008

## VIE LUXE INTERNATIONAL LLC
### Selected Financial Ratios-2004, 2005, 2006, and 2007

| Key Ratio | Formula | 2004 | 2005 | 2006 | 2007 | Description |
|---|---|---|---|---|---|---|
| Problem areas highlighted in red | | | | | | |
| **Liquidity Measures** | | | | | | |
| *Quantity of Liquidity Ratios:* | | | | | | |
| Working Capital | CA - CL | $162,459 | $11,312 | $261,740 | $307,684 | Current assets minus current liabilities |
| Current Ratio | CA / CL | 2.8 | 1.1 | 1.8 | 2.0 | Amount of current assets owned for each dollar of current liabilities owed |
| Quick Ratio | QA / CL | 2.0 | 0.4 | 0.9 | 0.9 | Amount of quick assets owned (cash, receivables) for each dollar of current liabilities owed |

*Timing of Liquidity Ratios:*

| | | | | | | |
|---|---|---|---|---|---|---|
| Defensive Interval | QA / Daily Op Exp | 207 | 51 | 133 | 102 days | Length of time the company can continue to operate without any new sales |
| Cash Conversion Cycle: | | | | | | |
| A/R Turnover (in days) | AR/Sales * 365 | 263 | 34 | 76 | 45 days | Number of days it takes to "turnover", or collect, receivables |
| Inv Turnover (in days) | Inv/ CGS * 365 | 223 | 194 | 223 | 232 days | Number of days it takes to "turnover", or sell, inventory |
| A/P Turnover (in days) | AP/CGS&SGA * 365 | 105 | 75 | 101 | 73 days | Number of days it takes to "turnover", or to pay, payables |
| CCC | | 381 | 153 | 199 | 203 days | Length of time the company is "out" cash from start of inventory production to a/r collection |

*Quality of Liquidity Ratios:*

| | | | | | | |
|---|---|---|---|---|---|---|
| Inventory to Working Capital | Inv / WC | 46% | 1185% | 114% | 111% | Measures the dependency of wc on inventory; too high a ratio means the company is not moving the inventory fast enough or there is un-salable/obsolete inventory |
| Receivables to Working Capital | AR / WC | 88% | 557% | 94% | 54% | Measures the dependency of wc on receivables; too high a ratio means the co is not collecting the receivables fast enough or significant bad debts |
| Net Sales to Working Capital | Sales / WC | 1 | 59 | 4 | 4 X | Indicates the demands made upon wc in support of sales volume-"early Warning" |

**Leverage Measures**

| | | | | | | |
|---|---|---|---|---|---|---|
| Debt to Equity | Total Debt / Equity | 49% | 508% | 119% | 91% | Expresses the relationship between capital contributed by owners and that by creditors; reveals how much protection the owners are providing creditors. The higher the ratio, the greater the risk being assumed by creditors. |
| Current Liabilities to Equity | CL / Equity | 49% | 508% | 119% | 91% | Measures the extent to which the company issues st financing rather than equity |

## Return on Equity

| | | | | | | |
|---|---|---|---|---|---|---|
| Profit Margin | NI / Sales | -95% | -27% | -1% | 0% | Measures the amount of profit from each dollar of revenue (sales) When sales are increasing, the pm determines the company's ability to control costs. A declining pm signals a cost control problem |
| Asset Turnover | Sales / Total Assets | 0.72 | 2.76 | 1.93 | 2.18 x | Measures the effective employment of assets to generate sales; a low turnover suggests insufficient sales or excessive assets; while a large turnover suggests assets are being sufficiently used to produce sales |
| Equity multiplier | Total Assets / Equity | 149% | 608% | 219% | 191% | Shows that debt usage can lever up the ROE; as leverage increases, the equity multiplier decreases (therefore, magnifying ROE) |
| ROE | NI / Equity or PM*AT*EM | -102% | -446% | -4% | -2% | Measures the return on the equity investment in the firm. If the ratio is too low (or negative), profits are insufficient. If the ratio is too high, the company is using too much debt and too little equity. |

## Causal Ratios

| | | | | | | |
|---|---|---|---|---|---|---|
| Fixed Asset to Equity | FA / Equity | 9% | 35% | 4% | 3% | Measures the extent to which owner's capital has been invested in fixed assets. A lower ratio indicates a greater cushion for creditors. |
| Collection Period | AR / Sales per day | 263 | 34 | 76 | 45 days | Measures credit and collection efficiency of the firm; if too high it can indicate inefficiency or too loose credit terms |
| Net Sales to Inventory | CGS / Inventory | 2 | 2 | 2 | 2 X | Measures the firm's merchandising efficiency; a high turnover signals that the company is able to move the inventory sufficiently; a low turnover signals inv problems (obsolesce etc) |
| Net Sales to Equity "Trading Ratio" | Net Sales / Equity | 108% | 1677% | 421% | 418% | Measures the extent to which a company's sales volume is supported by equity. An "undertrader" has a low ratio and must increase its sales; an "overtrader" has a high ratio and is stretching its invested dollars to the max- generally, the firm is burdened by excessive debt and insufficient working capital and its survival hinges on optimal conditions (no "shocks"). The overtrader must attract equity capital or hold back sales growth. |

11:04 AM
01/30/08
Accrual Basis

# VIE LUXE INTERNATIONAL, LLC
## Balance Sheet
### As of December 31, 2007

|  | Dec 31, 07 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 1000 · JP Morgan - checking acct. | 93,257.36 |
| 1100 · HSBC | 2,560.85 |
| **Total Checking/Savings** | 95,818.21 |
| **Accounts Receivable** | |
| 1200 · Accounts Receivable | 165,019.88 |
| **Total Accounts Receivable** | 165,019.88 |
| **Other Current Assets** | |
| 1120 · Inventory finished goods | 341,181.93 |
| **Total Other Current Assets** | 341,181.93 |
| **Total Current Assets** | 602,020.02 |
| **Fixed Assets** | |
| 1501 · Leasehold Improvements | 5,846.66 |
| 1503 · Computer Equipment | 7,523.71 |
| 1504 · Accum. Depr. | -9,612.86 |
| 1505 · Furniture and Fixtures | 5,555.63 |
| **Total Fixed Assets** | 9,313.14 |
| **Other Assets** | |
| 1601 · Security Deposit | 4,800.00 |
| **Total Other Assets** | 4,800.00 |
| **TOTAL ASSETS** | 616,133.16 |
| **LIABILITIES & EQUITY** | |
| **Liabilities** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| 2000 · Accounts Payable | 185,215.33 |
| **Total Accounts Payable** | 185,215.33 |
| **Other Current Liabilities** | |
| 2007 · HSBC Line of Credit | 99,120.00 |
| 2301 · Loan Daniel | 10,000.00 |
| **Total Other Current Liabilities** | 109,120.00 |
| **Total Current Liabilities** | 294,335.33 |
| **Total Liabilities** | 294,335.33 |
| **Equity** | |
| 3002 · Contributions M Gubelmann | 705,020.25 |
| 3900 · Retained Earnings | -376,852.43 |
| Net Income | -6,369.99 |
| **Total Equity** | 321,797.83 |
| **TOTAL LIABILITIES & EQUITY** | 616,133.16 |

11:02 AM
01/30/08
Accrual Basis

# VIE LUXE INTERNATIONAL, LLC
## Profit & Loss
### January through December 2007

|  | Jan - Dec 07 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| Vie Luxe Sales | 29.00 |
| 4000 · Sales | 1,372,675.86 |
| 4001 · Shipping & Handling | 72,310.26 |
| 4025 · Chargebacks | -6,148.12 |
| 4500 · Sales Allowance | -91,617.58 |
| 4501 · Discounts | -1,349.14 |
| **Total Income** | 1,345,900.28 |
| **Cost of Goods Sold** | |
| 5000 · Beginning Inventory | 298,011.31 |
| 5001 · Purchases | |
|    5003 · Cost of Goods Sold | 845.93 |
|    5101 · Labels | 5,569.90 |
|    5102 · Gift Box | 91,118.52 |
|    5103 · Purchases product | 18,180.11 |
|    5104 · Glass Purchases | 116,441.64 |
|    5105 · Purchases Crystals | 48,704.76 |
|    5106 · Master Cartons | 9,522.26 |
|    5107 · Fragrances | 49,471.26 |
|    5108 · Candle and Other Fill | 157,543.76 |
|    5109 · Plate Charges | 325.00 |
|    5001 · Purchases - Other | 11,203.36 |
| **Total 5001 · Purchases** | 508,926.50 |
| 5002 · Freight - Out | 110,060.93 |
| 5005 · FREIGHT IN | 54,440.41 |
| 5006 · Warehousing fee 3% | 26,891.25 |
| 5010 · Ending Inventory | -341,181.94 |
| **Total COGS** | 657,148.46 |
| **Gross Profit** | 688,751.82 |
| **Expense** | |
| 4002 · Reconciliation Discrepancies | 151.83 |
| 6000 · Stationary and Shipping Supplys | 631.41 |
| 6001 · Office expense | 23,541.21 |
| 6002 · Rent | 32,684.00 |
| 6004 · Telephone | 6,209.47 |
| 6005 · Bank fees | |
|    6005.1 · WIRE TRANSFER FEES | 15.00 |
|    6013 · Finance Charges | 587.74 |
|    6005 · Bank fees - Other | 1,086.34 |
| **Total 6005 · Bank fees** | 1,689.08 |
| 6007 · Postage, Messenger & Shipping | 27,689.14 |
| 6008 · Repairs & Maintenance | 337.50 |
| 6010 · Accounting fees | 15,391.50 |
| 6011 · Shipping | 6,088.37 |
| 6012 · Computer expense | 9,841.15 |
| 6018 · Independent Sales Consultants | 53,919.84 |
| 6021 · Press kits | 696.15 |
| 6030 · Utilities | 3,214.76 |
| 6150 · Health Insurance | 13,030.33 |
| 6151 · Licensing Fees Expense | 20,000.00 |
| 6152 · Liability Insurance | 7,308.44 |
| 6154 · WComp Insurance | 587.73 |
| 6160 · Travel | |
|    6163 · Transportation | 11,493.92 |
|    6160 · Travel - Other | 5,925.09 |
| **Total 6160 · Travel** | 17,419.01 |
| 6161 · Meals | 6,869.27 |

11:02 AM
01/30/08
Accrual Basis

# VIE LUXE INTERNATIONAL, LLC
## Profit & Loss
### January through December 2007

|  | Jan - Dec 07 |
|---|---:|
| 6200 · Sales Salaries | 52,918.22 |
| 6202 · Sales commissions | 43,876.07 |
| 6203 · Tooling & Die costs | 15,498.54 |
| 6208 · Guaranteed payments | 149,100.24 |
| 6220 · Dues and Subscriptions | 493.15 |
| 6340 · Professional Fees | 7,598.29 |
| 6500 · Payroll processing | 4,981.73 |
| 6501 · Office Salaries Expense | 37,362.80 |
| 6510 · misc. expense |  |
|    Sales Tax | 948.25 |
|    6510 · misc. expense - Other | 491.19 |
| Total 6510 · misc. expense | 1,439.44 |
| 6521 · Depreciation Expense | 1,813.56 |
| 6561 · Payroll Taxes |  |
|    6562 · DBL | -63.10 |
|    6561 · Payroll Taxes - Other | 10,672.31 |
| Total 6561 · Payroll Taxes | 10,609.21 |
| 6600 · Mockup expense | 1,019.50 |
| 6601 · Samples expense | 1,725.78 |
| 6602 · Trade show |  |
|    6602.1 · Commission | 6,253.67 |
|    6602 · Trade show - Other | 82,239.91 |
| Total 6602 · Trade show | 88,493.58 |
| 6603 · Product Development |  |
|    Labor Charges | 1,241.20 |
|    6603 · Product Development - Other | 647.78 |
| Total 6603 · Product Development | 1,888.98 |
| 6604 · Penalities & Fines | 762.00 |
| 6605 · Credit card fees | 17,075.02 |
| 6608 · Training | 420.66 |
| 6610 · DAMAGED MERCHANDISE | 60.00 |
| 6700 · Taxes and Licenses | 500.00 |
| 6999-1 · Collection fee | 203.28 |
| 6999 · Bad Debts | 103.62 |
| **Total Expense** | 685,243.86 |
| **Net Ordinary Income** | 3,507.96 |
| Other Income/Expense |  |
|   Other Income |  |
|     7003 · MISC INCOME | 152.13 |
|   Total Other Income | 152.13 |
|   Other Expense |  |
|     7400 · DONATIONS | 100.00 |
|     7500 · Interest Expense | 9,930.08 |
|   Total Other Expense | 10,030.08 |
| **Net Other Income** | -9,877.95 |
| **Net Income** | -6,369.99 |

# VIE LUXE INTERNATIONAL LLC
## PROFIT AND LOSS STATEMENT
### FOR THE YEARS ENDING DECEMBER 31, 2004, 2005, 2006, and 2007

|  | 2004 | 2005 | 2006 | 2007 |
|---|---:|---:|---:|---:|
| **Revenue** | | | | |
| Sales-Boutiques and Department Stores | $190,470 | $646,284 | $776,345 | 1,165,051 |
| Sales-Private Label | 0 | 0 | 337,936 | 207,652 |
| Shipping & Handling | 5,725 | 37,778 | 59,624 | 72,310 |
| Chargebacks, Allowances & Discounts | (2,169) | (16,832) | (1,637) | (99,114) |
| Other Income | 3,506 | 2,815 | 31 | 152 |
| Total Revenue | 197,532 | 670,045 | 1,172,299 | 1,346,051 |
| **Cost of Goods Sold** | | | | |
| Beginning Inventory | 0 | 75,412 | 133,994 | 298,011 |
| Purchases | 199,094 | 311,275 | 651,263 | 580,753 |
| Ending Inventory | (75,412) | (133,994) | (298,011) | (341,182) |
| Total Cost of Goods Sold | 123,682 | 252,693 | 487,246 | 537,582 |
| **Gross Profit** | 73,850 | 417,352 | 685,053 | 808,469 |
| **Gross Profit %** | 37.39% | 62.29% | 58.44% | 60.06% |
| **Selling Expenses** | | | | |
| Advertising and Press Kits | 17,258 | 10,000 | 8,353 | 696 |
| Bad Debts | 0 | 1,723 | 2,330 | 103 |
| Freight and Shipping | 0 | 56,936 | 84,891 | 110,061 |
| Independent Sales Consultants | 0 | 0 | 13,145 | 53,920 |
| Licensing Fees-Oscar DeLaRenta | 0 | 0 | 19,999 | 20,000 |
| Merchant Credit Card Fees | 767 | 7,656 | 10,241 | 17,074 |
| Mockup Expenses | 6,005 | 4,629 | 17,306 | 1,019 |
| Order Fulfillment Fees | 0 | 15,529 | 31,149 | 26,890 |
| Sales Salaries and Commissions | 34,903 | 94,149 | 96,988 | 96,792 |
| Samples Expense | 147 | 26,454 | 11,184 | 1,725 |
| Trade Show Expenses | 12,619 | 53,029 | 79,596 | 88,494 |
| Total Direct Selling Expenses | 71,699 | 270,105 | 375,182 | 416,774 |
| **General and Administrative Expenses** | | | | |
| Depreciation Expense | 1,452 | 3,637 | 2,710 | 1,814 |
| Insurance-Employee Health | 3,288 | 9,935 | 10,068 | 13,031 |
| Insurance-Product Liability | 4,830 | 6,173 | 7,515 | 7,897 |
| Office and Other Expenses | 16,681 | 28,984 | 35,274 | 44,535 |
| Office Salaries | 0 | 0 | 0 | 37,363 |
| Member (Owner) Salary | 86,827 | 129,000 | 114,114 | 149,096 |
| Payroll Taxes | 2,557 | 8,315 | 7,997 | 10,610 |
| Postage, Messenger, and Shipping | 8,467 | 19,183 | 26,867 | 33,775 |
| Professional Fees | 25,064 | 37,228 | 51,850 | 22,990 |
| Rent | 24,000 | 32,100 | 33,411 | 32,684 |
| Stationary and Shipping Supplies | 3,752 | 7,947 | 6,781 | 631 |
| Telephone and Utilities | 5,377 | 6,629 | 7,638 | 9,425 |
| Travel, Meals and Entertainment | 6,687 | 36,094 | 9,074 | 24,285 |
| Total G&A Expenses | 188,982 | 325,225 | 313,299 | 388,136 |
| **Interest Expense** | 0 | 261 | 8,354 | 9,929 |
| **Net Income/(Loss)** | ($186,831) | ($178,239) | ($11,782) | ($6,370) |

**UNAUDITED**